# EXHIBIT R

1    Shana Elson, Esq. (SBN # 240540)

2    9848 Tabor Street, Unit 211
Los Angeles, CA 90034
Telephone (310) 922-0658

3    *Attorney for Petitioner Kate Scott*

4    James Babinski

5    2146 Fox Hills Drive
Los Angeles, CA 90025
Telephone (424) 322-0573

6

7    *Petitioner in Pro Per*

**FILED**
Superior Court of California
County of Los Angeles

**SEP 28 2017**

Sherri R. Carter, Executive Officer/Clerk

By_____, Deputy
       Jennifer De Luna

8              SUPERIOR COURT OF CALIFORNIA

9               COUNTY OF LOS ANGELES

10    Kate Scott, *et al*

11                     Petitioners/Plaintiffs,

12               vs.

13    City Council for the City of Santa Monica, *et al*,

14                 Respondent/Defendants.

15

Case no. BS169465

Assigned to Judge Chalfant, Dept. 85

**VERIFIED AMENDED PETITION FOR WRIT OF MANDATE, INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE RALPH M. BROWN ACT**

[CAL. GOV'T CODE §§ 54950 *ET SEQ*]

16       This action seeks relief from the failure of City Council for the City of Santa Monica, the

17 governing body of the City of Santa Monica, which operates the Santa Monica Municipal Airport,

18 to perform as required by the Ralph M. Brown Act, thereby denying the public's right to the

19 protections afforded by the State of California's open government laws, the Charter of the City of

20 Santa Monica, article I, section 3, of the California Constitution, the California State Aeronautics

21 Act (Public Utilities Code §§ 21001-21707), and other statues.

22       Kate Scott and James Babinski seek a writ of mandate, injunctive, and declaratory relief

23 under California Code of Civil Procedure Sections 1085 and 1060 and Government Code sections

24 54960 and 54960.1. They allege as follows:

25                           **INTRODUCTION**

26      1.      This amended petition seeks to invalidate the governing body's closed-session

27 weekend approval of a settlement geared to systematically close a municipal airport. The complaint

28 seeks to enjoin the governing body from future closed session violations and declare said airport-

1

1    closure settlement void *ab initio* as without proper compliance with the open meeting laws and

2    lacking the authorized municipal settlement agreement execution formality. The approval violated

3    the Brown Act and California Constitution by not affording the public its guaranteed right to

4    provide testimony and scrutinize the terms of the settlement and airport closure in a regular open

5    and public session. The absence of the public scrutiny and impropriety of the settlement is also

6    evident in its haphazard municipal execution formality: contrary to the governing body's own

7    charter, the city clerk acted in a mayoral executive capacity; and the city manager acted in a city

8    clerk capacity by attesting to the city clerk's signature; under its own charter, an open-session

9    resolution would have been required to authorize the city clerk and city manager to execute in that

10    fashion to bind the municipality to the settlement given the departure in execution formality. Given

11    the foregoing, petitioners allege at some point prior to January 28, 2017, the governing body took

12    action as defined in Government Code section 54952.6, in violation of the Brown Act, California

13    Constitution, and Santa Monica City Charter, to close SMO: the Santa Monica Municipal Airport

14    ("Airport"). In furtherance of the Brown Act as also required by United States Supreme Court

15    precedent, the one who decides must hear ... there must be a hearing in a substantial sense. *Morgan*

16    *vs. United States* (1936) 298 U.S. 468, 481. Petitioners seek to declare the closed-session approval as

17    invalid and void as the purported settlement violated the basic tenets of the Brown Act and

18    established due process precedent and the signatories lacked City Council authorization via open

19    session resolution enter into the settlement agreement. Petitioners also seek the relief and remedies

20    available under the Brown Act, as warranted in the discretion of the Court, including, but not

21    limited to, that business concerning the airport be in open and public session and for the

22    recordation of future closed session meetings of the governing board.

23        2.        The Brown Act requires California's governments to govern openly and

24    transparently. Exceptions to the open meeting requirements of the Brown Act are few, narrow, and

25    strictly construed. The litigation exception is limited in scope, and cannot be used to make non-

26    litigation oriented policy decisions, or to take an action that ordinarily would be done in an open

27    meeting – irrespective of whether or not a public hearing is required by another statute (though, in

28    this case, such statutes exist).

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

3.      When in doubt, the Brown Act must be interpreted in favor of open meetings. Here, in one fell swoop, in a closed session, at a sparsely attended Saturday morning "retreat" meeting, the City Council ("City Council") for the City of Santa Monica ("City" or "Santa Monica") undid several acts that had been the subject of hotly contested City Council meetings, deliberately excluding the public. In doing so, the City Council entered into a settlement agreement that exceeded the scope of the litigation it purported to settle and bound the City to future acts, which take it outside of the Brown Act's extremely limited exception. Further, because the settlement agreement involves changes to an airport which require a public hearing, it could not have been agreed to in closed session.

## THE PARTIES

4.      Petitioner and plaintiff Kate Scott is a resident of the City of Santa Monica, owns residential property in the Sunset Park neighborhood just west of the Airport in the City of Santa Monica, is a student pilot training at the Airport, and invested in lessons and flight instruction at the Airport. As such, Ms. Scott has a beneficial interest in the Airport and was denied her guaranteed right to testify, speak, and scrutinize at agendized open sessions concerning said settlement and attempted closure of the Airport and to bring this proceeding concerning Respondent's performance of its legal duties under the Brown Act. Petitioner Kate Scott has appeared before properly noticed open session City Council meetings concerning Airport matters, and has spoken publicly. Had she been given the opportunity, she would have spoken here.

5.      Petitioner and plaintiff James Babinski is a resident of the County of Los Angeles employed by an aeronautical service provider operating at the Airport; apart from his employment, he regularly operates aircraft at the Airport as a certificated private pilot, enrolls in instrument flying lessons at the Airport, and invests his employment earnings from the Airport in lessons and equipment at the Airport. As such, Mr. Babinski has a beneficial interest in the Airport and was denied his guaranteed right to right to testify, speak, and scrutinize at agendized open sessions concerning said settlement and attempted closure of the Airport and to bring this proceeding concerning Respondent's performance of its legal duties under the Brown Act. Ms. Scott and Mr. Babinski may be singularly or collectively referenced herein as "Petitioner(s)" or "Plaintiff(s)". Mr.

3

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

1  Babinski has attended numerous City Council meetings where Airport matters were discussed, and

2  would have spoken on something as momentous as the Settlement Agreement at issue here.

3    6.    Respondent and defendant City Council for the City of Santa Monica is the

4  governing body of the City of Santa Monica, a municipal corporation, which operates the Airport

5  also referred to as SMO: the Santa Monica Municipal Airport ("City Council" or "Respondent(s)"

6  or "Defendant(s)"). The City of Santa Monica is a "local agency" by virtue of its status as a

7  municipal corporate pursuant to Government Code § 54951. The City Council is a "legislative

8  body" by virtue of its status as the governing body pursuant to Government Code § 54952. The

9  Ralph M. Brown Act ("Brown Act"), Government Code section 54950, *et. seq.* requires the City

10  Council to transact its business in open and public meetings with very limited exceptions that are

11  conditioned on fulfilling notice and reporting requirements under Government Code sections

12  54953, 54954.2, 54956.9, and 54957.1.

13    7.    Respondent and defendants DOES 1 through 10, inclusive, are individuals,

14  corporations, associations, public or quasi-public agencies, or otherwise related to respondent and

15  defendant City Council. Petitioners do not presently know their true names and capacities and

16  therefore sue said respondents and defendants by these fictitious names pursuant to California

17  Code of Civil Procedure section 474. Petitioners are informed and believe and thereon allege that

18  each fictitious respondent and defendant is responsible for, participated in, or contributed to the

19  matters and things of which Petitioners complain herein and in some fashion has legal

20  responsibility therefor. When the identity of such fictitious respondents and defendants and the

21  exact nature of and their responsibility for, participation in, and contribution to the matters and

22  things herein alleged have been ascertained by Petitioners, Petitioners will seek leave of this Court

23  to amend this petition and complaint to show their true names and capacities.

24    8.    Petitioners are informed and believe and allege based on that information and belief

25  that at all times material hereto each Doe respondent and defendant named in this petition and

26  complaint was the agent or employee of each of the other respondents and defendants and was at

27  all times material hereto acting within the course and scope of said agency and employment and

28  with the permission and consent of the other respondents and defendants.

4

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

FACTS

9.      The Airport is one of the oldest and busiest single-runway general aviation airports in the country.[1] Over 80,000 aircraft operations occur at the Airport annually.

10.     In 1926, the City of Santa Monica purchased the already-existing airport, then known as Clover Field, as dedicated by the Army Air Corps, after World War I pilot Lt. Greayer "Grubby" Clover. The purchase was funded with general obligation bonds, approved by voters and issued for 'park purposes' as 'air parks' now known as 'airports' were then commonly included within the definition as 'park purposes.' *See* Government Code Section 50471. This transaction was memorialized in Ordinance 339, a true and correct copy of which is attached hereto as Exhibit A.

11.     The City of Santa Monica leased the Airport to the federal government during World War II, during which the Federal Government enlarged and reconfigured the Airport into its current runway and taxiway configuration. Following the end of the war, in 1946 the City requested the Federal Government, via the Surplus Property Act of 1944, 49 U.S.C. §§ 47151-47153 (the "Surplus Property Act"), transfer a partial interest in the Airport to the City of Santa Monica, described by the City in a September 19, 1946 letter from the City of Santa Monica to the War Assets Administration (a true and correct copy of which is attached hereto as Exhibit B) as being "for the purpose of encouraging and fostering the development of civil aviation."

12.     In 1948, the Federal Government transferred Airport land, buildings, structures, improvements and equipment to the City for public airport purposes via a Surplus Property Act Instrument of Transfer, a true and correct copy of which – together with the City's Resolution 183 adopting it – is attached hereto as Exhibit C. That Instrument of Transfer demonstrates the partial interest in the City of Santa Monica, as well as the burdens and covenants running with the land, binding the City and "its successor and assigns forever," requiring the Airport to be used for 'air park,' civil aviation, and airport purposes forever.

13.     Separate from the Instrument of Transfer, Congress has declared, "[i]t is the policy of the United States to give special emphasis to developing reliever airports" including the Santa

---

[1] City Council Report for City Council meeting of April 30, 2013, Agenda Item 8-A (page 2), available at https://www.smgov.net/uploadedFiles/Departments/Airport/About/Staff_Report_to_Council_04.30.13.pdf

5

1   Monica Municipal Airport. 49 U.S. Code § 47101(a)(3). Furthering that policy, Congress enacted

2   (*inter alia*) the Airport and Airway Improvement Act of 1982, Pub. L. No. 97-248, title V (Sept. 3,

3   1982), as amended, which incorporates the Airport Improvement Program (49 U.S.C. §§ 47101–

4   47142, the "AIP"). The AIP conditions the receipt of federal airport development funds on certain

5   grant assurances "Grant Assurances" (49 U.S.C. § 47107) made by an airport sponsor – in this case

6   the City of Santa Monica – to the Federal Aviation Administration ("FAA"). The FAA recently

7   issued a Final Agency Decision[2] affirming an FAA Director's Determination that the City of Santa

8   Monica remains obligated to operate the Airport pursuant to these Grant Assurances: "[T]he AIP

9   grant obligations for SMO expire in 2023."[3] The FAA, under this authority, investigates and issues

10   notice(s) of investigation for violations concerning various Airport matters, including, but not

11   limited, to said Grant Assurances; one such notice of investigation proceeding under Part 16 is

12   identified as FAA Docket No. 16-16-13.

13           14.      The City of Santa Monica brought an action against the Federal Government, *City of*

14   *Santa Monica v. United States of America, et al.*, Case No. CV 13-8046-JFW (VBKx) (C.D. Cal.)

15   ("District Court Action"). This lawsuit alleged five causes of action for: Quiet Title; Violations of

16   the Fifth Amendment under theories of Taking, Regulatory Taking, and due process; and Violation

17   of the Tenth Amendment. The prayer for relief demanded: Declaratory judgments regarding the

18   title to the Airport Property and the City's contentions regarding violations of the United States

19   Constitution; that the court "enjoin the United States from taking any action affecting Santa

20   Monica's right, title, or interest in the Airport Property … from demanding or asserting in any

21   forum that Santa Monica must operate the Airport Property as an airport in perpetuity"; and that

22   the court "order that the United States shall cease and desist from taking any action to require

23   Santa Monica to operate the Airport Property as an airport after the 1984 Agreement expires in

24   July of 2015."

25

26

27   [2] *National Business Aircraft Assoc. et al vs. City of Santa Monica, California*, FAA Docket No. 16-14-04, Final Agency Decision (August 5, 2016), *available at* http://part16.airports.faa.gov/pdf/16-14-04.pdf ("*NBAA Part 16 Action*")

28   [3] *Id.* at p. 17.

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

15.     The City of Santa Monica also appealed the FAA's Decision in the *NBAA Part 16 Action* in the United States Court of Appeals for the Ninth Circuit, *City of Santa Monica v. FAA*, Case No. 16-72827 ("9th Circuit Action"). This action was a formal request to the United States Court of Appeals to review the legality of the FAA's administrative decision, and sought a "review of the Final Agency Decision and Order entered on August 15, 2016, and issued by the FAA in *National Business Aviation Association, et al., v. City of Santa Monica*, FAA Docket No. 16-14-04." That Final Agency Decision and Order affirmed an earlier Director's Determination "that the Respondent City of Santa Monica remains obligated by the grant assurances until August 27, 2023." The petition for review sought a declaration that the FAA's decision was invalid.

16.     The issues raised by the FAA in its Notice of Investigation (FAA Docket No. 16-16-13) were: Whether Santa Monica's refusal to enter into leases with aeronautical tenants was a grant assurance violation; whether Santa Monica's planned proprietary exclusive operation was a grant assurance violation (and whether Santa Monica was ready, willing, and able to run such an operation); and whether Santa Monica's attempts to remove two fixed base operators was a grant assurance violation. In that action, the FAA could have ultimately rescinded eligibility for future grants, issued a cease and desist order, or issued "any other compliance order issued by the Administrator to carry out the provisions of the [applicable federal law]." 14 C.F.R. § 16.109.

17.     Petitioners allege on information and belief that, at some point prior to January 25, 2017, the posting date of the agenda setting the January 28, 2017 closed session agenda items concerning the settlement to the Airport closure, the City Council took action as defined under Government Code section 54952.6 to settle the District Court Action, 9th Circuit Action, and an FAA notice of investigation, Part 16, FAA Docket No. 16-16-13. Further, petitioners further allege said action included an attempt to circumvent the signature formality authority.

18.     Ahead of a January 28, 2017 special meeting characterized as a retreat with a limited business, on or about January 25th the City of Santa Monica posted a meeting agenda for January 28, 2017, a true and correct copy of which is attached hereto as Exhibit D. The agenda shows six closed session items, as conferences with legal counsel—five for existing litigation under

7

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

1  Government Code section 54956.9(d)(1) and one for anticipated litigation under Government

2  Code section 54956.9(d)(2).

3      19.    That Saturday retreat meeting was set to begin at 9:00 a.m., was called to order at

4  9:11 a.m., after recital of the Pledge of Allegiance and public comment, the City Council recessed at

5  9:20 a.m. for about with the City Council spending approximately 36 minutes in closed session. A

6  true and correct copy of the minutes of that meeting are attached hereto as Exhibit E. The District

7  Court Action, the 9th Circuit Action, and FAA notice of investigation 16-16-13 (*inter alia*) were

8  among the pending cases closed-session items agendized for this meeting. There were just three

9  requests from the public to speak ahead of this sparsely attended 'retreat' meeting, each evidently in

10  response to the introduction of "scheduled charter" jet operations by JetSuiteX at the Airport, then

11  planned to commence on or about February 6, 2017.

12      20.    Petitioners allege on information and belief that those three members of the public

13  left before the Settlement Agreement announcement was made, because the only thing left on the

14  agenda was a wellbeing retreat.

15      21.    Petitioners allege on information and belief that Alan Levenson, one of those three

16  members of the public who appeared and spoke generally about the airport, described the City

17  Council's actions as "blindsiding" the public with the Settlement Agreement, that there were no

18  interested parties in the room and no public discussion even though residents and pilots will be

19  affected by the proposed changes to the runway[4]. Petitioners further allege on information and

20  belief that Mr. Levenson can confirm that the only thing on the agenda regarding the airport were

21  several closed session legal cases involving the Airport, which was typical for regular meetings, yet

22  somewhat odd for a Saturday retreat whose only public agenda item was the City's Wellbring

23  Project. Petitioners further allege on information and belief that at least Mr. Levenson, and

24  probably all three members of the public who spoke at that meeting, were simply taking advantage

---

[4] Petitioners allege on information and belief that the proposed change in the runway is likely to actually
*increase* aircraft operations at the airport (more flights in smaller aircraft necessary to transport the same
number of persons), and that the City of Santa Monica's own study or studies show that, even with the
anticipated change in the mix of aircraft utilizing the Airport, noise for residents at the departure end of the
realigned runway will actually *increase* due to aircraft, beginning their take-off several hundred feet further
west than they do now, will be lower to the ground when climbing out of the airport environment.

8

1  of the closed session that they happened to notice on Friday, the day before, as an opportunity to

2  address the council regarding their airport concerns, leaving afterwards with no idea that a major

3  airport announcement was about to be made.

4        22.    The video of the January 28, 2017 announcement also suggests the city attorney was

5  actually reading from the settlement agreement but did not share any copies other than bullet-

6  points and a three-page summary of the settlement agreement. More specifically, emerging from

7  the Closed Session, acting City Attorney Joseph Lawrence stated, reporting out[5]:

> In closed session the City Council discussed aspects of each of the items on the closed session agenda, there is action to report out on Item 1(A), which is the Federal Aviation Administration versus City of Santa Monica, Notice of Investigation Part 16, FAA Docket No. 16-16-13, Item 1(D), City of Santa Monica versus United States of America, United States District Court number CV 13-08046, and lastly the City of Santa Monica versus the Federal Aviation Administration, United States Court of Appeals for the Ninth Circuit case number 16-72827. The City has entered into or is entering into a consent decree agreement with the United States of America and the Federal Aviation Administration which completely resolves all of the outstanding disputes in each of the three matters that I just mentioned. The City and the United States and the FAA have agreed on that the airport will close December 31st – at the close, the Airport will close no later than December 31st, 2028; that in the interim, the operational length of the runway will be reduced to 3500' – that, with regard to that, it is anticipated that the reduction in runway length will cause over 40% of current jet operations to no longer be able to use Santa Monica Airport, it will eliminate, once the runway is reduced, it will eliminate all possibility of charter operations operating out of Santa Monica Airport, the agreement removes all restrictions on the Airport property that are currently subject to all the lawsuits – that means that the, what's called the Instrument of Transfer and the Quitclaim Deed property restrictions are removed; the FAA agrees that the City can operate a fixed base operation if the City so elects to, and the land that is no longer – would no longer be needed for runway – could be used, is released from Airport purposes and could be used for... as the City so desires, subject to a aviation easement, meaning that, essentially that for instance the City couldn't construct a 10 story building at the end of the runway. [] The FAA will work with the City, if the City so requests... Santa Monica become a demonstration project for unleaded fuel. The parties agree – I'm just reading various terms – not to undermine each other's efforts in pursuing their

___

[5] Meeting video available at http://santamonica.granicus.com/MediaPlayer.php?view_id=2&clip_id=3890 (starting at approx. 9:38).

respective rights under this agreement. It is recommended by the – and there are a variety of other terms – this resolves all [?] not only those lawsuits but also any claims that could have been brought by either the United States against Santa Monica or Santa Monica against the United States. All disputes are ended. There could obviously be future disagreements of one kind or another, we hope not, the parties agree to cooperate and try to resolve those as best we can. It is the recommendation of the City Attorney's Office, it is the recommendation of outside counsel Morrison & Forrester, and it is the recommendation of outside counsel Anderson Krieger, that the City Council approve this consent decree agreement. And about that – it's a consent decree – and what that means, it will be monitored by the U.S. District Court here in California, it is, it will – if there's a future dispute or disagreement about the – whether one side or the other is following the terms of the agreement, we will not get lost in a Part 16 proceeding, as we have in years past. It will be resolved by a court. And so again, it is recommended completely by the City Attorney's Office and all outside counsel who have been involved in the disputes over these many years that City Council approve this.

23.    Following a 4-3[6] vote agreeing to enter into the settlement agreement / consent decree, Council Member Kevin McKeown stated[7]: "I was silent in public discussion today because the decision had already been made and the documents had been signed in Washington. I can assure the community, however, that I was adamant and consistent in my opposition to this settlement and expressed my opposition repeatedly in closed session legal discussions that led to today's public action."

24.    Council Member Tony Vasquez also stated[8] he "had a conversation with our City Attorney a couple of days ago, thinking this might be happening" and further noted[9]: "The attorneys did a great job negotiating back and forth, 'cause this has been going on for some time." Finally, Mr. Lawrence announced[10]: "We have hand-outs, if anybody wishes to have – take – see the handouts, the handouts are two items, one is just essentially a bullet-point thing, and the other contains some of the actual language, it's a three-page handout which contains some of the actual language of the agreement."

---

[6] *Id.*, starting at approx. 19:15
[7] *Id.*, starting at approx. 19:45
[8] *Id.* starting at approx. 15:15
[9] *Id.*, starting at approx. 21:25
[10] *Id.*, starting at approx. 24:00

10

25.     Shortly thereafter, on or about February 1, 2017, the City's Mayor, Ted Winterer, during a radio interview broadcast on Southern California Public Radio, 89.3 FM KPCC, discussed the closed session conversations, further memorializing the alleged violations of Government Code sections 54959 and 54963; the mayor described the secrecy of these proceedings[11] in violation of the Brown Act as follows:

> That's the very nature of these confidential settlement agreements. When the FAA first approached us about having the dialog about resolving our issues on a larger scale, they wanted us not to talk to anybody and they agreed not to talk to anybody. This is – there's only about a handful of people at the FAA was aware that this was going on, and the same thing applied at City Hall. I mean, when you negotiate a settlement agreement like this there's always the prospect of leaks, and then people attempting to get in and try to undo it. And if, for instance, the NBAA, or AOPA, or any of the pilot lobbyist groups had gotten wind of this deal they would have done their utmost to try and thwart it. So, it's just the way things are done. Now, we did it on a Saturday morning because we already had a regularly scheduled meeting, we have an annual retreat, where we look at sort of what our goals are for the upcoming year, how we're going to achieve them – so it just happened because of the timing when this finally got approved by the Department of Justice, that's when we were able to approve it.

26.     Petitioners allege these actions, i.e., the report out and discussion of closed session deliberations during the report out open session and on the radio, violate the Brown Act, including, but not limited to, it appears, Government Code sections 54956.9, 54957.1, 54963(a), and may possibly subject the City Council to misdemeanor charges under Government Code section 54959; this activity not only shows a lack of compliance with the Brown Act, but utter disrespect for the open meetings laws and Constitution, as demonstrated by the following distinct violations of the Brown Act supporting invalidation of the Settlement Agreement concerning the attempted closure of the Airport, in that by disguising the approval of the settlement agreement under a closed session meeting on January 28, 2017, the City Council committed violations requiring a cure and correction. Petitioners allege that despite their demand for cure or correction, the City Council demonstrated disregard for the business of the public concerning the Airport and will likely

---

[11] Recording archive *available at* https://media.scpr.org/audio/upload/2017/02/01/Who_will_be_the_winners_and_losers_when_Santa_Monica_airport_closes_in_2028-669e2f56.mp3 (starting at approx. 6:15)

1  continue to violate the Brown Act, particularly on matters concerning the Airport, thus requiring

2  imposition of remedies under the Brown Act, i.e., tape recording, and voiding the Settlement

3  Agreement, under Government Code sections 54960, 54960.1. As further demonstration that the

4  Settlement Agreement was not approved, there was only a bullet-point summary and a three-page

5  summary without a settlement agreement. It appears the actual Settlement Agreement was not

6  procured until January 30, 2017. This is contrary to the report out suggesting the FAA, the United

7  States Department of Justice, and the White House approved entering into a settlement agreement

8  prior to January 28, 2017. However, while the Settlement Agreement was not handed out, it was

9  later posted online showing execution by the FAA and City Council on January 30, 2017.

10  Petitioners further allege this want of strict compliance with the Brown Act do not afford

11  protections to uphold the Settlement Agreement; more specifically, the closed session agenda dated

12  January 25, 2017 and the closed session on January 28, 2017 were nothing more than a ruse and

13  abuse of the closed session exception all geared to secretly close the Airport without conformance

14  with open meeting laws, the California Constitution, and part of a confidential settlement with the

15  FAA. Petitioners further suspect the city attorney and / outside counsel to the City Council, or

16  both, may have used the attorney client legal conference exception to devise this scheme and

17  remedies sought herein will likely reveal and or prevent such future violations.

18      27.    The Airport is a highly contentious issue in Santa Monica politics and the City

19  Council appears to take actions to purposely avoid and circumvent the transparency required under

20  the Brown Act. As then-Mayor McKeown observed at a March 24, 2015 City Council meeting

21  discussing the Airport: "We now have over one hundred and twenty-five requests [from members

22  of the public] to speak, that's over four hours at two minutes apiece."[12] As then-City Attorney

23  Marsha Moutrie noted at that meeting[13]: "I just have to observe that we haven't had a hundred

24  people testify on a hearing since a year ago, which was the last time [the City Council] did a full

25  scale airport hearing."

---

[12] Meeting video *available at* http://santamonica.granicus.com/MediaPlayer.php?view_id=2&clip_id=3470 (starting at approx. 33:45)

[13] *Id.*, starting at approx. 10:10.

Exhibit R
Page 432

28.    The Settlement Agreement incorporates the following results that could not have been reached through any of the above actions: Changing the runway configuration, from 4,973 feet to 3,500 feet in length and the construction and maintenance of runway safety areas at both runway ends (Section II); creating an avigation easement (Section III); restricting the City's ability to provide aeronautical services under a proprietary exclusive right (Sections IV(C)-(D)); and requiring the City to operate the Airport "until December 31, 2028" (Section VI), an arbitrarily chosen date[14].

29.    The Settlement Agreement reverses several resolutions adopted by the City Council in open meetings, including:

| Settlement Agreement Provision | Open Meeting Act Undone |
|---|---|
| A release of airport property from federal obligations (Section III) | Resolution 183, adopted by the City Council on August 10, 1948. |
| Places restrictions on the City's ability to provide aeronautical services under a proprietary exclusive right (Sections IV(C)-(D)). | The City Council, during the August 23, 2016 meeting, adopted Resolution 10988 and took decisive action to eliminate private fixed base operators ("FBOs") and establish a City-controlled proprietary exclusive FBO by the end of 2016; this provision undoes that legislative act. |
| Requires the City to enter into leases with all current and prospective Airport tenants providing aeronautical services, and that those leases be in "substantially the same form" as an attached exemplar (Section IV(D)). | Contrary to the Leasing Policy adopted by the City Council at an open meeting on March 23, 2016, which also authorized the City Manager to negotiate and execute leases at the airport in accordance with that policy. |
| Requires the City to operate the Airport "until December 31, 2028" (Section VI). | Contrary to Resolution 183 (above), Resolution 6296 (1981) ("[i]t is the policy of the City of Santa Monica to effect the closure of the Santa Monica Municipal Airport as soon as possible") and Resolution 10988, which stated the City's intent to close the Airport and |

[14] If the City had won its District Court Action but lost the Ninth Circuit Petition, the airport would have been federally obligated until August 2023; if the City had lost the District Court Action but prevailed in the Ninth Circuit Petition, the airport would have been federally obligated under the Surplus Property Act ("SPA") provisions and other statutes in perpetuity; if the City had prevailed in both the District Court Action and Circuit Court Petition, presumably the City would have closed the airport in August of 2018 as resolved by the City Council in March of 2016; if the City had lost both actions, the airport would have been bound by grant assurances until 2023 and thereafter under the SPA and other statutes in perpetuity.

13

| | runway on or before June 30, 2018. |
| Bars the City from restricting the sale of leaded aviation fuel (Section VII). | Also contrary to Resolution 10988, which established a policy of "eliminating lead fuel." |

The Settlement Agreement also provides that "the City may use the property no longer needed for the Airport with a shortened or reconfigured runway, taking into consideration standard safety areas, including the use of EMAS, for non-aeronautical uses that are safe and compatible with the operation of the Airport. Such land shall be subject to an avigation easement for the period the airport is operated which shall be recorded contemporaneously with <u>any instrument releasing such property</u>." (Emphasis added.)

### ADOPTION OF SETTLEMENT AGREEMENT GOES BEYOND CLOSED SESSION EXCEPTION

30.    Although the bulk of the court's opinion in *Trancas Prop. Owners Ass'n v. City of Malibu* (2006) dealt with matters requiring a public hearing, the court's opinion in *Trancas* is actually broader than that. *Trancas* states that the "Brown Act permits cities to settle litigation in closed session [but] makes no exception for settlements 'concerning' matters ordinarily dealt with in open session or settlements 'addressing' matters that ordinarily require a public hearing." 138 Cal. App. 4th 172, 186. *Trancas* further reiterates the precept that exceptions to the Brown Act must be narrowly constructed:

> [S]ection 54956.9 does not by its terms provide for entry into or approval of settlements in closed session, at all. Rather, the statute has been <u>construed</u> to allow a city council to do so. (E.g., 75 Ops.Cal.Atty.Gen. 14 [1992; 1992 Cal. AG LEXIS 2], *supra*; but see *Southern California Edison Co. v. Peevey, supra*, 31 Cal.4th [781] (2003) at pp. 813–814 (conc. & dis. opn. of Baxter, J.).) But this implied exemption is subject to narrow construction. (*Shapiro, supra*, 96 Cal.App.4th at p. 917; *accord, Shapiro v. Board of Directors* (2005) 134 Cal.App.4th 170, 185 [35 Cal. Rptr. 3d 826].) And as "emphasized" in the Attorney General's manual on the Brown Act, "the purpose of [section 54956.9] is to permit the body to receive legal advice and make litigation decisions only; it is not to be used as a subterfuge to reach nonlitigation oriented policy decisions." (Cal. Dept. of Justice, Off. of Atty. Gen., The Brown Act (2003), p. 40.)

*Id.* (emphasis added). Here, the public could not comment ahead of a closed session discussing litigation, a Settlement Agreement that encompasses policy decisions that go well beyond what results the litigation could reach; that wild impropriety alone should nullify the Settlement Agreement and require a cure.

14

Exhibit R
Page 434

## STATUTES REQUIRING A PUBLIC HEARING

31.     California's Public Utilities Code § 21661.6 requires a public hearing and establishment of a master plan prior to the acquisition of land or any interest therein … for the purpose of expanding or enlarging any existing publicly owner airport. Subsection (c). Section III of the Settlement Agreement transfers an interest to the City, as does the settling of the District Court Action with its cause of action for quiet title. Public Utilities Code § 21664.5(a) contains further requirements and definitions: "An amended airport permit shall be required for every expansion of an existing airport. An applicant for an amended airport permit shall comply with each requirement of this article pertaining to permits for new airports … (b) As used in this section, 'airport expansion' includes any of the following: (1) The acquisition of runway protection zones … (2) The construction of a new runway [and] (3) The extension or realignment of an existing runway …" (Emphasis added.) The Settlement Agreement contemplates realigning the existing runway, the creation of runway safety areas, and is, in good faith, expected to increase aircraft operations (as the shorter runway cannot be used by larger aircraft, more trips will be required to accommodate the same number of travelers).

32.     Public Utilities Code § 21605 also provides for a public hearing: "No proprietor of any permitted airport which is open to the public and has received public funds shall close or suspend operation of the airport, or close an existing runway or taxiway except on a temporary basis for inspection, maintenance, construction, or emergency purposes, without notifying the department in writing 60 days prior to the intended closure or suspension of operations. On its own motion or upon the request of an affected or interested person, the department may conduct a public hearing to determine the impact of the intended closure or suspension of operations, both economically and on the entire state air transportation system. The department may take appropriate action to assist the proprietor in keeping the airport operational and open for public use."

33.     Further, Petitioners allege on information and belief that a 15.69-acre plot that forms the eastern end of the Airport – including a portion of the existing runway – actually sits within the city limits of the City of Los Angeles, with the boundary between the two cities sitting on Centinela

15

1    Avenue (the "LA City Plot"). Upon information and belief, committing to any change in use in that

2    land – as the City has done in the Settlement Agreement – would require annexation and an

3    environmental impact report, etc., which upon information and belief has never been done.

4        34.    Further, Petitioners allege on information and belief that the newly acquired runway

5    protection zones set forth in the Settlement Agreement encroach significantly upon the LA City

6    Plot and other areas of land that are in fact within the boundaries of the City of Los Angeles.

7        35.    Therefore, in order to go through with the runway shortening the City agreed to in

8    the Settlement Agreement, the City would have needed to make appropriate applications, etc. to

9    the City of Los Angeles pursuant to the City of Los Angeles' city zoning/planning and building

10    procedures.

11        36.    The City would also need to go through the procedures via the county airport land-

12    use commission, for which it would need environmental studies. Then there would be approval by

13    the state aeronautics board. Additionally, before any of these processes could have/should have

14    occurred or been committed to, everything needed to go through both the airport and planning

15    commissions.

16        37.    The State Aeronautics Act governs various matters relative to aviation in this state.

17    21001 *et seq.*

18        38.    Public Utilities Code (PUC), Section 21675(a) requires preparation of an airport land

19    use compatibility plan (ALUCP) for each public use airport in the state. This requirement applies

20    regardless of whether a county chooses to establish and maintain an airport land use commission

21    (ALUC) or to utilize one of the other authorized formation types for airport land use compatibility

22    planning.

23        39.    The ALUCP is designed to encourage compatible land uses in the vicinity

24    surrounding an airport. It provides for the "orderly growth of each public airport and the area

25    surrounding the airport" while safeguarding "the general welfare of the inhabitants within the

26    vicinity of the airport and the public in general (PUC Section 21675(a))." The ALUCP contains

27    criteria for making consistency determinations, including building standards and height and land

28    use restrictions.

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

40.     An ALUCP must be formulated for "each public airport" (i.e., as in this case, an airport operated for the benefit of the general public) within the jurisdiction of the ALUC (Section 21675(a)). In addition to existing public-use airports, ALUCs have, on occasion, also developed ALUCPs for proposed public airports even though it is not required

41.     The geographic boundary of the ALUCP is known as the airport influence area (AIA). ALUCs establish the AIA after a hearing and in consultation with the involved agencies, as required by Section 21675(c). ALUCs sometimes describe the AIA as t he referral area (as it is the area within which projects are potentially referred to the ALUC).

42.     Section 21675(a) requires that each ALUCP "shall include and be based either on a long range master plan or an airport layout plan, as determined by the Division of Aeronautics of the California Department of Transportation, that reflects the anticipated growth of the airport during at least the next 20 years."

43.     Historically, opinions regarding whether or not review under the California Environmental Quality Act (CEQA; Public. Resources Code (PRC), Section 21000 *et seq.*) of an ALUCP prior to its adoption or amendment is required have varied. The central issue revolved around whether or not an ALUCP constitutes a "project" under CEQA, which is defined to include the "whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment (California Code of Regulations, Title 14 ("CEQA Guidelines") Section 15378)." Recent case law has confirmed that the adoption or amendment of an ALUCP is a "project" under CEQA. Practically speaking,  the environmental impacts of an ALUCP arise from its potential to result in displaced development as a result of the potential imposition of more limiting development criteria. Conversely, environmental impacts also may result if the ALUCP would lessen the restrictiveness of development criteria and expand the types of land uses that could be accommodated within an area. The remaining question of what type of environmental document, if any, must be prepared is a separate issue, as set forth below.

17

1    44.    Prior to the amendment of a general plan or specific plan, or the adoption of a

2    zoning ordinance or building regulation within the ALUCP planning boundary, the ALUC shall

3    review the plan, ordinance, or regulation for consistency with the ALUCP (PUC Section 21676(b)).

4    45.    Prior to the modification of an AMP (by a public agency owning the airport), the

5    ALUC shall review the proposed action (PUC Section 21676(c)).

6    46.    Per Section 21605, "[n]o proprietor of any permitted airport which is open to the

7    public and has received public funds shall close or suspend operation of the airport, or close an

8    existing runway or taxiway except on a temporary basis for inspection, maintenance, construction,

9    or emergency purposes, without notifying the department in writing 60 days prior to the intended

10    closure or suspension of operations. On its own motion or upon the request of an affected or

11    interested person, the department may conduct a public hearing to determine the impact of the

12    intended closure or suspension of operations, both economically and on the entire state air

13    transportation system. The department may take appropriate action to assist the proprietor in

14    keeping the airport operational and open for public use."

15    47.    The Settlement Agreement also incorporates other acts that, *by law*, require public

16    hearings and input and legislative acts done in open session of the U.S. Congress. 49 U.S.C. §

17    47107(h) requires the publication of any *modification* of airport obligations under the Grant

18    Assurances in the Federal Register and to *solicit public comment* before it can become effective. The

19    Surplus Property Act also dictates: "[B]efore the Secretary may waive any term imposed under this

20    section that an interest in land be used for an aeronautical purpose, the Secretary must provide

21    notice to the public not less than 30 days before waiving such term." 49 U.S.C. § 47153(c). (There

22    must also be an affirmative finding by the FAA that a release will benefit aviation. *See* 49 U.S.C. §

23    47153(a); 14 C.F.R. § 155.3(a); *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178 (8th Cir.

24    2001).)

25    48.    Further, without an act of Congress, there is no statutory authority that provides for

26    the release of the City from its Grant Assurances obligations. *See, e.g.*, 49 U.S.C. § 47107(a)(8)

27    (requiring approval from the Secretary of Transportation prior to a *temporary* closure of an airport

28

18

1    for a nonaeronautical purpose). Too, both 49 U.S.C. § 47107(h)(1) and (2) speak only to *modifying*

2    an assurance, with no authorization whatsoever to *remove* entirely any grant assurance obligation.

3        49.    The Surplus Property Act likewise binds the FAA which, absent the conditions set

4    forth above (which are not present here), cannot enter into the release of obligations set forth in

5    the Settlement Agreement without Congress specifically granting it the ability to do so. *See, e.g.*, the

6    recent Congressionally authorized releases of St. Clair and St. Marys (Pub. L. 113-285 and Pub. L.

7    114-328, § 2829D, respectively).

8                        **MISUSE OF THE LITIGATION EXCEPTION**

9        50.    Petitioners allege on information and belief there exists, as detailed by the former

10    chair and four year veteran of the Santa Monica City's Airport Commission, David Goddard, there

11    exists a long history of the City's improper use of closed session discussion, and the District Court

12    Action and other litigation was brought specifically to provide a basis for the City Council's

13    continued misuse of closed sessions and ultimate adoption of the Settlement Agreement.

14        51.    As recently as October 24, 2016, Nelson Hernandez, Senior Advisor to the City

15    Manager, in response to an article in the L.A. Times, sent out an emailed statement that read in

16    relevant part (emphasis in the original):

17        There is no "deal" or discussions with FAA regarding closure of the Santa Monica
        Airport. Let me say it again. The city is not considering a deal with the FAA regarding
18        our efforts to close the airport. As stated before, the closure of the airport is a legal
19        matter that will be decided in court, not in closed session.

20        52.    There is no reference in any agenda for any City Council meeting which indicated

21    that the City Council was discussing, or would take action to adopt, any settlement of the District

22    Court Action or the 9th Circuit Action, let alone an agreement as far-reaching and contentious as

23    the Settlement Agreement.

24        53.    The purpose of the Brown Act is to provide notice and opportunity for members of

25    the public to participate in the decision-making process of local agencies. The failure to properly

26    notice this matter, as well as the discussion and approval of the Settlement Agreement in closed

27    session, violates the Brown Act, depriving the public of notice and the guaranteed right to testify

28    and opportunity to be heard regarding this matter of great public importance.

54.    The clear identification of the importance of open and public deliberations is evident by the City Council itself as noted above. The numerous lawsuits further demonstrate the requirement to further deliberate in public and not in secret. Last, the fact two public entities are involved in the closure of the Airport, the FAA and the City Council, further cry for enforcement of the Brown Act to openly deliberate concerning issues purportedly resolved and involved in the Settlement Agreement.

55.    On April 18, 2017, petitioners sent a "Notice of Brown Act Violation" which included a "Demand to Cure and Correct pursuant to Government Code § 54960.1 ("Demand") to the City Council, via email[15], facsimile transmission[16], and certified mail (receipt no. 7010 1870 0001 8754 2861). A true and correct copy of the Demand, together with a copy of the email transmission and the facsimile transmission report showing complete transmission without error, properly issued by the sending fax machine, is attached hereto as Exhibit G.

56.    In the Demand, Petitioners notified the City Council it had violated the Brown Act as stated herein and requested a cure by their next meeting, set for April 25, 2017.

57.    Subsequent to the delivery of the Demand, the City Council did not appear to heed the call to cure or correct the adoption of the Settlement Agreement; the posted agenda for special meetings held April 25, 2017[17] and April 29, 2017[18] (the latter of which pursuant to an agenda that was generated on April 27th, at 9:14 a.m. and posted sometime thereafter) did not contain any item concerning the adoption of the Settlement Agreement or issues identified in the Demand. True and correct copies of these agendas are attached hereto as Exhibit H.

58.    The April 25, 2017 meeting took place without any reference to the Demand.

---

[15] To the email addresses provided by the City for each City Council member (see Contact the Council, *available at* https://www.smgov.net/departments/council/content.aspx?id=2409 and City Council Members, *available at* https://www.smgov.net/departments/council/content.aspx?id=13705): ted.winterer@smgov.net, gleam.davis@smgov.net, tony.vazquez@smgov.net, kevin@mckeown.net, sue.himmelrich@smgov.net, pam.oconnor@smgov.net, and terry.oday@smgov.net
[16] To fax number (310) 458-1621; *see Id.*
[17] *Available at* http://santamonicacityca.iqm2.com/Citizens/Detail_Meeting.aspx?ID=1092
[18] *Available at* http://santamonicacityca.iqm2.com/Citizens/Detail_Meeting.aspx?ID=1122

20

Exhibit R
Page 440

1   59.    Petitioners have not received any response and believe the City Council is refusing to

2   cure  or correct the closed-session approval of the Settlement Agreement. Indeed, the City has

3   contested this petition with a demurrer and at a hearing on an order to show cause.

4   **CAUSE OF ACTION FOR VIOLATIONS OF THE RALPH M. BROWN ACT**

5   *AGAINST ALL RESPONDENTS AND DEFENDANTS*
    *FOR RELIEF PURSUANT TO GOV'T CODE SECTIONS 54960, 54960.1, 54960.2;*
6   *CAL. CODE CIV. PROC. SECTIONS 1060, 1085, INCLUDING VIOLATIONS OF SANTA MONICA CITY*
7   *CHARTER SECTIONS 613, 615, 704, 707*

8   60.    Petitioners hereby reallege and incorporate herein by this reference Paragraphs 1

9   through 59 of this Petition as though set forth herein in full.

10  61.    Petitioners allege on information and belief the City Council failed to discuss and

11  authorize the City Council's approval of the Settlement Agreement in an open and public session.

12  62.    Petitioners allege on information and belief the City Council failed to discuss and

13  authorize the shortening of the runway and systematic closure of the Airport in an open and public

14  session.

15  63.    Petitioners allege on information and belief the City Council discussed and

16  authorized these acts in closed session in violation of the Brown Act under the anticipated

17  litigation closed-session exception to the Brown Act, inapplicable in this case.

18  64.    Petitioners allege on information and belief the City Council attended the January 28,

19  2017 closed session meeting where action was taken in violation of the Brown Act and the City

20  Council intended to deprive petitioners and the public of information to which the City Council

21  knows or has reason to know the petitioners and public are entitled to know and that the action

22  approving the Settlement Agreement should have been in open session for the reasons herein

23  stated.

24  65.    Petitioners allege on information and belief the City Council disclosed confidential

25  information from the January 28, 2017 closed session deliberations as well as concerning the

26  approval of the Settlement Agreement, specifically, that there were apparently serial actions

27  required to be in an open and public session under Government Code section 54952.6, prior to the

28  January 25, 2017 agendizing of the January 28, 2017 closed session and the City Council moved

21

1  forward with those actions and the closed session on January 28, 2017 with the knowing intent to

2  violate of the Brown Act and deprive petitioners and the public of information to which the City

3  Council knows or has reason to know should have been in an open and public session.

4      66.     Petitioners allege on information and belief the City Council failed to cure and

5  correct the Brown Act violation identified by the Petitioners in the Demand as part of a concerted

6  effort to enter into the Settlement Agreement in violation of the Brown Act.

7      67.     Petitioners have a clear, present, and beneficial right to Airport and their continued

8  employment, enjoyment, and use of the Airport, and its continued existence without the attempted

9  shortening of the runway and closure of the Airport and reserve the right to enjoin any attempts to

10 enforce the Settlement Agreement sections as threatened by the city manager in the report out to

11 commence shortening the runway as expeditiously as possible.

12     68.     Petitioner Kate Scott has appeared and spoken before the City Council on Airport-

13 related matters in the past, and, but for the lack of notice, would have appeared before the City

14 Council to speak publicly regarding the adoption of this Settlement Agreement (or any other

15 resolution or action that would have such a dramatic impact on the Airport).

16     69.     Petitioner James Babinski has been present at several Airport Commission and City

17 Council meetings concerning the Airport, and, but for the lack of notice, would have appeared

18 before the City Council to speak publicly regarding the adoption of this Settlement Agreement (or

19 any other resolution or action that would have such a dramatic impact on the Airport).

20     70.     Given the significant public input that always accompanies Airport-related matters

21 before the City Council (as set forth above), it is highly likely that more persons would have

22 attended a meeting where Airport action of this magnitude was being contemplated, had it been

23 duly noticed. Whether or not the input would have swayed the City Council's decision can only be

24 determined if this matter is properly put to public comment before a vote. *See, e.g., Cohan v. City of*

25 *Thousand Oaks*, 30 Cal. App. 4th 547, 556 (1994). Neither Petitioners, nor on information and belief

26 any other member of the public, ever had that opportunity.

27     71.     Petitioners have a clear, present, and beneficial right to the City Council's

28 performance and strict abidance of the City Council's obligations under the Brown Act, in that past

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

1  and threatened future violations deprive the petitioners of the ability to defend their rights in the

2  continued employment, enjoyment, use and other like interests in the continued existence of the

3  existing runway and Airport and reserve the right to enjoin any attempts to enforce the Settlement

4  Agreement sections as threatened by the city manager in the report out to commence shortening

5  the runway as expeditiously as possible.

6      72.    The Brown Act requires that the agenda for each meeting contain a general

7  description of each item of business to be transacted, including those to be discussed in closed

8  session. Government Code § 54952.2(a)(1).

9      73.    The Brown Act prohibits a public agency from taking action or discussing any item

10  not appearing on the posted agenda. Government Code §54954.2(a)(2).

11      74.    The City Council violated Government Code § 54952.2 by discussing and taking

12  action on the Settlement Agreement without properly listing it on any agenda and without any

13  public notice.

14      75.    Government Code section 54953(c) states "No legislative body shall take action by

15  secret ballot, whether preliminary or final."

16      76.    Government Code section 54962 prohibits the City Council from holding any closed

17  session except as expressly authorized.

18      77.    Petitioners allege that these violations of the Brown Act, as set forth above, evidence

19  a pattern and practice of ignoring the State of California's open meeting laws, and have deprived

20  Petitioners and members of the public of proper notice and of their right to address the City

21  Council on this important public issue.

22      78.    Without a writ of mandate, injunctive, and declaratory relief provided for by the

23  Brown Act, Petitioners are informed and believe, and on that basis allege, that they and other

24  interested persons, citizens, and taxpayers will be irreparably harmed because they will be denied

25  notice of and the opportunity to participate in the City Council's meetings, a right which is

26  guaranteed by law.

27      79.    Government Code Section 54960(a) provides that any interested person, such as the

28  Petitioners, "may commence an action by mandamus, injunction, or declaratory relief for the

Exhibit R
Page 443

1    purpose of stopping or preventing violations or threatened violations of this chapter by members

2    of the legislative body of a local agency ...”

3         80.    Because the City Council has failed to acknowledge its violations of the Brown Act,

4    the City Council is likely to continue to violate the Brown Act in the future.

5         81.    Government Code section 54960.1 allows for this petition to seek judicial

6    nullification of an action in violation of Government Code Sections 54953, 54954.2, 54954.5,

7    54954.6, 54956, or 54956.5.

8         82.    Petitioners have complied with all notice and demand requirements set forth in

9    Government Code section 54960.1.

10        83.    The City Council has failed or refused to cure its prior Brown Act violation(s)

11   committed when approving the Settlement Agreement.

12        84.    The City Council has ignored the public's right to be informed and involved and

13   should therefore be ordered by the Court to record future closed sessions.

14        85.    The People of California have elevated the right to open government to one

15   protected by their State Constitution. The California Constitution, Article 1, Section 3, Paragraphs

16   (a) - (b) state:

17        The people have the right to instruct their representatives, petition government for
18        redress of grievances, and assemble freely to consult for the common good. The
         people have the right of access to information concerning the conduct of the people's
19        business, and, therefore, the meetings of public bodies and the writings of public
         officials and agencies shall be open to public scrutiny.
20             A statute, court rule, or other authority, including those in effect on the
21        effective date of this subdivision, shall be broadly construed if it furthers the people's
         right of access, and narrowly construed if it limits the right of access.
22

23   86.    Code of Civil Procedure § 1060 provides:

24        Any person interested ... who desires a declaration of his or her rights or duties with
25        respect to another ... may, in cases of actual controversy relating to the legal rights
         and duties of the respective parties, bring an original action or cross-complaint in the
26        superior court for a declaration of his or her rights and duties in the premises,
         including a determination of any question of construction or validity arising under the
27        instrument or contract. He or she may ask for a declaration of rights or duties, either

28

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time....

87.    There presently exists, between the Petitioners and the City Council, an actual controversy relating to the legal rights of Petitioners and other members of the public under the Brown Act.

88.    Petitioners request a judicial determination that Respondent has violated and is likely to continue to violate the Brown Act.

89.    This determination is necessary and proper because Respondent refuses to conform to the requirements of the Brown Act.

90.    Respondent has a ministerial duty to perform according to the laws of the State of California, including the Brown Act.

91.    Respondent has failed and refused to perform its ministerial duties as required by the Brown Act.

92.    Petitioners have a clear, present, and legal right to Respondent's performance of its ministerial duties, as required by the Brown Act.

93.    Respondent has a present legal duty and present ability to perform its ministerial duties set forth in both the Brown Act.

94.    Petitioners have an interest in having the laws executed and public duties enforced and, therefore, have a beneficial interest in the outcome of the proceedings.

95.    Through this action, Petitioners seek no greater relief that would be afforded to any other member of the public.

96.    Petitioners have exhausted their administrative remedies.

97.    Petitioners have sent a Brown Act "Demand to Cure and Correct pursuant to Government Code § 54960.1" to the City Council.

98.    The City Council has refused to cure and correct any of the alleged violations.

99.    The only plain, speedy, and adequate remedy left to Petitioners is the relief provided by Government Code sections 54960 and 54960.1.

25

**PRAYER**

Wherefore, Petitioners pray as follows:

    1.    For a declaration that the City Council's authorization to shorten the Airport runway and close the Airport is null and void;

    2.    For a declaration that the City Council's approval of the Settlement Agreement at the agendized closed session on January 28, 2017 is null and void;

    3.    For a declaration that the signatures of the city clerk and city manager on the Settlement Agreement lacked authority thereby causing the Settlement Agreement to be null and void;

    4.    For a writ of mandate directing the City Council to conduct its business with regard to the Airport during its regular meetings, except where special meetings are necessary in light of all the circumstances.

    5.    For a writ of mandate directing the City Council to conduct all future discussions and take any future actions with regard to the Airport in open and public meetings, except when closed sessions are clearly authorized by the Brown Act and are reasonably required in light of all the circumstances;

    6.    For an order pursuant to Government Code section 54960 directing the City Council to tape and digitally record its closed sessions and preserve the tape and digital recordings for a period and under the terms of security and confidentiality the Court deems appropriate;

    7.    For such injunctive relief, as necessary and appropriate, should the City Council move forward to implement the Settlement Agreement during the pendency of this proceeding, including, but not limited to the attempt to shorten the runway at the Airport;

    8.    For such further orders or declarations, as appropriate, declaring the City Council violated the Brown Act by confirming that the Settlement Agreement requires adoption in an open and public session of the City Council in conformance with *Trancas Property Owners Association vs. City of Malibu*, and The Settlement Agreement posted online by the City Council is null and void, *ab initio*, and the City Council may not taken any actions to enforce or implement the Settlement Agreement.

26

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

1        9.      To the extent appropriate, for an order requiring the City Council to produce for in

2    camera review all of the City Council's documents, reports, minutes, transcripts, and tapes of its

3    closed-session meetings on November 22, 2016, December 6, 2016, January 10, 2017, January 18,

4    2017, January 24, 2017 and January 28, 2017, to allow the Court to determine whether the City

5    Council held discussions outside the scope of the posted agenda items, discussed topics not

6    expressly permitted by statute for closed session, and/or took action not formally reported;

7        10.     For reasonable attorneys' fees and costs of suit pursuant to Government Code

8    section 54960.5; and

9        11.     For such other and further relief as the court deems just and proper.

10

11                                        Respectfully submitted,

12

13   Date: September 25, 2017              By: _Shana Elson_____

14                                         Shana Elson, Esq.
                                           Attorney for Petitioner Kate Scott

15

16   Date: September 25, 2017              By: _____

17                                         James Babinski (Civ. Code § 1633.7(d))
                                           Plaintiff/Petitioner

18

19

20

21

22

23

24

25

26

27

28

---
                                        27
                     VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

VERIFICATIONS

I, Kate Scott, declare as follows: I have read the foregoing VERIFIED PETITION FOR WRIT OF MANDATE (Code Civil Procedure §

1085; Government Code §§ 54960, 54960.1); COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF and, except for matters stated on information and belief, the facts stated therein are true on my own knowledge. As to those matters stated on information and belief, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed this 25th day of September 2017, at Los Angeles, California.

_____

Kate Scott (Civ. Code § 1633.7(d))

I, James Babinski, declare as follows: I have read the foregoing VERIFIED PETITION FOR WRIT OF MANDATE (Code Civil Procedure §

1085; Government Code §§ 54960, 54960.1); COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF and, except for matters stated on information and belief, the facts stated therein are true on my own knowledge. As to those matters stated on information and belief, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed this 25th day of September 2017, at Los Angeles, California.

_____

James Babinski (Civ. Code § 1633.7(d))

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE

10/03/2017

ORDINANCE NO. 339

[Commissioners' Series]

AN ORDINANCE DETERMINING THAT THE PUBLIC INTEREST AND NECESSITY OF THE CITY OF SANTA MONICA AND ITS INHABITANTS DEMAND THE ACQUISITION, CONSTRUCTION AND COMPLETION OF A CERTAIN MUNICIPAL IMPROVEMENT, TO-WIT: THE ACQUISITION OF LANDS IN THE CITY OF SANTA MONICA, CALIFORNIA, BEING A PART OF THAT CERTAIN TRACT OF LAND COMMONLY KNOWN AS CLOVER FIELD, FOR PUBLIC PARK PURPOSES AND THE IMPROVEMENT THEREOF BY THE ACQUISITION OR CONSTRUCTION THEREON OF ALL SUCH BUILDINGS, STRUCTURES AND IMPROVEMENTS AS MAY BE NECESSARY OR CONVENIENT FOR THE PURPOSE OF A PUBLIC PARK.

THE CITY COUNCIL OF THE CITY OF SANTA MONICA ORDAINS AS FOLLOWS:

SECTION 1. That the public interest and necessity of the City of Santa Monica and its inhabitants demand the acquisition, construction and completion by said City of a certain municipal improvement, to-wit: the acquisition of lands in the City of Santa Monica, California, being a part of that certain tract of land commonly known as Clover Field, for public park purposes, and the improvement thereof by the acquisition or construction thereon of all such buildings, structures and improvements as may be necessary or convenient for the purpose of a public park.

SECTION 2. That the estimated cost of said municipal improvement is the sum of Eight Hundred Sixty Thousand Dollars ($860,000.00).

SECTION 3. That the cost aforesaid is and will be too great to be paid out of the ordinary annual income and revenue of the municipality, and it is the intention of the Council of the City of Santa Monica to call an election and submit to the qualified voters of said City the proposition to vote bonds of said City and incur an indebtedness in the above amount for said purpose.

SECTION 4. The Commissioner of Public Safety as ex-officio Mayor shall sign, and the Commissioner of Finance, as ex-officio City Clerk shall attest and certify to the adoption of said Ordinance and the Commissioner of Finance as ex-officio City Clerk shall cause the same to be published once in the Santa Monica Evening Outlook, a newspaper of general circulation in the City of Santa Monica, and to be posted in the following places: the bulletin board of the City Hall near the main entrance to the City Hall fronting on Santa Monica Boulevard, in said City, the bulletin board in the United States post office room, in the Santa Monica post office in California, and the bulletin board in the Post Office, being ex-officio Post Office in that part of the City of Santa Monica known as Ocean Park, said Post Office being located on Main Street in said City of Santa Monica.

-1-

I hereby certify that the whole number of members of the City Council of the City of Santa Monica is three, and that the foregoing Ordinance was passed and adopted by a two-thirds vote of said Council at its meeting held on March Third, 1926, by the following vote:

Ayes:  - Morton, Dutton.

Noes:  - Steele.

Absent -

Signed this ____ day of March, 1926.

_____
Commissioner of Public Safety, of
ex-officio Mayor of the City of
Santa Monica.

Attest:

_____
Commissioner of Finance,
ex-officio City Clerk,
ex-officio Clerk of the City
Council of the City of Santa Monica.

Approved as to form: March ____ 1926.

_____
City Attorney.

-2-

Ex A

10/03/2017

Reproduced from the holdings of the National Archives and Records Administration
Pacific Region (Laguna Niguel)



# CITY OF
# SANTA MONICA
## CALIFORNIA

TREASURER
CITY CLERK
LICENSE COLLECTOR
POLICE COURT
MUNICIPAL BUS LINES

**D. C. FREEMAN**
COMMISSIONER OF FINANCE

September 19, 1946

Mr. Arthur W. Manley, Chief
Airports Division
War Assets Administration
Railroad Retirement Building
Washington 25, D. C.

SUBJECT:   Application for disposal to the City of Santa Monica of
Government owned airport facilities located on the Santa
Monica Municipal Airport, Santa Monica, California.

Dear Mr. Manley:

1.   The Santa Monica Municipal Airport, commonly known as Clover Field,
has been under lease to the War Department since Pearl Harbor.  During this
time the War Department, Corps of Engineers, have made improvements and ad-
ditions to the existing City airport facilities consisting primarily of the
construction of a concrete runway, taxiway, two hangars, class room building,
control tower, fencing, service road, and utilities.  At present there is no
military use or other use made of the airport by the War Department.

2.   It is understood that the War Department, which is the owning agency
of the above described airport facilities, has prepared a Form SPB-5 which
was certified to the War Assets Administration on July 29, 1946.

3.   The office of the Chief of Engineers, U.S. Army, through the Los
Angeles sub-office, Real Estate Division, Los Angeles, has issued a right of
entry granting temporary use of hangars designated as buildings T-200 and
T-201 on February 7, 1946 and a supplemental right of entry effective July 15,
1946 permitting the City to use all taxiways, runways, parking areas, govern-
ment owned utility systems such as water, power and telephone lines, as well
as the control tower, building T-13, an unnumbered City owned building and
an unnumbered latrine.  Pursuant to the reference right of entries, the City
of Santa Monica opened the Municipal Airport to the general use of the public
on August 1, 1946.

4.   Upon opening of the airport to the public the City assumed an addi-
tional annual expense for the operation and maintenance of the airport of
approximately $35,000.  The principal sources of revenue to offset these
additional expenses are the sale of gasoline, leasing of City owned airport
land to airport operators who desire to construct their own airport buildings,
percentage of gross business from airport operators, and rental of space for
tie down of aircraft.

Reproduced from the holdings of the National Archives and Records Administration
Pacific Region (Laguna Niguel)

5.  The City is handicapped in the operation and development of the airport because it cannot lease City owned airport land already under lease to the War Department and of course the War Department can not terminate the leases with the City until disposal of the government owned airport property located thereon.  It will be necessary for the City to construct additional airport facilities consisting of texiways, service roads, installation of utilities, and major grading operations before sites are available for lease to airport operators for construction of hangars.  The City has prepared a detailed master plan of these additional airport facilities estimated to cost approximately $663,200.  The work cannot proceed, however, until termination of the leases now held by the War Department.

6.  It is therefore desired that the airport facilities constructed by the War Department on the Santa Monica Municipal Airport land which land is owned in fee by the City be classified by the Administrator for disposal as an airport or as airport facilities, subject to such conditions as the Administrator may desire to impose under the provisions of Surplus Property Administration Regulation 16 and amendments thereto.  It is believed that this action is fully justified because of the fact that the surplus airport property is used and is necessary for and in connection with the operation and maintenance of the Santa Monica Municipal Airport which is now being operated on a revocable right of entry.

7.  For the above reasons and pursuant to the provisions of Surplus Property Administration Regulation 16 and amendments thereto and subject to the conditions that may be imposed thereunder, the City of Santa Monica hereby requests that it be given an opportunity to acquire, without reimbursement, all government owned airport facilities located upon land owned by the City of Santa Monica for the purpose of encouraging and fostering the development of civil aviation.

8.  It is further requested that upon disposal of all government owned property, both aviation facilities and non-aviation facilities, that leases number W-04-193-Eng-4894 and 3460-Eng.-549 be terminated.

9.  The City proposed to negotiate for the purchase of approximately 55 acres of additional land for airport expansion southeasterly of the present airport property owned in fee by the City.  This expansion is a part of the development approved in the detailed master plan.  It is understood that a copy of the reference master plan is an enclosure to the SPB-5 prepared by the War Department.  It is desired to request that termination of the following leases, location of which are shown on SPB-5, Drawing No. 254-4M be held in obeyance until the City has an opportunity to either negotiate for the purchase or the condemnation of the reference 55 acres:

|  |  |
|---|---|
| W-868-Eng-2354 | Portion |
| W-868-Eng-4332 | All |
| W-04-193-Eng-5553 | All |
| W-04-193-Eng-5562 | All |
| W-868-Eng-4828 | Portion |
| W-04-193-Eng-5561 | All |
| W-04-193-Eng-5554 | All |
| W-868-Eng-4332 | All |
| W-04-193-Eng-5552 | All |

Reproduced from the holdings of the National Archives and Records Administration
Pacific Region (Laguna Niguel)

| | |
|---|---|
| W-868-Eng-4815 (road only) | All |
| Permit L.A. 408 (vacated street) | All |
| W-3460-Eng-928 | All  (sewer line R/W) |
| C.E. Form No. 37 - 25 Sept. 1942 | All    "    "    " |
| C.E. Form No. 37 - Oct. 1942 | All    "    "    " |

   10.  The City has no particular interest in the acquisition of the non-aviation facilities such as the T.O. buildings designated by numbers T-4 to T-13 on Drawing No. 254-4M.  However, the City will accept transfer of these buildings, without reimbursement, if such action would expedite the disposal and if permissible under government disposal directives.

                          Very truly yours,

                    CITY COUNCIL OF THE CITY OF SANTA MONICA

               By_____
                     Commissioner of Finance, ex-officio
                     City Clerk of the City of Santa
                     Monica


cc:    Regional Director, 6th Region
       Civil Aeronautics Administration

       Deputy Regional Director
       Office of Real Property Disposal
       War Assets Administration
       215 W. 5th Street
       Los Angeles 13, California

                              -3-

EXHIBIT C
Exhibit R
Page 455

MAR-05-98 THU 05:14 PM    CU CLK-REC ADMIN    FAX NO. 909 486 7110    P. 02/13

Book 28055 Page 211

### INSTRUMENT OF TRANSFER

KNOW ALL MEN BY THESE PRESENTS:                     Deed # 1 CCS

That, the UNITED STATES OF AMERICA, acting by and through the WAR ASSETS ADMINISTRATION under and pursuant to Reorganization Plan One of 1947 (12 F.R. 4534), and the powers and authority contained in the provisions of the Surplus Property Act of 1944, as amended, and applicable rules, regulations, and orders, PARTY OF THE FIRST PART, in consideration of the assumption by the CITY OF SANTA MONICA, a body corporate and politic under the laws of the State of California, PARTY OF THE SECOND PART, of all the obligations and its taking subject to certain reservations, restrictions, and conditions and its covenant to abide by and agreement to certain other reservations, restrictions, and conditions, all as set out hereinafter, has remised, released and forever quitclaimed, and by these presents does remise, release, and forever quitclaim to said City of Santa Monica, its successors and assigns, under and subject to the reservations, restrictions, and conditions, exceptions, and reservation of rights hereinafter set out, all its right, title, interest, and claim in and to the following described real, personal, or mixed property situated in the County of Los Angeles, State of California, to wit:

(1)  Tract #1 - A temporary easement granted by Raymond E. Wright and Lula Nancy Marter Wright, husband and wife to the United States of America, by easement deed dated 21 October 1942, for right-of-way to locate, relocate, construct, reconstruct, maintain, repair, operate, renew, enlarge, remove and replace, increase and/or change the number and/or size of conduits, pipes, pipe lines, accessories and appurtenances for the conveyance and disposal of sewage and/or effluent under, over, along and upon that certain land situated in the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width, situate in the City of Los Angeles, County of Los Angeles, State of California, being under and across a portion of Lot 94, Tract No. 12460, as per map recorded in Book 235, Pages 20 and 21 of Maps, Records of Los Angeles County, lying 5 feet on each side of the following described center line.

Beginning at the intersection of the Southeasterly line of said Lot 94 with the center line of Wasatch Avenue, (60 feet in width), said point being North 32° 34' 40" West, a distance 188.81 feet from the intersection of the center line of Wasatch Avenue and the center line of Woodgreen Street (60 feet in width); thence North 32° 34' 40" West along the Northwesterly prolongation of the center line of Wasatch Avenue a distance of 44.00 feet to a point in the Northwesterly line of said Lot 94, containing 440 square feet, more or less.

(2)  Tract #2 - A temporary easement granted by the Southern California Water Company, a corporation organized and existing under and by virtue of the laws of the State of California, to the United States of America, by easement deed dated 22 October 1942, for right-of-way to locate, relocate, construct, reconstruct, maintain, repair, operate, renew, enlarge, remove and replace, increase and/or change the number and/or size of conduits, pipes, pipe lines, accessories and appurtenances for the conveyance and disposal of sewage and/or effluent under, over, along and upon that certain land situated in the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width, situate in the City of Los Angeles, County of Los Angeles, State of California being under and across a portion of the Subdivision of the Lands of Samuel Cripe in the Rancho La Ballona as per map recorded in Book 1, Page 64,

10/03/2017



Ex C

MAR-05-98 THU 05:15 PM   CO CLK-REC ADMIN          FAX NO. 909 486 7100          P. 03/13

Book 28055 p. 212

Licensed Surveyors Maps, Records of said County lying 5 feet on each side of the following described center line: Beginning at the intersection of the Northwesterly line of Lot 94, Tract No. 12450, as per map recorded in Book 235, Pages 20 and 21 of Maps, Records of Los Angeles County, with the Northwesterly prolongation of the center line of Wasatch Avenue, (50 feet in width) said point being N 32° 34' 40" West, a distance of 182.81 feet from the intersection of the center line of Wasatch Avenue and the center line of Woodgreen Street, (60 feet in width); thence North 32° 34' 40" West along the Northwesterly prolongation of the center line of Wasatch Avenue, a distance of 16 feet to the Northwesterly line of said Subdivision of the Lands of Samuel Cripe in the Rancho La Ballona, containing 160 square feet, more or less.

(3)  Tract #3 - A temporary easement granted by the Bank of America National Trust & Savings Association, a national banking association, owners, and Gore Bros. Inc., a corporation organized and existing under and by virtue of the laws of the State of California, Vendee, under a land purchase contract, to the United States of America, by easement deed dated 21 October 1942, for right-of-way to locate, relocate, construct, reconstruct, maintain, repair, operate, renew, enlarge, remove and replace, increase and/or change the number and/or size of conduits, pipes, pipe lines, accessories and appurtenances for the conveyance and disposal of sewage and/or effluent under, over, along and upon that certain land situated in the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width situate in the City of Los Angeles, County of Los Angeles, State of California, being under and across a portion of the 10.70 Acres of Fractional Jose De La Luz Machado 61.97334 Acres in the Rancho La Ballona, (District Court Case Number 2722) as per map recorded in Book 3, Pages 204 to 209 inclusive, Miscellaneous Records of Los Angeles County, lying 5 feet on each side of the following described center line: Beginning at the intersection of the Southeasterly line of said Fractional Jose De Luz Machado 61.97334 Acres with the Northwesterly prolongation of the center line of Wasatch Avenue (Wasatch Avenue shown on Tract No. 12450, as per map recorded in Book 235, Pages 21 and 20 of Maps, Records of said County) said point being North 32° 34' 40" West along the Northwesterly prolongation of the center line of Wasatch Avenue, a distance of 198.81 feet from the intersection of the center line of Wasatch Avenue (50 feet in width) and the center line of Woodgreen Street (60 feet in width); thence North 32° 34' 40" West 11.19 feet; thence North 65° 08' 43" West 442.15 feet to a point in the Northwesterly line of said Fractional Jose De Luz Machado 61.97334 Acres, containing 4533 square feet, more or less.

(4)  Tract #4 - A temporary easement granted by Gore Bros. Inc., a corporation organized and existing under and by virtue of the laws of the State of California, to the United States of America, by easement deed dated 20 October 1942, for right-of-way to locate, relocate, construct, reconstruct, maintain, repair, operate, renew, enlarge, remove and replace, increase and/or change the number and/or size of conduits, pipes, pipe lines, accessories and appurtenances for the conveyance and disposal of sewage and/or effluent under, over, along and upon that certain land situated in the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width, situate in the City of Los Angeles, County of Los Angeles, State of California, being under and across a portion of Fractional Jose De La Luz Machado 61.97334 Acres in the Rancho La Ballona (District Court Case No. 2722) as per map recorded in Book 3, Pages 204 to 209 inclusive, Miscellaneous Records of Los Angeles County, lying 5 feet on each side of the following described center line: Commencing at the intersection of

10/03/2017

-2-

MRK-05-98 THU 05:17 PM   CO CLK-REC ADMIN        FAX NO. 909 466 7110          P. 04/13

Book 28055 Page 213

the center line of Wasatch Avenue (50 feet in width) and Woodgreen Street (60 feet in width), shown on Tract No. 12460, as per map recorded in Book 235, Pages 20 and 21 of Maps, Records of Los Angeles County; thence North 32° 36' 40" West along the center line and prolongation of the center line of said Wasatch Avenue, a distance of 210.00 feet; thence North 65° 08' 43" West 442.16 feet to the TRUE POINT OF BEGINNING.  Thence North 65° 08' 43" West 425.10 feet; thence North 33° 33' 55" West 25.59 feet to the point of termination in the Southeasterly line of Woodbine Avenue (27 feet wide) shown on Tract No. 12367 as per map recorded in Book 249, Page 13 of Maps, Records of Los Angeles County; said point of termination being North 57° 11' 50" East 25.50 feet from the most Southerly corner of said Tract No. 12367.

(5)  Tract #6 - A temporary right-of-way for construction, operation, maintenance, renewal, and removal of a sewer line along, across, beneath and over the following described property, to wit:

The Southwesterly ten (10) feet of Lot 62 of Tract 12367, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 249, Pages 12 and 13 of Maps, records in the Office of the County Recorder of said County and State, granted by a lease entered into by and between the Bank of America National Trust and Savings Association, a National Banking Association, and the United States of America, on 1 September 1942, as modified by Supplemental Agreements: #1, dated 10 January 1944, #2, dated 31 July 1944, #3, dated 4 August 1946, and #4, dated 30 December 1946, which was duly transferred and assigned to the Capital Company, a California Corporation, on 7 September, 1945.

(6)  That certain sewer pipe line constructed pursuant to and all rights acquired by, that certain Resolution of 9 October 1942, in the Minutes of the Board of Public Works, City of Los Angeles, Page 205, Book No. 325, granting permission to the Federal Government to install a sanitary sewer in Stewart Avenue between Rose Avenue and Woodbine Streets.

(7)  Those certain chattels enumerated in Schedule "A" attached hereto and made a part hereof as though fully set forth hereat.

EXCEPTING, HOWEVER, from this conveyance all right, title, and interest in and to all property in the nature of equipment, furnishing, and other personal property located on the land leased from the City of Santa Monica as hereinafter set out, which can be removed from the land with out material injury to the land or structures located thereon, other than those chattels enumerated in Schedule "A" attached hereto and made a part hereof as though fully set forth hereat, and reserving to the PARTY OF THE FIRST PART for itself and its lessees, licensees, permitees, agents, and assigns the right to use the property excepted hereby in such a manner as will not materially and adversely affect the development, improvement, operation or maintenance of the airport and the right of removal from said premises of such property, all within a reasonable period of time after the date hereof, which shall not be construed to mean any period more than one (1) year after the date of this instrument, together with a right of ingress to and egress from said premises for such purposes.

Further, the PARTY OF THE FIRST PART, for the consideration hereinabove expressed, does hereby surrender, subject to the terms and conditions of this instrument, to the PARTY OF THE SECOND PART, the former's leasehold interest in and to the premises known as "Clover Field, Santa Monica Municipal Airport", set forth and described in Lease No. W-04-193-Eng-4894, dated 8 December, 1941, as

10/03/2017

-3-

MAR-05-98 THU 05:18 PM   CO CLK-REC ADMIN           FAX NO. 909 486 7710              P. 05/13

Book _____ 214

modified by Supplemental Agreements: #1, dated July 23, 1945, and #2, dated July 15, 1946; and in Lease No. W-3460-Eng-549, dated December 1, 1941, as modified by Supplemental Agreements: #1, dated December 20, 1944, and #2, dated July 15, 1946, both from the City of Santa Monica to the United States of America, and including 168.87 acres, more or less of land situated in the County of Los Angeles, State of California.

THE PARTY OF THE SECOND PART does hereby release the PARTY OF THE FIRST PART from any and all claims which exist or may arise under the provisions of the aforesaid lease, except claims which may be submitted under Section 17 of the Federal Airport Act.

Said property transferred hereby was duly declared surplus and was assigned to the War Assets Administration for disposal, acting pursuant to the provisions of the above-mentioned Act, as amended, Reorganization Plan One of 1947 and applicable rules, regulations and orders.

THAT THE PARTY OF THE FIRST PART has released and quit-claimed, and by this instrument does release and quitclaim to the PARTY OF THE SECOND PART all of the structures and improvements on the leased land, including underground and overhead utility systems, which were added thereto by PARTY OF THE FIRST PART.

That by the acceptance of this instrument or any rights hereunder, the said PARTY OF THE SECOND PART, for itself, its successors, and assigns, agrees that the aforesaid surrender of leasehold interest, transfer of structures, improvements and chattels, and assignment, shall be subject to the following restrictions, set forth in subparagraphs (1) and (2) of this paragraph, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Surplus Property Act of 1944, as amended, Reorganization Plan One of 1947 and applicable rules, regulations and orders:

(1)  That, except as provided in subparagraph (6) of the next succeeding unnumbered paragraph, the land, buildings, structures, improvements and equipment in which this instrument transfers any interest shall be used for public airport purposes for the use and benefit of the public, on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right for use of the airport within the meaning of the terms "exclusive right" as used in subparagraph (4) of the next succeeding paragraph. As used in this instrument, the term "airport" shall be deemed to include at least all such land, buildings, structures, improvements and equipment.

(2)  That, except as provided in subparagraph (6) of the next succeeding paragraph, the entire landing area, as defined in WAA Regulation 16, dated June 26, 1946, and all structures, improvements, facilities and equipment in which this instrument transfers any interest shall be maintained for the use and benefit of the public at all times in good and serviceable condition, provided, however, that such maintenance shall be required as to structures, improvements, facilities and equipment only during the remainder of their estimated life, as determined by the Civil Aeronautics Administrator or his successor. In the event materials are required to rehabilitate or repair certain of the aforementioned structures, improvements, facilities or equipment, they may be procured by demolition of other structures, improvements, facilities or equipment transferred hereby and located on the above described premises which have outlived their use as airport property in the opinion of the Civil Aeronautics Administrator or his successor.

-4-

MAR-05-98 THU 05:19 PM    CO CLK-REC ADMIN            FAX NO. 909 486 7110              P. 06/13

Book 28055 Page 215

That by the acceptance of this instrument, or any rights hereunder, the PARTY OF THE SECOND PART, for itself, its successors and assigns, also assumes the obligations of, covenants to abide by and agrees to, and this surrender, transfer, and assignment is made subject to, the following reservations and restrictions set forth in subparagraphs (1) to (7) of this paragraph, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Surplus Property Act of 1944, as amended, Reorganization Plan One of 1947 and applicable rules, regulations and orders.

(1)    That insofar as it is within its powers, the PARTY OF THE SECOND PART shall adequately clear and protect the aerial approaches to the airport by removing, lowering, relocating, marking or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

(2)    That the United States of America (hereinafter sometimes referred to as the "Government") through any of its employees or agents shall at all times have the right to make nonexclusive use of the landing area of the airport at which any of the property transferred by this instrument is located or used, without charge: Provided, however, that such use may be limited as may be determined at any time by the Civil Aeronautics Administrator or his successor to be necessary to prevent undue interference with use by other authorized aircraft: Provided, further, that the Government shall be obligated to pay for damages caused by such use, or if its use of the landing area is substantial, to contribute a reasonable share of the cost of maintaining and operating the landing area, commensurate with the use made by it.

(3)    That during any national emergency declared by the President of the United States of America or the Congress thereof, the Government shall have the right to make exclusive or nonexclusive use and have exclusive or nonexclusive control and possession, without charge, of the airport at which any of the property transferred by this instrument is located or used, or of such portion thereof as it may desire, provided, however, that the Government shall be responsible for the entire cost of maintaining such part of the airport as it may use exclusively, or over which it may have exclusive possession or control, during the period of such use, possession, or control, and shall be obligated to contribute a reasonable share, commensurate with the use made by it, of the cost of maintenance of such property as it may use nonexclusively or over which it may have nonexclusive control and possession; Provided, further, that the Government shall pay a fair rental for its use, control, or possession, exclusively or nonexclusively of any improvements to the airport made without United States aid.

(4)    That no exclusive right for the use of the airport at which the property transferred by this instrument is located shall be vested (directly or indirectly) in any person or persons to the exclusion of others in the same class, the term "exclusive right" being defined to mean

(1)    any exclusive right to use the airport for conducting any particular aeronautical activity requiring operation of aircraft;

(2)    any exclusive right to engage in the sale or supplying of aircraft, aircraft accessories, equipment, or supplies (excluding the sale of gasoline and oil), or aircraft services necessary for the operation of aircraft (including the maintenance and repair of aircraft, aircraft engines, propellers, and appliances).

-5-

MAR-05-98 THU 05:20 PM  CO CLK-REC ADMIN          FAX NO. 909 480 7710          P. 01/13

Book ___29055___ Page _216_

(5)      That, except as provided in subparagraph (6) of this para-
graph, the property transferred hereby may be successively transferred
only with the proviso that any such subsequent transferee assumes all
the obligations imposed upon the PARTY OF THE SECOND PART by the pro-
visions of this instrument.

(6)      That no property transferred by this instrument shall be
used, leased, sold, salvaged, or disposed of by the PARTY OF THE
SECOND PART for other than airport purposes without the written con-
sent of the Civil Aeronautics Administrator, which shall be granted
only if said Administrator determines that the property can be used,
leased, sold, salvaged or disposed of for other than airport purposes
without materially and adversely affecting the development, improve-
ment, operation or maintenance of the airport at which such property
is located; Provided, that no structures disposed of hereunder shall
be used as an industrial plant, factory, or similar facility within
the meaning of Section 25 of the Surplus Property Act of 1944, as
amended, unless the PARTY OF THE SECOND PART shall pay to the United
States such sum as the War Assets Administrator or his successor in
function shall determine to be a fair consideration for the removal
of the restriction imposed by this proviso.

(7)      The PARTY OF THE SECOND PART does hereby release the
Government, and will take whatever action may be required by the
War Assets Administrator to assure the complete release of the
Government from any and all liability the Government may be under
for restoration or other damages under any lease or other agreement
covering the use by the Government of the airport, or part thereof,
owned, controlled or operated by the PARTY OF THE SECOND PART, upon
which, adjacent to which, or in connection with which, any property
transferred by this instrument was located or used; Provided, that
no such release shall be construed as depriving the PARTY OF THE
SECOND PART of any right it may otherwise have to receive reimburse-
ment under Section 17 of the Federal Airport Act for the necessary
rehabilitation or repair of public airports heretofore or hereafter
substantially damaged by any Federal agency.

By acceptance of this instrument, or any right hereunder,
the PARTY OF THE SECOND PART further agrees with the PARTY OF THE
FIRST PART as follows:

(1)      That in the event that any of the aforesaid terms,
conditions, reservations or restrictions is not met, observed, or
complied with by the PARTY OF THE SECOND PART or any subsequent
transferee, whether caused by the legal inability of said PARTY OF
THE SECOND PART or subsequent transferee to perform any of the
obligations herein set out, or otherwise, the title, right of pos-
session and all other rights transferred by this instrument to the
PARTY OF THE SECOND PART, or any portion thereof, shall at the
option of the PARTY OF THE FIRST PART revert to the PARTY OF THE
FIRST PART sixty (60) days following the date upon which demand to
this effect is made in writing by the Civil Aeronautics Adminis-
trator or his successor in function, unless within said sixty (60)
days such default or violation shall have been cured and all such
terms, conditions, reservations and restrictions shall have been
met, observed or complied with, in which event said reversion shall
not occur and title, right of possession, and all other rights
transferred hereby, except such, if any, as shall have previously
reverted, shall remain vested in the PARTY OF THE SECOND PART, its
transferees, successors and assigns.

(2)      That if the construction as covenants of any of the
foregoing reservations and restrictions recited herein as covenants
or the application of the same as covenants in any particular in-
stance is held invalid, the particular reservations or restrictions
in question shall be construed instead merely as conditions upon

-6-

MAR-05-98 THU 05:21 PM   CO CLK-REC ADMIN        FAX NO. 303 480 1110        P. 08/13

Book 28055 Page 217

the breach of which the Government may exercise its option to cause the title, right of possession and all other rights transferred to the PARTY OF THE SECOND PART, or any portion thereof, to revert to it, and the application of such reservations or restrictions as covenants in any other instance and the construction of the remainder of such reservations and restrictions as covenants shall not be affected thereby.

TO HAVE AND TO HOLD the property transferred hereby, under and subject to the aforesaid reservations, restrictions and conditions, unto the said PARTY OF THE SECOND PART, its successors and assigns forever.

IN WITNESS WHEREOF, the UNITED STATES OF AMERICA, acting by and through the War Assets Administration, has caused these presents to be executed in its name and on its behalf by W.A. Rover, District Director, War Assets Administration, and the CITY OF SANTA MONICA, acting by and through its City Council, has caused these presents to be executed in its name and on its behalf by ___R. M. DORTON, City Manager and attested by ___K. O. GRUBB___, its City Clerk, and its seal to be hereunto affixed, all as of the ___10th___ day of ___August___, 1948.

UNITED STATES OF AMERICA
Acting by and through
WAR ASSETS ADMINISTRATION

By _____
District Director
Los Angeles District Office

WITNESSES:

_Evelyn St. John_
_Martha E. Livingston_

WITNESSES:

_N. B. Kimberling_
_Ada N. Manthus_

ATTEST:

_K. O. Grubb_
City Clerk

CITY OF SANTA MONICA
STATE OF CALIFORNIA

By _____
CITY MANAGER

-7-

ORIGINAL

10/03/2017

MAR-05-98 THU 05:22 PM   CO CLK-REC ADMIN          FAX NO. 909 486 7770          P. 09/13

Book 28055 Page 218

### SCHEDULE "A"

| SWPA NO.P-L | ITEM | UNITS | QUANTITY |
|---|---|---|---|
| 2661568-1-1 | Ice Chest | ea. | 4 |
| "       1-2 | "     " | ea. | 1 |
| "       1-3 | Ice Box | ea. | 1 |
| 2661566-1-1 | Steel Drums | ea. | 2 |
| "       1-2 | "     " | ea. | 2 |
| "       1-3 | "     " | ea. | 1 |
| "       1-4 | "     " | ea. | 1 |
| "       1-5 | "     " | ea. | 5 |
| "       1-6 | "     " | ea. | 7 |
| "       1-7 | "     " | ea. | 3 |
| "       1-8 | "     " | ea. | 1 |
| 2661567-1-1 | Fire Extinguisher | ea. | 4 |
| "       1-2 | "     " | ea. | 10 |
| "       1-3 | "     " | ea. | 4 |
| "       1-4 | "     " | ea. | 12 |
| 2661569-1-1 | Wire Camouflage | ea. | 10 |
| 2661570-1-1 | Hose Fibre Fire w/nozzle | ea. | 2 |
| "       1-2 | "     "     " | ea. | 4 |
| "       1-3 | "     "     " | ea. | 2 |
| 2661566-1-1 | Oak Barrel | ea. | 1 |
| 2661571-1-1 | Ping Pong Table | ea. | 1 |
| 8009-5711 | | | |
| WAA-21  #6 | Truck fire, pumper | | |
| 2667337-3-4 | | | |
| WAA-21  #6 | Tractor, International, Mod.TDR 18 Bulldozer | | |
| 2667337-4-4 | | | |
| WAA-21  #3 | Tractor, Pordson | | |
| 2667342-3-3 | | | |
| WAA-21  #4 | Grader, Motorized, J.D. Adams Mod. 201 | | |
| 2667342-2-1 | | | |
| WAA-21 #10 | Crane, Tractor, Hughes-Keenan, Model MC2R | | |
| 8009-11123-1-1 | | | |
| RP-1 | Truck, Fire & Rescue, International | | |

10/03/2017

MAR-05-98 THU 05:23 PM    CO CLK-REC ADMIN    FAX NO. 909 486 7110    P. 10/13

Book _28055_ Page _219_

STATE OF CALIFORNIA        )
                          ) SS
COUNTY OF LOS ANGELES      )

On this _19th_ day of _August_, 1948, before me _Helen P Peralta_, a Notary Public in and for the County of Los Angeles, State of California, personally appeared Walter A. Rover, known to me to be the District Director, Los Angeles District Office, War Assets Administration, and known to me to be the person who executed the within instrument on behalf of the War Assets Administration which executed said instrument on behalf of the United States of America and acknowledged to me that he subscribed to the said instrument the name of the United States of America and the name of the War Assets Administration on behalf of the United States of America, and further that the United States of America executed said instrument.

WITNESS my hand and official seal.

_Helen P Peralta_
Notary Public in and for said
County and State

My Commission expires
My Commission Expires Apr. 23, 1943

_deed #4_

MAR-05-98 THU 05:23 PM    CO CLK-REC ADMIN              FAX NO. 909 486 7710              P. 11/13

Book 28055 Page 220

WAA Form 1241
(4-12-48)

UNITED STATES OF AMERICA
War Assets Administration

C E R T I F I C A T E

I, the undersigned ___L. S. WRIGHT, Secretary___

___The General Board___, War Assets Administration, in my

official capacity as such ___Secretary___

and duly authorized in the DELEGATION OF AUTHORITY INCIDENT TO THE CARE,

HANDLING AND CONVEYANCING dated ___Apr. 9, 1948___, to make the following

certification, do hereby certify:

1. That ___Walter A. Rover___ is the

___District Director, Los Angeles District Office___

War Assets Administration, duly appointed, authorized and acting in such

capacity at the time of the execution of the attached instrument.

2. That the attached DELEGATION OF AUTHORITY INCIDENT TO THE

CARE, HANDLING AND CONVEYANCING is a true and correct copy of the original

of said DELEGATION OF AUTHORITY, dated ___Apr. 9, 1948___

Given under my hand this ___10th___ day of ___August___, 1948.

___(signature)___
Secretary
(Title)
The General Board
(Office)
War Assets Administration

*deed "4*

MAR-05-98 THU 05:24 PM    CO CLK-REC ADMIN         FAX NO. 909 486 7110            P. 12/13

Book 28055 Page 221

(NOTICE)

DELEGATION OF AUTHORITY NO. 145

DELEGATION OF AUTHORITY INCIDENT TO THE CARE, HANDLING, AND CONVEYANCING OF
SURPLUS REAL PROPERTY AND PERSONAL PROPERTY ASSIGNED FOR DISPOSAL THEREWITH

The Deputy Administrator, Office of Real Property Disposal, and each Associate Deputy Administrator, Office of Real Property Disposal, War Assets Administration; the Regional Director, the Deputy Regional Director for Real Property Disposal, the Associate Deputy Regional Director for Real Property Disposal, and the Assistant Deputy Regional Director for Real Property Disposal, in each and every War Assets Administration Regional Office; the District Director and Deputy District Director for Real Property Disposal, in each and every War Assets Administration District Office, and any person or persons designated to act, and acting, in any of the foregoing capacities, are hereby authorized, individually (1) to execute, acknowledge and deliver any deed, lease, permit, contract, receipt, bill of sale, or other instruments in writing in connection with the care, handling and disposal of surplus real property, or personal property assigned for disposition with real property, located within the United States, its territories and possessions, (2) to accept any notes, bonds, mortgages, deeds of trust or other security instruments taken as consideration in whole or in part for the disposition of such surplus real or personal property, and to do all acts necessary or proper to release and discharge any such instrument or any lien created by such instrument or otherwise created, and (3) to do or perform any other act necessary to effect the transfer of title to any such surplus real or personal property located as above provided; all pursuant to the provisions of the Surplus Property Act of 1944, as amended, (58 Stat. 765; 50 U.S.C. App. Supp. 1611); Public Law 181, 79th Cong. (59 Stat. 533; 50 U.S.C. App. Supp. 1614a, 1614b); Reorganization Plan 1 of 1947 (12 F.R.4534); Public Law 239, 80th Cong. (61 Stat. 678); and War Assets Administration Regulation No. 1 (12 F. R. 6661), as amended.

The Regional Director in each and every War Assets Administration Regional Office is hereby authorized to redelegate to such person or persons as he may designate the authority delegated to him by this instrument.

L. S. Wright, the Secretary of The General Board and Robert Whittet, Associate Deputy Administrator, Office of Real Property Disposal, War Assets Administration, are hereby authorized, individually, to certify true copies of this Delegation and provide such further certification as may be necessary to effectuate the intent of this Delegation in form for recording in any jurisdiction, as may be required.

This Delegation shall be effective as of the opening of business on April 9         , 1948.

This authority is in addition to delegations of authority previously granted under dates of May 17, 1946; May 29, 1946; July 30, 1946; September 16, 1946; October 31, 1946; November 22, 1946; January 13, 1947; June 6, 1947; and December 1, 1947; but shall not in any manner supersede provisions of said delegations as do not conflict with the provisions of this Delegation.

JESS LARSON
Administrator

Dated:    APR 9        , 1948.

MAR-05-98 THU 05:25 PM  CO CLK-REC ADMIN        FAX NO. 909 486 7110          P. 13/13

Book 28055 Page 222   RESOLUTION NO. 183

(CITY COUNCIL SERIES)

A RESOLUTION OF THE CITY COUNCIL OF THE
CITY OF SANTA MONICA ACCEPTING AN INSTRU-
MENT OF TRANSFER FROM THE UNITED STATES
OF AMERICA.

THE CITY COUNCIL OF THE CITY OF SANTA MONICA DOES RESOLVE AS
FOLLOWS:

SECTION 1.  That that certain instrument of transfer from
the United States of America, acting by and through the War Assets
Administration, whereby said United States of America does surrender
to the City of Santa Monica the former's lease-hold interest in
and to the premises known as Cloverfield Santa Monica Municipal Air-
port and certain easements and temporary rights of way appurtenant
thereto, be and the same hereby is accepted.

SECTION 2.  That the City Manager hereby is authorized
to execute said instrument of transfer on behalf of the city and
the City Clerk shall attest his signature thereto.

SECTION 3.  That the City Clerk shall certify to the adop-
tion of this resolution and thenceforth and thereafter the same
shall be in full force and effect.

ADOPTED and APPROVED this 10th day of __August__, 1948.

ATTEST:

_____          _____
City Clerk                                          Mayor pro tem

I hereby certify that the foregoing resolution was duly
adopted by the City Council of the City of Santa Monica at a
regular meeting thereof held on the 10th day of August,
1948, by the following vote of the Council:

            AYES:     Councilmen: Barnard, Quercio, Markworth, Neilson,
                                        Talmage, Schimmer
            NOES:     Councilmen: None
            ABSENT:   Councilmen: Gates

                                        _____
                                        City Clerk

Approved as to form this
10 day of August, 1948.

ROYAL M. SORENSEN
Royal M. Sorensen, City Attorney

10/03/2017

deed #4

10:03/2017

**EXHIBIT D**



# City of Santa Monica

## City Council Meeting

## AGENDA

**TED WINTERER**
MAYOR

**SUE HIMMELRICH**
COUNCILMEMBER

**GLEAM DAVIS**
MAYOR PRO TEM

**TONY VAZQUEZ**
COUNCILMEMBER

**TERRY O'DAY**
COUNCILMEMBER

**KEVIN MCKEOWN**
COUNCILMEMBER

**PAM O'CONNOR**
COUNCILMEMBER

**RICK COLE**
CITY MANAGER

**JOSEPH LAWRENCE**
INTERIM CITY ATTORNEY

**DENISE ANDERSON-WARREN**
CITY CLERK

### STANDARDS OF BEHAVIOR THAT PROMOTE CIVILITY AT ALL PUBLIC MEETINGS:

- Treat everyone courteously;
- Listen to others respectfully
- Exercise self-control

- Give open-minded consideration to all viewpoints;
- Focus on the issues and avoid personalizing debate;
- Embrace respectful disagreement and dissent as democratic rights, inherent components of an inclusive public process, and tools for forging sound decisions

Meetings are broadcast live on CityTV cable channel 16, Radio Station KCRW FM 89.9 (after 8:00 PM), and on the internet at www.smgov.net and www.kcrw.org. Cable television re-broadcasts air on Thursday and Saturday at 11:30 AM. The agenda will air on CityTV on Saturday and Sunday at 11:00 AM and 6:00 PM, and on Monday and Tuesday at 12:30 PM and 6:00 PM.

### STANDING IN AISLES OR AGAINST THE WALL IS NOT PERMITTED

Ex 0

 



### RULES OF ORDER FOR THE CONDUCT OF CITY COUNCIL MEETINGS
(Resolution No.10928 (CCS))

Persons wishing to address the City Council regarding items on the agenda must be present and submit their name and address (optional) in writing to the City Clerk **before the public hearing is opened for that item.** Request-to-Speak forms are available prior to the meeting and throughout the meeting. Remarks from the public are limited to a total of 6 minutes per Council meeting, with a maximum of 2 minutes and a minimum of one minute per item. Except for the author of the request, public comment on 12-items are limited to 1 minute. Except on Public Input, speakers may donate 2 minutes to another person who may speak for a total of 4 minutes on that item. Both the donor of time and the designated speaker must submit their cards in person together.

**ORDER OF BUSINESS** (may not be changed except by majority vote of the City Council.)

1. Closed Session.
2. Special Agenda Items (City Manager's Report Commendations, Presentations, etc.).
3. Consent Calendar (All items considered in one motion unless removed by a Councilmember for discussion. Public comment shall be heard prior to council discussion).
4. Study Session.
5. Continued Items.
6. Administrative Proceedings.
7. Ordinances:
   • 1st Reading
   • 2nd Reading

8. Staff Administrative Item.
9. Public Hearings.
10. Reports of Boards and Commissions.
11. Resolutions.
12. Written Communications (other than Reports of Commission and Officers).
13. Councilmember Discussion Items.
14. Public Input (members of the public may address the City Council **only** on items not on the agenda, but within the subject matter jurisdiction of the City)

**Agendas and reports are accessible on the City's webpage at www.smgov.net/council/agendas. They are also available at the City Clerk's Office and in alternate formats upon request. For a free subscription to the City Council Agendas, please contact the City Clerk's Office at (310) 458-8211 or clerk@smgov.net.**

**Addressing the City Council:** State your name, address (optional), and neighborhood for the record; address the City Council as a whole, not as individuals. After the public hearing closes, no member of the public shall address the City Council on the matter under consideration without first securing Council approval. Please be courteous.

**Members of the audience:** Please refrain from clapping, whistling, or acts of disorderly conduct; do not distribute literature without prior authorization of the presiding officer; remain seated unless addressing the City Council; do not stand or sit in aisles; do not enter the well area of the dais or go behind rails unless authorized by the presiding officer.

Members of the public unable to attend a meeting but wishing to comment on an item(s) listed on the agenda may submit written comments prior to the meeting by mailing them to: City Clerk, 1685 Main Street, Santa Monica, CA 90401 or to councilmtgitems@smgov.net.

**MATERIALS RECEIVED FROM THE PUBLIC BY 4:30 PM THE EVENING OF THE COUNCIL MEETING WILL BE DISTRIBUTED TO COUNCIL PRIOR TO THE MEETING AND POSTED ONLINE.**

**City Hall and the Council Chamber are wheelchair accessible. If you require any special disability related accommodations (i.e. sign language interpreting, access to an amplified sound system, etc.), please contact the City Clerk's Office at (310) 458-8211 or TDD: (310) 917-6626 at least 3 days prior to the scheduled meeting.**

**Si desea comunicarse con alguien en español, llame a nuestra oficina al (310) 458-8211 y pida hablar con Esterlina Lugo.**

**Santa Monica Blue Bus Lines #2, #3, #4, #9 and the EXPO Line serve City Hall. Parking is available on Main Street, on Olympic Drive, and in the Civic Center Parking Structure (validation free).**

**SMOKING IS PROHIBITED IN CITY HALL (SMMC 4.44.030)**

---

10/03/2017



City of
**Santa Monica**®

**AGENDAS**

CITY OF SANTA MONICA

SPECIAL MEETING

CIVIC CENTER EAST WING

1855 MAIN STREET, EAST WING

SATURDAY JANUARY 28, 2017

**MEETING BEGINS AT 9:00 AM**

CALL TO ORDER
PLEDGE OF ALLEGIANCE
ROLL CALL

(This is a special City Council meeting.  Public comment is restricted to only items listed on the agenda.)

1.     CLOSED SESSIONS

1.A.    **Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): Federal Aviation Administration v. City of Santa Monica, Notice of Investigation, Part 16 FAA Docket No. 16-16-13**

1.B.    **Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. Atlantic Aviation, Los Angeles Superior Court Case Number SC 126 653**

1.C.    **Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. American Flyers, Los Angeles Superior Court Case Number 16RO5422**

1.D.    **Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. United States of America, U. S. District Court Case Number CV 13-08046**

1.E.    **Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. Federal Aviation Administration, United States Court of Appeals for Ninth Circuit Case Number 16-72827**

**Exhibit R**
**Page 471**

 

**1.F.    Conference with Legal Counsel – Anticipated Litigation – Anticipant significant exposure to litigation pursuant to Government Code Section 54956.9(d)(2):  1 case**

   (Please note that Agenda Items may be reordered during the Council meeting at the discretion of the City Council.)

2.    SPECIAL AGENDA ITEMS

   **No items**

3.    CONSENT CALENDAR
(All items will be considered and approved in one motion unless removed by a Councilmember for discussion.)

   **No items**

4.    STUDY SESSION

**4.A.    Use of a Framework for Performance Management and Data-Driven Decision Making**

   **Recommended Action**
   Staff recommends that the City Council review and comment on developing an organizational framework based on the dimensions of Civic Wellbeing and the Sustainable City Plan and direct staff to proceed with building a comprehensive performance management system based on the framework.

ADJOURNMENT

Any documents produced by the City and distributed to a majority of the City Council regarding any item on this agenda will be made available at the City Clerk's Counter located at City Hall, 1685 Main Street, Santa Monica during normal business hours. Documents are also available at www.smgov.net/council/agendas.

For a *free* subscription to City Council Agendas contact the City Clerk's Office at (310) 458-8211 or clerk@smgov.net.  This agenda is available in alternate format upon request.

Members of the public unable to attend a meeting but wishing to comment on an item(s) listed on the agenda may submit written comments prior to the meeting by mailing them to: City Clerk, 1685 Main Street, Santa Monica, CA 90401 or councilmtgitems@smgov.net. Materials received from the public by 4:30 PM the evening of the Council meeting will be distributed to Council prior to the meeting **and posted online**.

Si desea comunicarse con alguien en español, llame a nuestra oficina al (310) 458-8211 y pida hablar con Esterlina Lugo.

*City Hall and the Council Chamber are wheelchair accessible.  If you require any special disability related accommodations (i.e. sign language interpreting, access to an amplified*





*sound system, etc.), please contact the City Clerk's Office at (310) 458-8211 or TDD: (310)
917-6626 at least 3 days prior to the scheduled meeting.*

Santa Monica Blue Bus Lines #2, #3, #4 and #9 serve City Hall.  Parking is available on
Main Street, on Olympic Drive, and in the Civic Center Parking Structure (validation free).

---

*City of Santa Monica*                    *Generated: 1/25/2017 5:22 PM*                    *Page 5*

10/03/2017

**EXHIBIT E**

(NOT APPROVED)

**CITY OF SANTA MONICA**

**CITY COUNCIL MINUTES**

**JANUARY 28, 2017**

A special meeting of the Santa Monica City Council was called to order by Mayor Winterer at 9:11 a.m., on Saturday, January 28, 2017, at City Council Chambers, 1685 Main Street.

| Roll Call: | Present: | Mayor Ted Winterer |
| | | Mayor Pro Tem Gleam Davis |
| | | Councilmember Sue Himmelrich |
| | | Councilmember Kevin McKeown |
| | | Councilmember Pam O'Connor |
| | | Councilmember Terry O'Day |
| | | Councilmember Tony Vazquez |
| | Also Present: | City Manager Rick Cole |
| | | Interim City Attorney Joseph Lawrence |
| | | City Clerk Denise Anderson-Warren |

**CONVENE/PLEDGE**
On order of the Mayor, the City Council convened at 9:11 a.m., with all members present. Councilmember Vazquez led the assemblage in the Pledge of Allegiance.

**CLOSED SESSIONS**
Members of the public Alan Levenson, Jonathan Stein (time donated by Bruria Finkel), and Zina Josephs commented on public comment on closed sessions.

On order of the Mayor, the City Council recessed at 9:20 a.m., to consider closed sessions and returned at 9:56 a.m., with all members present, to report the following:

**1.A.** Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): Federal Aviation Administration v. City of Santa Monica, Notice of Investigation, Part 16 FAA Docket No. 16-16-13

The Interim City Attorney reported that the City is entering into a Consent Decree Agreement with the United States of America and the Federal Aviation Administration which completely resolves all of the outstanding disputes in the cases related to Items 1-A, 1-D, and 1-E.

The Consent Decree Agreement Terms include:

1                                                    January 28, 2017

10/03/2017

EX E

- Ends lawsuits and other legal proceedings between the City and United States/FAA;
- Airport Property released from all restrictions of the Instrument of Transfer and Quitclaim Deed;
- Airport Closes December 31, 2018; and,
- Runway shortened to 3500 feet, eliminating air charter operations and substantially reducing jet traffic.

The Consent Decree agreement key terms are as followings:

The City, United States of America and Federal Aviation Administration agree to consent decree: resolves all outstanding disputes and claims between the FAA, United States and the City of Santa Monica; the Santa Monica Airport will close no later than December 31, 2028; in the interim the operational length of the runway will be reduced to 3500 feet, it is anticipated that the reduction in runway length, will cause over 40% of current jet operation unable to use Santa Monica Airport, it will eliminate all possibility of charter operations operating out of Santa Monica Airport; removes all restrictions on the airport property that are currently subject lawsuits, which means Airport Property released from all restrictions of the Instrument of Transfer and Quitclaim Deed; FAA agrees that the City of Santa Monica can operate a fixed based operations, if the city elects to; Prior to the closure, the land that is no longer needed for a runway is released for airport purposes and could be used as the City so desires, subject to aviation easement; the FAA will work with the City, if the city request to become a demonstration project for unleaded fuel; The parties further agree not to undermine directly or indirectly this agreement or any terms for so long as the agreement or any resulting Consent Decree remains in effect.

It is recommended by the Interim City Attorney and outside counsel that the City Council approve this Consent Decree No. 10439 (CCS).

Questions were asked and answered about the effect that this agreement would have on jet fuel sales; with the shortening of the runway to 3500 feet is there a possibility to direct traffic to start looking for cut-throughs for traffic; does this agreement require that the airport be closed; and, how soon can it be anticipated that the airport runway will be shortened.

<u>Motion by Councilmember O'Day, seconded by Mayor Pro Tem Davis</u>, to approve and agree to the Consent Decree Agreement. The motion was approved by the following vote:

AYES:     Councilmembers O'Day, O'Connor, Mayor Pro Tem Davis, Mayor Winterer
NOES:     Councilmembers McKeown, Vazquez, Himmelrich
ABSENT:   None

2                                                   January 28, 2017

Councilmember McKeown stated his no vote for the record because "Five months ago this Council, with my enthusiastic support, voted to close Santa Monica Santa Monica Airport by June 30, 2018, the beginning of next summer. Today's settlement keeps the airport open until December 31, 2028, essentially until 2029 – that's twelve long years from now.

With this settlement, we snatch defeat from the jaws of victory. This, at a time when the FAA's willingness to negotiate revealed the FAA itself suspected they would lose their court battles with Santa Monica — even while they continue to hold our land hostage.

I was silent in public discussion today because the decision had already been made, and the documents had been signed in Washington. I can assure the community I was adamant, and consistent, in my opposition to this settlement, and expressed my opposition repeatedly in closed session legal discussions that led to today's public action.

This consent decree means that planes, including some jets, will continue to fly for 12 more years. The mandate Santa Monica voters sent the Council with Measure LC is deferred for 12 more years. Airport Park is delayed for 12 more years. I vote no for all those reasons."

Councilmember Vazquez stated his no vote for the record "I was pretty much in agreement comments made by Councilmember McKeown. The Attorney's did a great job negotiating back and forth because this has been going on for some time. But for me, the clincher was I feel while there is no guarantee in these decision, especially when you put it in before a judge, whether you win or lose, I thought we had a strong enough case that we worst case scenario we would close this thing by 2023. For me that was the biggest deciding factor. To the public moving forward we need be very vigilant sure that we continue to elect a very progressive Council, because 12 years from now I would hate to see a future Council cut a deal with the FAA to continue to operate this airport for more than 12 years."

Councilmember Himmelrich stated her no vote for the record, "I agree with what has been said, but I don't believe this guarantee is a certainty, and a lot can happen in 12 years, and I further believe that even the burden of a reduced amount of jets affecting our residents and West L.A. residents is something that is unacceptable."

**1.B.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. Atlantic Aviation, Los Angeles Superior Court Case Number SC 126 653**

3                                    January 28, 2017

The Interim City Attorney advised this matter was heard with no reportable action taken.

**1.C.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. American Flyers, Los Angeles Superior Court Case Number 16RO5422**

The Interim City Attorney advised this matter was heard with no reportable action taken.

**1.D.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. United States of America, U. S. District Court Case Number CV 13-08046**

This item was approved as part of Item 1-A.

**1.E.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. Federal Aviation Administration, United States Court of Appeals for Ninth Circuit Case Number 16-72827**

This item was approved as part of Item 1-A.

**1.F.    Conference with Legal Counsel – Anticipated Litigation – Anticipant significant exposure to litigation pursuant to Government Code Section 54956.9(d)(2):  1 case**

The Interim City Attorney advised this matter was heard with no reportable action taken.

**REPORT ON COUNCIL TRAVEL**

Councilmember Vazquez reported that he was in the middle of attending the Independent City Association (ICA) meeting in Santa Barbara this weekend. He sits on the Executive Board, and he will be returning for a Board meeting at the adjournment of the City Council meeting.

**STUDY SESSION: PERFORMANCE MANAGEMENT**

**4.A.    Use of a Framework for Performance Management and Data-Driven Decision Making**, was presented.

**Recommended Action**
Staff recommends that the City Council review and comment on developing an organizational framework based on the dimensions of Civic Wellbeing and the Sustainable City Plan and direct staff to proceed with building a comprehensive performance management system based on the framework, was presented.

4                                                                    January 28, 2017

There were no members of the public present to speak on this item.

Questions asked and answered of staff included: Should other categories be added to the Wellbeing Index (i.e. Economic and Physical Safety, Time/Life balance, and Life Satisfaction); how can you measure the solutions and how people are feeling; what kind of integrations that can happen to make up the gap between 0 – 5 years range to make sure that kids don't fall through the cracks; how do we make sure young adults feel more secure and what types of policies should be effective; are wellbeing index being incorporated in the School District; how to incorporate the Wellbeing Index to make sure that young people are successful; how will core competence and metrics work into the operations and budget; will outcomes versus outputs be determined by metrics; and, how do you reach a balance of getting data and protecting people's privacy in Open Data;

Considerable discussion ensued on topics including, but not limited to: Accountability, lead to reallocating funds in the necessary areas and that the policies will change according to the data received; Be innovative, create new programs that addresses the community needs and how it could improve; make sure we still integrate/recognize Climate Change and Sustainability within the Wellbeing Framework; Gender equality should have a significant inclusion in this framework; invest savings locally, specifically banking; housing issues being addressed; and there should be pilot programs on any new measures being recommended, or issues that are identified.

Motion by Councilmember O'Connor, seconded by Mayor Winterer, to receive and file the information presented. The motion was unanimously approved by voice vote, with all members present.

**ADJOURNMENT**    On order of the Mayor, the City Council meeting was adjourned at 12:36 p.m.

ATTEST:                                    APPROVED:

Denise Anderson-Warren                     Ted Winterer
City Clerk                                 Mayor

Exhibit R
Page 479

10/03/2017

**EXHIBIT F**

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

CITY OF SANTA MONICA,

       Petitioner,

    v.

UNITED STATES OF AMERICA, et al.

       Respondent.

Civil Action No. 13-CV-8046-JFW (VBKx)

## STIPULATION AND ORDER/CONSENT DECREE

It is stipulated by and between the undersigned parties by their respective attorneys that:

1.  The Court has jurisdiction over each of the parties, and venue of this action is proper in the United States District Court for the Central District of California.

2.  The City of Santa Monica (the City) filed this case seeking to quiet title to certain properties and the United States disputes these claims. Live controversies exist between the parties including these and other issues.

3.  The parties consent to the Court's entry of the Settlement Agreement in the form attached to this Stipulation and Order/Consent Decree.

4.  The parties' execution of this Stipulation and Order/Consent Decree and the Settlement Agreement shall settle and resolve any and all claims of the City arising from the events giving rise to the allegations described in the Complaint in this action and in certain other proceedings between the parties, as provided in the Settlement Agreement.

1

*Ex F*

5.    Neither this Stipulation and Order/Consent Decree nor the attached Settlement Agreement shall be construed to preclude the United States or the Federal Aviation Administration from bringing an action against the City for any violation(s) of any laws, regulations or orders other than those addressed in the Settlement Agreement.

6.    In the event that the proposed Settlement Agreement is not entered pursuant to this Stipulation and Order/Consent Decree, this Stipulation shall become null and void and shall be of no effect whatever, and the making of this Stipulation shall be without prejudice to any party in this or any other proceeding.

2

For the Federal Aviation Administration:

Reginald C. Govan
Chief Counsel
Federal Aviation Administration

**For the Department of Justice**
JOYCE BRANDA
Acting Assistant Attorney General

EILEEN M. DECKER
United States Attorney

JUDRY SUBAR
Assistant Branch Director

RAPHAEL O. GOMEZ (D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-1318
Facsimile: (202) 616-8460
Raphael.gomez@usdoj.gov

GARY D. FELDON (D.C. Bar #987142)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-4686
Fax: (202) 616-8460
Email: Gary.D.Feldon@usdoj.gov

Dated: 1/30/17

3

**For the City of Santa Monica:**

JOSEPH LAWRENCE
Interim City Attorney
LANCE S. GAMS
Chief Deputy City Attorney
IVAN O. CAMPBELL
Deputy City Attorney
1685 Main Street, Third Floor
Santa Monica, CA 90401-3295
Telephone: 310-458-8336
Facsimile: 310-393-6727

ARTURO J. GONZALEZ
agonzalez@mofo.com
Morrison & Forester LLP
425 Market Street
San Francisco, CA 94105
Telephone: 415-268-7000
Facsimile: 415-268-7522

WILLIAM V. O'CONNOR, JR.
WOConnor@mofo.com
JOANNA L. SIMON
JoannaSimon@mofo.com
Morrison & Foerster LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
Telephone: 858-720-5100
Facsimile: 858-720-5125

_____
WILLIAM V. O'CONNOR, JR.

Dated: January 30, 2017

4

## ORDER

IT IS SO ORDERED by this Court, this _____ day of January, 2017, at Los Angeles, California.

_____

Honorable John F. Walter
United States District Court
For the Central District of California

10/03/2017

5

## SETTLEMENT AGREEMENT/CONSENT DECREE BETWEEN THE FEDERAL AVIATION ADMINISTRATION AND THE CITY OF SANTA MONICA

The United States of America, acting through the Federal Aviation Administration (FAA) and the City of Santa Monica, CA (City) (collectively, the Parties) enter into this Settlement Agreement (Agreement), by and through their undersigned representatives, to resolve the disputes outlined below and pertaining to the operation of the Santa Monica Municipal Airport (Airport or SMO). This Agreement, once signed by the FAA and the City, shall be presented to the U.S. District Court for the Central District Court of California (U.S. District Court) for entry as a Consent Decree.

### Background

**Airport Property & Runway**

SMO is generally composed of two parcels of property.

1. *First Parcel*. The first parcel consists of approximately one hundred and seventy acres that the City of Santa Monica (City) leased to the U.S. government during World War II. (This parcel is referred to herein as the First Parcel and is more fully described as the premises referred to as "Clover Field, Santa Monica Municipal Airport" in the leases, as modified, that are referred to in that certain Instrument of Transfer, dated as of August 10, 1948, between the United States of America and the City that was recorded at Book 28055, Pages 211 through 222, inclusive, in the Official Records of Los Angeles County, California (the IOT).)

2. *Second Parcel*. The second parcel consists of approximately eighteen acres with respect to which the United States of America duly executed a Quitclaim Deed dated April 8, 1949, and recorded at Book 30037, Pages 364 though 370, inclusive, in the Official Records of Los Angeles County, California (the Quitclaim Deed), conveying its interests in said parcel to the City. (This parcel is referred to herein as the Second Parcel.) (The First Parcel and the Second Parcel, together with any other right, title and interest in any premises, structures, improvements or other property conveyed by the United States of America to the City in the IOT or the Quitclaim Deed, are collectively referred to herein as Airport Property).

*Airport Runway*. The Airport's current runway of 4,973 feet occupies land in both the First Parcel and Second Parcel , and also includes adjoining land that the Douglas Aircraft Company conveyed to the City by grant deed in 1945.

1

## District Court Litigation

On August 10, 1948, pursuant to the Surplus Property Act of 1944 (SPA), the U.S. Government and the City executed an "Instrument of Transfer" (IOT) by which the U.S. Government surrendered its leaseholds and which the U.S. Government contends imposed certain restrictions on the future use of the Airport property including that:

> the land, buildings, structures, improvement and equipment in which this instrument transfers any interest shall be used for public airport purposes for the use and benefit of the public, on reasonable terms and with unjust discrimination and without grant or exercise of any exclusive right . . . .

The IOT further provides that "the restrictions . . . shall run with the land . . . ." and requires that:

> the entire landing area . . . be maintained for the use and benefit of the public at all times in good and serviceable conditions, provided, however, that such maintenance shall be required as to structures, improvement, facilities and equipment only during the remainder of their estimated life . . . .

On April 8, 1949, the U.S. government effected a Quit Claim Deed, transferring its interests in all or substantially all of the Second Parcel to the City.

On October 31, 2013, the City sued the FAA under the Quiet Title Act regarding the meaning and effect of the IOT. *City of Santa Monica v. United States of America, et al.*, Case No. CV 13-08046 JFW (VBKx). The City's claim seeks, in part, a declaratory judgment providing that the City has unencumbered title to the Airport Property.

On February 13, 2014, the U.S. District Court dismissed the City's claim based on the statute of limitations. However, on March 11, 2016, the U.S. Court of Appeals for the Ninth Circuit reversed the District Court's dismissal and remanded the case to the District Court. Trial is currently set for August 29, 2017.

## Circuit Court Litigation

On June 27, 1994, the City accepted a $1,604,700.00 federal grant for certain improvements at the Airport pursuant to the terms of a grant agreement that the Parties agree remained in effect for twenty years. On August 27, 2003, the City and the FAA executed a grant amendment that provided $240,600.00 in federal funds to the City. The Parties dispute whether the terms of the grant remain in effect for twenty years from the date of the acceptance of the amendment or for twenty years from the date of the acceptance of the initial agreement in which case they have expired.

2

In response to a complaint filed pursuant to 14 C.F.R. part 16, on August 15, 2016, the FAA issued a Final Agency Decision (FAD) holding that by accepting the additional funds, the grant expiration date was extended until August 27, 2023. *Nat'l Bus. Aviation Assoc., v. City of Santa Monica*, FAA Docket No. 16-14-04. The City sought review of the FAD in the U.S. Court of Appeals for the Ninth Circuit. *City of Santa Monica v. FAA*, Case No. 16-72827 (9th Cir.).

**Federal Administrative Proceedings**

The FAA issued a Notice of Investigation (NOI) to determine, in part, whether the City is violating its federal obligations to provide access to the fixed based operators (FBOs). *In re Compliance with Fed. Obligations by the City of Santa Monica*, FAA Docket No. 16-16-13. The NOI is based on the City's handling of the tenancy of the Airport's FBOs, the possible ban on the sale of unleaded fuels, and the City's declared intent to provide certain aeronautical services at SMO on an exclusive basis (proprietary exclusive). The City filed a response to the NOI asserting that it has fully complied with its obligations in regard to these matters.

On December 12, 2016, the FAA issued an Interim Cease and Desist order ordering the City to cease and desist from removing the FBO's until the FAA issues a final agency decision under the NOI. No final decision has been reached regarding the NOI.

**NOW, THEREFORE**, in consideration of the mutual covenants and other consideration described herein, the the Parties agree it is in the interest of the public and civil aviation to AGREE as follows:

**I.   COMPLETE SETTLEMENT OF ALL CLAIMS**

Within 30 days of this Agreement's execution, the Parties shall jointly move in *City of Santa Monica v. United States of America, et al.*, Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.), for entry of this Agreement as a Consent Decree and for a stay of the the litigation pending the decision on the Consent Decree. Also within 30 days of this Agreement, the Parties shall jointly move to stay *City of Santa Monica v. Federal Aviation Administration*, No. 16-72827, (9th Cir.), pending the entry of the Consent Decree. Within 14 days of the entry of the Consent Decree, the City shall dismiss with prejudice *City of Santa Monica v. Federal Aviation Administration*, No. 16-72827, (9th Cir.). Furthermore, the Parties agree that entry of the Consent Decree shall resolve all pending disputes at issue in *In re Compliance with Federal Obligations by the City of Santa Monica*, FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.), and that the FAA shall therefore dismiss the NOI.

In addition, the FAA shall send a letter in substantially the form of Exhibit A to this Agreement to private parties that have filed Part 16 complaints raising issues within the scope of this Agreement requesting that the parties withdraw those complaints. The Parties acknowledge that the FAA does not have authority to require private parties to withdraw their Part 16 complaints

3

and that the FAA must consider any complaints not withdrawn. Thus, the Parties further acknowledge that no action of a private party in a Part 16 proceeding can constitute a breach of this Agreement.

Unless modified by the court having jurisdiction over the Consent Decree, the Decree shall expire on December 31, 2028. The Parties agree that the expiration of the Decree shall have no effect on the terms or condition of this Agreement, which terms or conditions shall survive the expiration of the Decree.

Further, the Parties agree that this Agreement upon entry of the Consent Decree shall resolve all claims by the Parties that have been brought, or could have been brought, in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.), *City of Santa Monica v. Federal Aviation Administration*, No. 16-72827, (9th Cir.), or *In re Compliance with Federal Obligations by the City of Santa Monica,* FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.), including all the Parties' actual or potential claims pertaining to the past operation of the Airport by the City pertaining to tenants, non-tenant aircraft and FBOs.

If one of the Parties alleges a breach of the terms or conditions of this Agreement, the exclusive venue for remedying such a breach shall be the court having jurisdiction over the Consent Decree.

In the event the court in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.) does not enter the Consent Drecree as-written, the Parties shall confer and, as soon as feasible, decide whether to move the court to enter a modified Consent Decree. If the Parties have not reached an agreement on the form of the revised Consent Decree within 30 days, the Parties shall jointly move to lift the stays of litigation in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.) and *City of Santa Monica v. Federal Aviation Administration,* No. 16-72827, (9th Cir.). The FAA shall also at that time resume proceedings in *In re Compliance with Federal Obligations by the City of Santa Monica,* FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.). In such event each Party agrees that this Agreement shall be of no force and effect and may not be used by either Party for any purpose whatsoever.

## II. RUNWAY

    **A.    Runway Length.** The Parties agree that the Airport's runway shall have an operational runway length of 3,500 feet. The 3,500 foot distance shall not include the runway safety areas that shall be constructed and maintained at both runway ends. The runway safety area may include an engineered materials arrestor system (EMAS) at the City's option. The Parties further agree that the Airport shall accomodate aircraft operations that can safely take off

4

and land on a runway of the agreed-on length. Prior to the initiation of shortening the runway, the City shall comply with the 30 day notice provisions of 14 C.F.R. Part 157.5(b)(2).

**B.    Costs to Shorten the Runway.** The costs to shorten the runway, including but not limited to the installation of EMAS, shall be borne by the City. If sought by the City, the FAA will provide technical support to the City through the FAA's Office of Airports to assist in obtaining federal funds to support the shortening of the runway, as consistent with federal laws, regulations and the availability of funds.

**C.    Environmental Studies.** The City shall be responsible for complying with its state and federal environmental requirements related to its planning and implementation of modifications at SMO. The City's responsibility shall include the cost of conducting any necessary environmental studies or other requirements under the National Environmental Policy Act (NEPA). 42 U.S.C. § 4321 *et seq.*

## III. USE AND RELEASE OF PROPERTY

Consistent with the ultimate configuration of the runway pursuant to Section II, the FAA agrees that prior to closure of the Airport, the City may use the property no longer needed for the the Airport with a shortened or reconfigured runway, taking into consideration standard safety areas, including the use of EMAS, for non-aeronautical uses that are safe and compatible with the operation of the Airport. Such land shall be subject to an avigation easement for the period the airport is operated which shall be recorded contemporaneously with any instrument releasing such property. A copy of the form of avigation easement is attached hereto as Exhibit B. This agreement does not constitute FAA approval of any particular future use.

## IV. CITY'S PROPRIETARY EXCLUSIVE RIGHT

### A. FAA's Acknowledgement of the City's Right

The City may exercise its proprietary exclusive right to provide aeronautical services at SMO, including but not limited to the sale and into-plane delivery of all types of aviation fuels, in accordance with generally-applicable rules governing the exercise of proprietary exclusive rights.

### B. City's Obligations

The City shall provide any proprietary exclusive aeronautical services at SMO (i) in conformance with the standard of grant assurance 22 (ii) on reasonable terms at reasonable rates, and (iii) during all hours that such services would normally be provided at comparable general aviation airports, taking into account permissible curfews provided for in section V. The City further agrees that, if the City does not fully provide a type of service at any point in time and a private FBO desires to provide such a service, that operator shall have reasonable access to the airport on commercially reasonable terms and in conformance with the standards of grant assurance 22. See 79 Fed. Reg. 18755 (April 3, 2014).

5

## C. Timing of the City's Exercise of Its Right

Subject to the City's right pursuant to subsection D, below, the City will not implement any proprietary exclusive operations, as defined above, until the work to shorten the runway, as provided in Section II above, is complete.

## D. Leases for Private Aeronautical Service Providers Prior to the City's Exercise of Its Right

Leases offered to all tenants providing aeronautical services shall be on reasonable terms and in substantially the same form as that attached as Exhibit C. For purposes of this Agreement, the phrase "reasonable terms" shall mean terms that are customary and usual at similarly situated and sized general aviation airports.

The City shall offer all current tenants providing aeronautical services leases of no less than three (3) years with reasonable terms appropriate to the aeronautical service usually and customarily provided such service at similar facilities, including but not limited to tenant investment and financing requirements.

The City shall also offer leases to all prospective tenants providing aeronautical services for which there is space at SMO subject to reasonable terms and consistent with the standards of grant assurance 22, provided the City is not itself providing such services on a proprietary exclusive basis.

Any and all leases providing aeronautical services may, at the City's election, be subject to termination upon six months written notice of the City's exercise of its proprietary exclusive right to provide the category of services otherwise being provided by private FBOs, provided the City is ready, willing, and able to fully provide such aeronautical service in accordance with applicable law.

## V.   AIRPORT CURFEW

The City may submit an application for enhanced curfews consistent with 14 C.F.R. part 161 (Part 161). Review of such an application shall be conducted under the procedural rules and subject to the substantive standards applicable to all Part 161 applications submitted to the FAA, which shall not be affected by this Agreement. Review of any decision made in connection with such an application shall be conducted exclusively in the same manner as, and in the same forum as, review of any decision made in connection with a Part 161 application submitted to the FAA. That is, this Agreement shall not affect the form or substance of such a review. Notwithstanding any other provision of this Agreement, judicial review of FAA's decision and record thereof with regard to any Part 161 application submitted by the City shall be within the exclusive jurisidiction of the applicable U.S. Court of Appeals.

10/03/2017

6

## VI.   DURATION

The City agrees to operate the Airport consistent with its obligations set forth in this Agreement until December 31, 2028, unless an earlier date is agreed to by the Parties. Any subsequent decison by the FAA to release the Airport at an earlier date shall be made consistent with the standard of 49 U.S.C. § 47153. The obligation to operate the Airport until December 31, 2028 shall be binding on any subsequent purchaser of Airport Property. Within 90 days of a Consent Decree embodying this Agreement taking effect, the City shall cause this Agreement to be recorded in the property records for the County of Los Angeles, California.

Without limiting the express terms of this Agreement, the FAA agrees that the Airport Property shall be released from all covenants, reservations, restrictions, conditions, exceptions and reservations of rights imposed under the IOT and the Quitclaim Deed and the grant assurances imposed in 1994 upon the effectiveness of this Agreement and to provide such notice as required under 49 U.S.C. §47153(c). Upon the City's request, the FAA shall execute, acknowledge and deliver from time to time any instruments reasonably necessary requested by the City appropriate to evidence the release of the Airport Property from all such covenants, reservations, restrictions, conditions, exceptions and reservations of rights. The Parties shall record any instruments necessary to effectuate this provision.

The City's operation of the Airport until December 31, 2028 shall conform with (i) the standards set forth in grant assurances 19, 22, 23, 24, 25, and 30; and (ii) all applicable state and federal operational, maintenance, and safety standards. For purposes of this paragraph, the substantive standards of grant assurances 19, 22, 23, 24, 25, and 30 shall apply until December 31, 2028.

If the City enters into future grant agreements with the FAA, then it shall also be bound by those terms as provided for in any such grant agreement in addition to any applicable the standards expressly set forth in this Agreement.

If the City does not enter into future agreements with the FAA that continue to require the City to operate the Airport after December 31, 2028, the Parties agree that the City may, in its sole discretion at any time on or after January 1, 2029, cease to operate the Airport as an airport and may close the Airport to all aeronautical use forever, subject only to the applicable 30 day notice requirements set forth in 49 U.S.C. § 46319(a) and 14 C.F.R. Part 157.5(b)(2).

## VII.   UNLEADED FUEL

The FAA is committed as a matter of national aviation policy to support the development and use of unleaded aviation gas appropriate to the operation of piston aircraft where commercially and technically feasible. The FAA agrees to consider any demonstration project the City may seek to implement pertaining to the use of unleaded fuel. Nothing in this Agreement shall allow the City to restrict the sale of leaded aviation fuel for as long as the FAA authorizes use of such fuels within the United States.

7

## VIII.  MISCELLANEOUS PROVISIONS

**A.  Enforcement.** The Parties reserve the right to judicially enforce any terms or provisions of this Agreement.

**B.  Consent Decree.** The terms of this Agreement shall be memorialized and embodied in a consent decree to be filed in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.) in the form attached as Exhibit D.  The court shall have jurisdiction to issue  injunctive relief only as to the provisions of sections II, III, and IV.  Further, the court shall have jurisdiction to enforce the provisions of sections II, III and IV as to any successors, transferees, licensees, agents, heirs, and assigns of the City's interests in, operation of, or sponsorship of SMO.  The court shall not have jurisdiction to subject the Parties to penalties or sanctions for any alleged violations of its obligations in this Agreement.

**C.  Own Costs.** Each Party shall bear its own costs, including attorney fees.

**D.  Authority.** The representatives of each Party hereby certify that he or she is duly authorized to enter into the Agreement.  The City represents that it has the full authority to perform all of the acts and obligations it has agreed to perform under the terms of this Agreement. The United States, acting though the Department of Justice and the FAA represents that the FAA has the full authority to perform all of the acts and obligations it and the United States of America has agreed to perform under the terms of this Agreement.

**E.  Copies and Counterparts.**  It is contemplated that this Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together constitute one and the same document. Facsimiles, hard copies, and scanned electronic copies of signatures, including scanned electronic copies sent by email, shall constitute acceptable, binding signatures for purposes of this Agreement.

**F.  Defense of This Agreement.**  The Parties agree to vigorously and actively defend this Agreement, any resulting Consent Decree, and all terms embodied therein as fair and reasonable, to vigorously and actively defend the same against any challenge by any individual or entity.  The Parties further agree not to undermine directly or indirectly this Agreement, any resulting Consent Decree or any terms set forth therein for so long as this Agreement or any resulting Consent Decree remains in effect.

**G.  Modification.** This Agreement may be supplemented, amended, or modified only by the mutual agreement of the Parties, and, once the Consent Decree is entered, only with the approval of the court  No supplement, amendment, or modification of this Agreement shall be binding unless it is in writing and signed by all duly authorized representatives of each Party.

8

**H. Successors or Assigns.** This Agreement and any resulting consent decree shall be binding upon and inure to the benefit of the Parties and their respective successors, transferees, licensees, agents, heirs, and assigns. Prior to any change of the sponsor of SMO or to the identity of the holder of any operating certificate related to the operation or sponsorship of SMO the City shall obtain the written agreement of such new entity to be bound by the terms of this Agreement and any resulting consent decree.

**I. Precedent.** Nothing in this Agreement shall constitute an admission concerning any allegation, claim, or defense at issue in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.), *City of Santa Monica v. Federal Aviation Administration,* No. 16-72827, (9th Cir.), or *In re Compliance with Federal Obligations by the City of Santa Monica,* FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.), and this Agreement has no precedential effect as to any other dispute between the Parties or between either the City or the FAA and any third party. This Agreement is made in light of the unique circumstances of this case and the uncertainty of the specific matters resolved hereby. Nothing herein shall be construed to be an admission of liability or as an interpretation of the validity or terms or provisions of any other instruments or contracts.

**J. Release.** Upon the entry of the Consent Decree, the Parties and all their heirs, administrators, representatives, attorneys, successors, and assigns, hereby release, waive, acquit, and forever discharge each other and all their respective officers, employees, and agents from, and are hereby forever barred and precluded from prosecuting, any and all claims, causes of action, and/or requests for relief asserted in *City of Santa Monica v. United States of America, et al.,* Case No. 13-CV-8046-JFW (VBKx) (C.D. Cal.), *City of Santa Monica v. Federal Aviation Administration,* No. 16-72827, (9th Cir.), and *In re Compliance with Federal Obligations by the City of Santa Monica,* FAA NO. 16-16-13 (U.S. Dep't of Transp., Fed. Aviation Admin.), as well as any and all claims, causes of action, and/or requests for relief, whether or not made, against any Party that could have been raised in those matters, with the exception of proceedings to enforce this Agreement or the Consent Decree.

**K. No Third Party Rights.** This Agreement is not intended to create, and does not create, any third-party beneficiary rights, confer upon any non-party a right to enforce or sue for an alleged breach of the Agreement, or generate any other kind of right or privilege for any person, group, or entity other than the Parties.

**L. Effective Date.** This Agreement shall be effective upon the date the Court enters an order approving this Agreement.

9

For the Federal Aviation Administration:

_____

Reginald C. Govan
Chief Counsel
Federal Aviation Administration


For the Department of Justice

JOYCE BRANDA
Acting Assistant Attorney General

EILEEN M. DECKER
United States Attorney

JUDRY SUBAR
Assistant Branch Director

RAPHAEL O. GOMEZ (D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-1318
Facsimile: (202) 616-8460
Raphael.gomez@usdoj.gov

_____

GARY D. FELDON (D.C. Bar #987142)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-4686
Fax: (202) 616-8460
Email: Gary.D.Feldon@usdoj.gov

Dated: 1/30/17 _____

10

For the City of Santa Monica:
Attest:

Rick Cole
City Manager

Denise Anderson-Warren
City Clerk

Joseph Lawrence
Interim City Attorney

Dated: 1-30-17

Approved as to form:

William V. O'Connor
Morrison & Foerster LLP
12531 High Bluff Drive | San Diego, CA 92130-2040
P: +1 (858) 720.7932
WOConnor@mofo.com

Dated: January 30, 2017

Attorneys for the City of Santa Monica

**IT IS SO ORDERED.**

Signed ___, _____, 2017, at Los Angeles, California

_____

Honorable John F. Walter
United States District Court
For the Central District of California

11

**Acknowledgements:**

District of Columbia
City of Washington

Subscribed, sworn and acknowledged before me by Reginald C. Govan, Chief Counsel of the Federal Aviation Administration, this 27 day of January, 2017.

*Judy S. McGhee*

Notary Public.
My commission expires 10/14/2020



JUDY S. MCGHEE
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires October 14, 2020

State of California
County of _____

On _____ before me, _____ personally

Appeared _____

_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

_____     (Seal)
Signature

10/03/2017

12

10/03/2017

**EXHIBIT G**

*Kate Scott*
*James Babinski*
*2146 Fox Hills Drive*
*Los Angeles, CA 90025*

By ~~Hand Delivery~~ Email & Certified US Mail & Facsimile Transmission to (310) 458-1621

April 18, 2017

City Council for the
City of Santa Monica
Council Chambers
1685 Main Street
Santa Monica, CA 90401

Re:     *Written demand that this legislative body cure or correct violation(s) of the*
        *Brown Act concerning that certain "Confidential Settlement" taken up in Closed*
        *Session that took place January 28, 2017 in abrogation of Government Code sections*
        *54953, 54956, and 54956.9*

Dear Mayor and Members of the City Council:

On January 28, 2017, during a closed session, the City Council ("City Council" for the City of Santa Monica ("City") agreed to enter into a consent decree and settlement agreement (the "Settlement Agreement") with the Federal Aviation Administration ("FAA"). This agreement was described by Mayor Winterer in an interview broadcast by KPCC on or about February 1, 2017 as a "confidential settlement" deliberately kept from public scrutiny. The Settlement Agreement was not properly put to the public as an agenda item in an open session of the City Council. This is illegal and contrary to the Brown Act. We hereby immediately request a cure or correction of this Brown Act violation.

More specifically: The Settlement Agreement violates the grant, bond indentures and covenants, and purpose of the real property acquisition by the city which set out the use of the real property as the Airport, and further violates the grant, conveyance covenants, and purpose of the real property conveyance from the United States government to the City which requires the real property to be used as an airport "forever." The Settlement Agreement has the goal of violating said grant and use of the land as an airport. Settlement Agreement approval contemplating such action in a settlement agreement via closed session is not authorized by the Brown Act; the closure contemplated in the Settlement Agreement is *ultra vires* and must have be approved in open session affording due process including providing the public adequate notice and an opportunity to be heard. The Closed Session approval of the Settlement Agreement is void *ab initio*.

Further, the Settlement Agreement was not properly executed by the City Council or Mayor and only by the City Manager and City Clerk and therefore void, *ab initio*, as there is no indicia of authority derived from the City Council or Mayor to the City Manager and/or City Clerk; in other words, the City Manager attested to the Settlement Agreement and the City Clerk signed as the empowered authorized signatory. Such execution formality is non-existent and the authorization should have been provided for in open session under an agendized meeting to have

EX G

*Kate Scott*
*James Babinski*
*2146 Fox Hills Drive*
*Los Angeles, CA 90025*

the City Council and City Clerk to confer signatory authority of the City of Santa Monica to the City Manager and City Clerk; absent such open session authorization and approval of the Settlement Agreement, as is the City's approval of the Settlement Agreement is void, *ab initio*.

These acts, taken in light of the January 25, 2017 agenda and January 28, 2017 Closed Session, constitute *per se* violations of the Brown Act and require cure or correction pursuant to Gov't Code § 54960.1. We demand the City Council cure or correct those violations immediately.

Sincerely,

James Babinski
Kate Scott

*April 18, 2017 Demand that the City Council for the City of Santa Monica Cure or Correct Brown Act Violations, Page 2 of 2*

KATE SCOTT + JAMES BABINSKI
2146 FOX HILLS DR
LOS ANGELES CA 90025-6005



CERTIFIED MAIL™

7010 1870 0001 8754 2861



$3.81    US POSTAGE
FIRST-CLASS MAIL
APR 18 2017
Mailed from ZIP 90025

endicia.com/mac        071M00852380

SANTA MONICA CITY COUNCIL
CITY HALL
1685 MAIN ST RM 209
SANTA MONICA CA 90401-3248

10/03/2017



# FAX Transmission Status

Transmission complete: 2017-04-18 18:38:44 MDT

| Job ID | 326422787 | Destination | (310)458-1621 |
|--------|-----------|-------------|---------------|
| Status | Success | Detail | Success |
| Pages | 2 | Xmit Time | 00:05:26 |



*Kate Scott*
*James Babinski*
*2146 Fox Hills Drive*
*Los Angeles, CA 90025*

By ~~Hand Delivery~~ Email & Certified US Mail & Facsimile Transmission to (310)458-1621

April 18, 2017

City Council for the
City of Santa Monica
Council Chambers
1685 Main Street
Santa Monica, CA 90401

**Re:** *Written demand that this legislative body cure or correct violation(s) of the*
*Brown Act concerning that certain "Confidential Settlement" taken up in Closed*
*Session that took place January 28, 2017 in abrogation of Government Code sections*
*54953, 54956, and 54956.9*

Dear Mayor and Members of the City Council:

On January 28, 2017, during a closed session, the City Council ("City Council" for the City of Santa Monica ("City") agreed to enter into a consent decree and settlement agreement (the "Settlement Agreement") with the Federal Aviation Administration ("FAA"). This agreement was described by Mayor Winterer in an interview broadcast by KPCC on or about February 1, 2017 as a "confidential settlement" deliberately kept from public scrutiny. The Settlement Agreement was not properly put to the public as an agenda item in an open session of the City Council. This is illegal and contrary to the Brown Act. We hereby immediately request a cure or correction of this Brown Act violation.

More specifically: The Settlement Agreement violates the grant, bond indentures and covenants, and purpose of the real property acquisition by the city which set out the use of the real property as the Airport, and further violates the grant, conveyance covenants, and purpose of the real property conveyance from the United States government to the City which requires the real property to be used as an airport "forever." The Settlement Agreement has the goal of violating said grant and use of the land as an airport. Settlement Agreement approval contemplating such action in a settlement agreement via closed session is not authorized by the Brown Act; the closure contemplated in the Settlement Agreement is *ultra vires* and must have be approved in open session affording due process including providing the public adequate notice and an opportunity to be heard. The Closed Session approval of the Settlement Agreement is void *ab initio*.

Further, the Settlement Agreement was not properly executed by the City Council or Mayor and only by the City Manager and City Clerk and therefore void, *ab initio*, as there is no indicia of authority derived from the City Council or Mayor to the City Manager and/or City Clerk; in other words, the City Manager attested to the Settlement Agreement and the City Clerk signed as the empowered authorized signatory. Such execution formality is non-existent and the authorization should have been provided for in open session under an agendized meeting to have

10/03/2017

 **Gmail**

James Babinski <jbabinski7@gmail.com>

## Written demand to cure or correct violation(s) of the Brown Act
1 message

**James Babinski** <jbabinski7@gmail.com>                               Tue, Apr 18, 2017 at 5:36 PM
To: ted.winterer@smgov.net, gleam.davis@smgov.net, tony.vazquez@smgov.net, kevin@mckeown.net,
sue.himmelrich@smgov.net, pam.oconnor@smgov.net, terry.oday@smgov.net
Cc: katemscott@gmail.com

Dear Mayor and Members of the City Council:

Attached, please find a demand to cure or correct violations of the Brown Act, as set forth more specifically in the attached
written demand. Original to follow via Certified U.S. Mail.

Respectfully yours,
James N. Babinski
Kate M. Scott

📄 **471178441.pdf**
147K

10/03/2017





# City of Santa Monica

## City Council Meeting

## AGENDA

**TED WINTERER**
MAYOR

**SUE HIMMELRICH**
COUNCILMEMBER

**GLEAM DAVIS**
MAYOR PRO TEM

**TONY VAZQUEZ**
COUNCILMEMBER

**TERRY O'DAY**
COUNCILMEMBER

**KEVIN MCKEOWN**
COUNCILMEMBER

**PAM O'CONNOR**
COUNCILMEMBER

**RICK COLE**
CITY MANAGER

**JOSEPH LAWRENCE**
INTERIM CITY ATTORNEY

**DENISE ANDERSON-WARREN**
CITY CLERK

## STANDARDS OF BEHAVIOR THAT PROMOTE CIVILITY AT ALL PUBLIC MEETINGS:

- Treat everyone courteously;
- Listen to others respectfully
- Exercise self-control

- Give open-minded consideration to all viewpoints;
- Focus on the issues and avoid personalizing debate;
- Embrace respectful disagreement and dissent as democratic rights, inherent components of an inclusive public process, and tools for forging sound decisions

Meetings are broadcast live on CityTV cable channel 16, Radio Station KCRW FM 89.9 (after 8:00 PM), and on the internet at www.smgov.net and www.kcrw.org. Cable television re-broadcasts air on Thursday and Saturday at 11:30 AM.  The agenda will air on CityTV on Saturday and Sunday at 11:00 AM and 6:00 PM, and on Monday and Tuesday at 12:30 PM and 6:00 PM.

## STANDING IN AISLES OR AGAINST THE WALL IS NOT PERMITTED

10/03/2017

Ex A

 

## RULES OF ORDER FOR THE CONDUCT OF CITY COUNCIL MEETINGS
### (Resolution No.10928 (CCS))

Persons wishing to address the City Council regarding items on the agenda must be present and submit their name and address (optional) in writing to the City Clerk **before the public hearing is opened for that item.** Request-to-Speak forms are available prior to the meeting and throughout the meeting. Remarks from the public are limited to a total of 6 minutes per Council meeting, with a maximum of 2 minutes and a minimum of one minute per item. Except for the author of the request, public comment on 12-items are limited to 1 minute. Except on Public Input, speakers may donate 2 minutes to another person who may speak for a total of 4 minutes on that item. Both the donor of time and the designated speaker must submit their cards in person together.

**ORDER OF BUSINESS** (may not be changed except by majority vote of the City Council.)

1. Closed Session.
2. Special Agenda Items (City Manager's Report Commendations, Presentations, etc.).
3. Consent Calendar (All items considered in one motion unless removed by a Councilmember for discussion. Public comment shall be heard prior to council discussion).
4. Study Session.
5. Continued Items.
6. Administrative Proceedings.
7. Ordinances:
   - 1st Reading
   - 2nd Reading

8. Staff Administrative Item.
9. Public Hearings.
10. Reports of Boards and Commissions.
11. Resolutions.
12. Written Communications (other than Reports of Commission and Officers).
13. Councilmember Discussion Items.
14. Public Input (members of the public may address the City Council **only** on items not on the agenda, but within the subject matter jurisdiction of the City)

**Agendas and reports are accessible on the City's webpage at www.smgov.net/council/agendas. They are also available at the City Clerk's Office and in alternate formats upon request. For a free subscription to the City Council Agendas, please contact the City Clerk's Office at (310) 458-8211 or clerk@smgov.net.**

**Addressing the City Council:** State your name, address (optional), and neighborhood for the record; address the City Council as a whole, not as individuals. After the public hearing closes, no member of the public shall address the City Council on the matter under consideration without first securing Council approval. Please be courteous.

**Members of the audience:** Please refrain from clapping, whistling, or acts of disorderly conduct; do not distribute literature without prior authorization of the presiding officer; remain seated unless addressing the City Council; do not stand or sit in aisles; do not enter the well area of the dais or go behind rails unless authorized by the presiding officer.

Members of the public unable to attend a meeting but wishing to comment on an item(s) listed on the agenda may submit written comments prior to the meeting by mailing them to: City Clerk, 1685 Main Street, Santa Monica, CA 90401 or to councilmtgitems@smgov.net.

**MATERIALS RECEIVED FROM THE PUBLIC BY 12 PM ON THE DAY OF THE COUNCIL MEETING WILL BE DISTRIBUTED TO COUNCIL PRIOR TO THE MEETING AND POSTED ONLINE.**

**City Hall and the Council Chamber are wheelchair accessible. If you require any special disability related accommodations (i.e. sign language interpreting, access to an amplified sound system, etc.), please contact the City Clerk's Office at (310) 458-8211 or TDD: (310) 917-6626 at least 3 days prior to the scheduled meeting.**

**Si desea comunicarse con alguien en español, llame a nuestra oficina al (310) 458-8211 y pida hablar con Esterlina Lugo.**

**Santa Monica Blue Bus Lines #2, #3, #4, #9 and the EXPO Line serve City Hall. Parking is available on Main Street, on Olympic Drive, and in the Civic Center Parking Structure (validation free).**

**SMOKING IS PROHIBITED IN CITY HALL (SMMC 4.44.030)**

10/03/2017



City of
**Santa Monica**®

**AGENDAS**

CITY OF SANTA MONICA

REGULAR AND SPECIAL JOINT MEETING

CITY HALL COUNCIL CHAMBERS

1685 MAIN STREET, ROOM 213

TUESDAY APRIL 25, 2017

**MEETING BEGINS AT 5:30 PM**

<u>CALL TO ORDER</u>
<u>PLEDGE OF ALLEGIANCE</u>
<u>ROLL CALL</u>

(Please note that Agenda Items may be reordered during the Council meeting at the discretion of the City Council.)

1.    <u>CLOSED SESSIONS</u>

1.A.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): Kelly Soo Park v. Karen Thompson, United States Court of Appeals, Ninth Circuit, Case Number 14-56655, D. C. No. 2:14-cv-00330-SJO-RZ

1.B.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): Arlene Rosenblatt, an individual on behalf of herself and all others similarly situated, v. City of Santa Monica et al., United States District Court, Central District of California, Western Division, Case Number 2:16-cv-04481-ODW-AGR

1.C.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): Joseph v. City of Santa Monica, United States District Court, Central District of California, Case Number CV17-00723-ODW(AFMx)

1.D.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): City of Santa Monica v. United States of America, United States District Court Case Number CV 13-08046

1.E.    Conference with Legal Counsel – Existing Litigation – Litigation has been initiated formally pursuant to Government Code Section 54956.9(d)(1): National Business Aviation, Inc.., et al., v. Michael P. Huerta, Federal Aviation Administrator, U. S. Court of Appeals, District of Columbia Circuit Case No. 17-1054

**Exhibit R**
**Page 507**

**1.F.** **Conference with Labor Negotiator - City Negotiator: Donna C. Peter, Director of Human Resources - Bargaining Units: Administrative Team Associates (ATA), California Teamsters Local 911 (Teamsters), Management Team Associates (MTA), Public Attorneys Union (PAU), Supervisory Team Associates (STA), Municipal Employees Association (MEA), Firefighters Local 1109 IAFF (Local 1109), Fire Executive Management Association (FEMA), Police Officer Association (POA), SMART-TD**

The following is the order of business for items to be heard no earlier than 6:30 p.m.

2.　SPECIAL AGENDA ITEMS

**2.A.** **Proclamation Declaring April 26, 2017 as Denim Day in the City of Santa Monica**

**2.B.** **Proclamation Recognizing Municipal Clerks Week May 7 - 13, 2017.**

**2.C.** **Proclamation: Arts Month**

**2.D.** **Commendation: Lincoln Boulevard Task Force**

**2.E.** **City Manager's Report: GoSaMo Results**

3.　CONSENT CALENDAR
(All items will be considered and approved in one motion unless removed by a Councilmember for discussion.)

**3.A.** **Award of Construction Contract for Street Lighting Improvements on Stewart Street**

**Recommended Action**
Staff recommends that the City Council:
1. Award Bid #SP2482 to Elecnor Belco Electric, Inc., a California-based company, for the installation of new street lighting on Stewart Street between Exposition Boulevard and Kansas Avenue;
2. Authorize the City Manager to negotiate and execute a contract with Elecnor Belco Electric, Inc., in an amount not to exceed $190,895 (including a $24,900 contingency);
3. Authorize the Director of Public Works to issue any necessary change orders to complete additional work within contract authority.

**3.B.** **Award a Construction Contract for the replacement of Moss Avenue Pump Station and SMURRF VFDs**

**Recommended Action**
Staff recommends that the City Council:
1. Award Bid #2269 to Leed Electric Inc., a California-based company, for the replacement of Variable Frequency Drives (VFDs) for Moss Avenue Pump Station (MAPS) and Santa Monica Urban Runoff Recycling Facility

---





(SMURRF);

2. Authorize the City Manager to negotiate and execute a contract with Leed Electric Inc., in an amount not to exceed $980,113 (including a 20% contingency);

3. Authorize the Director of Public Works to issue any necessary change orders to complete additional work within contract authority.

**3.C.    First Modification to Software License Agreement for Open Data Platform**

**Recommended Action**
Staff recommends that the City Council authorize the City Manager to negotiate and execute a first modification to agreement #4006 in an amount not to exceed $111,264 with Socrata, Inc., a Delaware-based company, for licensing related to the City's open data platform and the sustainability performance portal. This recommended award is made as an exception to the competitive bidding process pursuant to Section 2.24.080 (a) and is for a total amount not to exceed $216,264 with future year funding contingent on Council budget approval.

**3.D.    Award Construction Contract for Pier Electrical Upgrade Project**

**Recommended Action**
Staff recommends that the City Council:

1. Award Bid #2347 to Metro Builders and Engineers Group, Ltd., a California-based company, for the Pier Electrical Upgrade Project;

2. Authorize the City Manager to negotiate and execute a contract with Metro Builders and Engineers Group, Ltd., in an amount not to exceed $1,217,515 (including a 15% contingency);

3. Award Bid #1982 to Caltrop Corporation, a California-based company, for construction management and inspection services for the Pier Electrical Upgrade Project;

4. Authorize the City Manager to negotiate and execute an agreement with Caltrop Corporation, a California-based company, in an amount not to exceed $324,820 (including a 10% contingency);

5. Authorize the Director of Public Works to issue any necessary change orders to complete additional work within contract authority.

**3.E.    Change Order for Big Blue Bus' Little Blue Book Production**

**Recommended Action**
Staff recommends that the City Council authorize the Purchasing Services Manager to issue a change order to blanket purchase order #25712 with Pacific Graphics, Inc., a California-based company, for the print production of the Little Blue Book transit guide and system map. This would result in a revised blanket purchase order total not to exceed $245,000, with future year funding contingent on Council budget approval.

**3.F.    Amended City Debt Service Policy**

**Recommended Action**

Exhibit R
**Page 509**

 

Staff recommends that Council adopt the amended debt policy for the City of Santa Monica.

**3.G.  Bid Award for the Purchase of Two Compressed Natural Gas Street Signs and Markings Stencil Trucks**

**Recommended Action**
Staff recommends that the City Council:
1.  Award Bid #4261 to Roadline Products, a California-based company, for the purchase and delivery of two Compressed Natural Gas Street Signs and Markings Stencil Trucks;
2.  Authorize the Purchasing Services Manager to issue a purchase order with Roadline Products for the purchase and delivery of two Compressed Natural Gas Street Signs and Markings Stencil Trucks in an amount not to exceed $335,398 for one year.

**3.H.  Approve Lease expenses for off-site City office space**

**Recommended Action**
Staff recommends that the City Council approve additional total lease expenses for 1437 Fourth Street, Suites 300 and 310, in the amount of $521,440 for the four-year lease term, and for 1212 Fifth Street, Suite 300, in the amount of $219,080 for the five-year lease term.

**3.I.  Statement of Official Action Upholding the Appeal of the Landmarks Commission's Denial of a Landmark Designation Application for the Property Located at 2600 Wilshire Boulevard**

**Recommended Action**
Staff recommends that the City Council approve the attached Statement of Official Action upholding Appeal 17ENT-0019 and designating the commercial building and parcel located at 2600 Wilshire Boulevard as a City Landmark.

SPECIAL MEETING OF THE PUBLIC FINANCING AUTHORITY

ROLL CALL

**3.J.  Resolution of the Santa Monica Public Financing Authority Establishing Regular Annual Meeting Dates  - *Staff will request to pull item from the agenda.***

**Recommended Action**
Staff recommends that the Santa Monica Public Financing Authority:
1.  Adopt the attached Authority Resolution to establish the second Tuesday of June and the fourth Tuesday of October, of every year, as the  regular meetings of the Authority;

Exhibit R
**Page 510**



2. Authorize the officers of the Authority to take all actions necessary to implement the purpose of the Resolution.

ADJOURNMENT OF SPECIAL MEETING

4.    STUDY SESSION

   **No items**

5.    CONTINUED ITEMS

   **No items**

6.    ADMINISTRATIVE PROCEEDINGS

   **No items**

7.    ORDINANCES
(Public comment is permitted on ordinances for introduction and first reading. No public discussion is permitted on ordinances for second reading and adoption.)

7.A.    **Second Reading and Adoption of Ordinance Amending Santa Monica Municipal Code Section 4.44.020 to Add Parklets to the Areas in Which Smoking is Prohibited**

   **Recommended Action**
   Staff recommends that City Council adopt the attached Ordinance.

7.B.    **Second Reading and Adoption of Ordinance Reauthorizing Santa Monica Municipal Code Chapter 6.109.040, State Franchise Holder Public, Educational, or Governmental Access Fees**

   **Recommended Action**
   Staff recommends that City Council adopt the attached Ordinance.

7.C.    **Second Reading and Adoption of an Ordinance Approving Procedural Amendment to the Development Agreement Between the City of Santa Monica and Providence Health System-Southern California, a California Non-Profit Religious Corporation ("Providence"), as Sole Corporate Member of Providence Saint John's Health Center, A California Non-Profit Religious Corporation ("Saint John's")**

   **Recommended Action**
   Staff recommends that City Council adopt the attached Ordinance.

7.D.    **Second Reading and Adoption of Ordinance Amending Chapter 4.85 Of The Santa Monica Municipal Code Regulating Lobbying**

   **Recommended Action**

*City of Santa Monica*                    *Generated: 4/25/2017 2:31 PM*                    *Page 7*

 

Staff recommends that City Council adopt the attached Ordinance.

8.    STAFF ADMINISTRATIVE ITEMS

**8.A.    Design approval for the Lincoln Neighborhood Corridor Plan Streetscape**

**Recommended Action**
Staff recommends that City Council approve the final streetscape and transportation concept for the Lincoln Neighborhood Corridor Plan.

**8.B.    Planning for Potential Parks Funding**

**Recommended Action**
Staff recommends that the City Council:
Review and comment on the concept of a potential park funding measure, provide direction to staff, and authorize the City Manager to negotiate and execute a fourth modification to agreement #10141 in the amount of $51,350 with Goodwin Simon Strategic Research, a California-based company, to conduct a resident survey to gauge support for a potential park funding strategy. This will result in a four year amended agreement with a new total amount not to exceed $273,800.

**8.C.    Transition of Mountain View Mobile Home Park to Nonprofit Ownership**

**Recommended Action**
Staff recommends that the City Council:
1.  Authorize the City Manager to enter into exclusive negotiations with the Caritas Corporation, a California-based non-profit corporation, to transfer ownership of City-owned Mountain View Mobile Home Park pursuant to Council-approved parameters; and

2.  Authorize the City Manager to negotiate and execute a seventh modification to Contract #9183 in an amount not to exceed $566,052, including a ten-percent contingency, with Real Estate Consulting and Services, Inc., a California-based company, to provide property management services at Mountain View Mobile Home Park. The proposed amendment would result in a 99-month amended contract with a new total contract amount not to exceed $4,260,939, and would extend the contract term for an additional twelve months through June 2018.

9.    PUBLIC HEARINGS

**No items**

10.    REPORTS OF BOARDS AND COMMISSIONS

**No items**

11.    RESOLUTIONS

**No items**

**Exhibit R**
**Page 512**


12.   WRITTEN COMMUNICATIONS OTHER THAN REPORTS OF COMMISSION AND
      OFFICERS

   **No items**

13.   COUNCILMEMBER DISCUSSION ITEMS

**13.A.  Recommendation to accept Anita Prentice's resignation from the Social
Services Commission and authorize the City Clerk to publish vacancy.**

**13.B.  Recommendation to accept Elizabeth Wilson's resignation from the
Commission for the Senior Community and authorize the City Clerk to publish
the vacancy**


14.   PUBLIC INPUT
(Public comment is permitted only on items not on the agenda that are within the subject
matter jurisdiction of the City.  State law prohibits the City Council from taking any action on
items not listed on the agenda, including issues raised under this agenda item.)

ADJOURNMENT

Any documents produced by the City and distributed to a majority of the City Council
regarding any item on this agenda will be made available at the City Clerk's Counter
located at City Hall, 1685 Main Street, Santa Monica during normal business hours.
Documents are also available at www.smgov.net/council/agendas.

For a *free* subscription to City Council Agendas contact the City Clerk's Office at (310) 458-
8211 or clerk@smgov.net.  This agenda is available in alternate format upon request.

Members of the public unable to attend a meeting but wishing to comment on an item(s)
listed on the agenda may submit written comments prior to the meeting by mailing them to:
City Clerk, 1685 Main Street, Santa Monica, CA 90401 or councilmtgitems@smgov.net.
Materials received from the public by 12 PM on the day of the Council meeting will be
distributed to Council prior to the meeting **and posted online**.

Si desea comunicarse con alguien en español, llame a nuestra oficina al (310) 458-8211 y
pida hablar con Esterlina Lugo.

*City Hall and the Council Chamber are wheelchair accessible.  If you require any special
disability related accommodations (i.e. sign language interpreting, access to an amplified
sound system, etc.), please contact the City Clerk's Office at (310) 458-8211 or TDD: (310)
917-6626 at least 3 days prior to the scheduled meeting.*

Santa Monica Blue Bus Lines #2, #3, #4 and #9 serve City Hall.  Parking is available on
Main Street, on Olympic Drive, and in the Civic Center Parking Structure (validation free).

---

Exhibit R
Page 513



# City of Santa Monica

## City Council Meeting

## AGENDA

**TED WINTERER**
MAYOR

**SUE HIMMELRICH**
COUNCILMEMBER

**GLEAM DAVIS**
MAYOR PRO TEM

**TONY VAZQUEZ**
COUNCILMEMBER

**TERRY O'DAY**
COUNCILMEMBER

**KEVIN MCKEOWN**
COUNCILMEMBER

**PAM O'CONNOR**
COUNCILMEMBER

**RICK COLE**
CITY MANAGER

**JOSEPH LAWRENCE**
INTERIM CITY ATTORNEY

**DENISE ANDERSON-WARREN**
CITY CLERK

### STANDARDS OF BEHAVIOR THAT PROMOTE CIVILITY AT ALL PUBLIC MEETINGS:

- Treat everyone courteously;
- Listen to others respectfully
- Exercise self-control

- Give open-minded consideration to all viewpoints;
- Focus on the issues and avoid personalizing debate;
- Embrace respectful disagreement and dissent as democratic rights, inherent components of an inclusive public process, and tools for forging sound decisions

Meetings are broadcast live on CityTV cable channel 16, Radio Station KCRW FM 89.9 (after 8:00 PM), and on the internet at www.smgov.net and www.kcrw.org. Cable television re-broadcasts air on Thursday and Saturday at 11:30 AM. The agenda will air on CityTV on Saturday and Sunday at 11:00 AM and 6:00 PM, and on Monday and Tuesday at 12:30 PM and 6:00 PM.

### STANDING IN AISLES OR AGAINST THE WALL IS NOT PERMITTED

10/03/2017



### RULES OF ORDER FOR THE CONDUCT OF CITY COUNCIL MEETINGS
(Resolution No.10928 (CCS))

Persons wishing to address the City Council regarding items on the agenda must be present and submit their name and address (optional) in writing to the City Clerk **before the public hearing is opened for that item.** Request-to-Speak forms are available prior to the meeting and throughout the meeting. Remarks from the public are limited to a total of 6 minutes per Council meeting, with a maximum of 2 minutes and a minimum of one minute per item. Except for the author of the request, public comment on 12-items are limited to 1 minute. Except on Public Input, speakers may donate 2 minutes to another person who may speak for a total of 4 minutes on that item. Both the donor of time and the designated speaker must submit their cards in person together.

**ORDER OF BUSINESS** (may not be changed except by majority vote of the City Council.)

1. Closed Session.
2. Special Agenda Items (City Manager's Report Commendations, Presentations, etc.).
3. Consent Calendar (All items considered in one motion unless removed by a Councilmember for discussion. Public comment shall be heard prior to council discussion).
4. Study Session.
5. Continued Items.
6. Administrative Proceedings.
7. Ordinances:
   - 1st Reading
   - 2nd Reading
8. Staff Administrative Item.
9. Public Hearings.
10. Reports of Boards and Commissions.
11. Resolutions.
12. Written Communications (other than Reports of Commission and Officers).
13. Councilmember Discussion Items.
14. Public Input (members of the public may address the City Council **only** on items not on the agenda, but within the subject matter jurisdiction of the City)

**Agendas and reports are accessible on the City's webpage at www.smgov.net/council/agendas. They are also available at the City Clerk's Office and in alternate formats upon request. For a free subscription to the City Council Agendas, please contact the City Clerk's Office at (310) 458-8211 or clerk@smgov.net.**

**Addressing the City Council:** State your name, address (optional), and neighborhood for the record; address the City Council as a whole, not as individuals. After the public hearing closes, no member of the public shall address the City Council on the matter under consideration without first securing Council approval. Please be courteous.

**Members of the audience:** Please refrain from clapping, whistling, or acts of disorderly conduct; do not distribute literature without prior authorization of the presiding officer; remain seated unless addressing the City Council; do not stand or sit in aisles; do not enter the well area of the dais or go behind rails unless authorized by the presiding officer.

Members of the public unable to attend a meeting but wishing to comment on an item(s) listed on the agenda may submit written comments prior to the meeting by mailing them to: City Clerk, 1685 Main Street, Santa Monica, CA 90401 or to councilmtgitems@smgov.net.

**MATERIALS RECEIVED FROM THE PUBLIC BY 12 PM ON THE DAY OF THE COUNCIL MEETING WILL BE DISTRIBUTED TO COUNCIL PRIOR TO THE MEETING AND POSTED ONLINE.**

**City Hall and the Council Chamber are wheelchair accessible. If you require any special disability related accommodations (i.e. sign language interpreting, access to an amplified sound system, etc.), please contact the City Clerk's Office at (310) 458-8211 or TDD: (310) 917-6626 at least 3 days prior to the scheduled meeting.**

**Si desea comunicarse con alguien en español, llame a nuestra oficina al (310) 458-8211 y pida hablar con Esterlina Lugo.**

**Santa Monica Blue Bus Lines #2, #3, #4, #9 and the EXPO Line serve City Hall. Parking is available on Main Street, on Olympic Drive, and in the Civic Center Parking Structure (validation free).**

**SMOKING IS PROHIBITED IN CITY HALL (SMMC 4.44.030)**

---

*City of Santa Monica*          *Generated: 4/27/2017 9:14 AM*          *Page 2*





City of
**Santa Monica®**

**AGENDAS**

CITY OF SANTA MONICA

SPECIAL MEETING

CITY HALL COUNCIL CHAMBERS

1685 MAIN STREET, ROOM 213

SATURDAY APRIL 29, 2017

**MEETING BEGINS AT 10:00 AM**

CALL TO ORDER
PLEDGE OF ALLEGIANCE
ROLL CALL

(This is a special City Council meeting.  Public comment is restricted to only items listed on
the agenda.)

1.    CLOSED SESSIONS

**1.A.    Public Employee Recruitment Title: City Attorney**

ADJOURNMENT

Any documents produced by the City and distributed to a majority of the City Council
regarding any item on this agenda will be made available at the City Clerk's Counter
located at City Hall, 1685 Main Street, Santa Monica during normal business hours.
Documents are also available at www.smgov.net/council/agendas.

For a *free* subscription to City Council Agendas contact the City Clerk's Office at (310) 458-
8211 or clerk@smgov.net.  This agenda is available in alternate format upon request.

Members of the public unable to attend a meeting but wishing to comment on an item(s)
listed on the agenda may submit written comments prior to the meeting by mailing them to:
City Clerk, 1685 Main Street, Santa Monica, CA 90401 or councilmtgitems@smgov.net.
Materials received from the public by 12 PM on the day of the Council meeting will be
distributed to Council prior to the meeting **and posted online**.

Si desea comunicarse con alguien en español, llame a nuestra oficina al (310) 458-8211 y
pida hablar con Esterlina Lugo..

*City Hall and the Council Chamber are wheelchair accessible.  If you require any special
disability related accommodations (i.e. sign language interpreting, access to an amplified
sound system, etc.), please contact the City Clerk's Office at (310) 458-8211 or TDD: (310)
917-6626 at least 3 days prior to the scheduled meeting.*

**Exhibit R
Page 516**



Santa Monica Blue Bus Lines #2, #3, #4 and #9 serve City Hall.  Parking is available on Main Street, on Olympic Drive, and in the Civic Center Parking Structure (validation free).

10/03/2017

**Exhibit R**
**Page 517**

1

<u>**PROOF OF SERVICE – CIVIL**</u>

2     12.     At the time of service I was over 18 years of age **and not a party to this action**.

3     13.     My residence or business address is: <u>9848 Tabor Street, Unit 211, Los Angeles, CA</u>

4 <u>90034</u>

5     14.     On September 25, 2017 I served the following **documents: VERIFIED AMENDED**

6 **PETITION FOR WRIT OF MANDATE, INJUNCTIVE AND DECLARATORY RELIEF FOR**

7 **VIOLATIONS OF THE RALPH M. BROWN ACT.**

8     15.     I served the documents on the **person or persons** below, as follows:

9     (a)     Name of person served: Santa Monica City Council

10     (b)     Business or residential address where person was served: C/O Office of the City

11 Attorney, 1685 MAIN ST RM 310, SANTA MONICA CA 90401-3248.

12     16.     The documents were served by the following means:

13 [\_\_\_]   **By personal service.** I personally delivered the documents to the persons at the addresses listed in
item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b)
14 by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the
attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no
15 person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place
in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was
16 made to the party or by leaving the documents at the party's residence with some person not younger than
17 18 years of age between the hours of eight in the morning and six in the evening.

18 [ x ]   **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the
persons at the addresses in item 4 and deposited the sealed envelope with the United States Postal Service,
19 with the postage fully prepaid.

20 [\_\_\_]   **By overnight delivery.** I enclosed the documents in an envelope or package provided by an
overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or
21 package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight
22 delivery carrier.

[\_\_\_]   **By messenger service.** I served the documents by placing them in an envelope or package
23 addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger
service for service.
24

25 I declare under penalty of perjury under the laws of the State of California that the foregoing is true
26 and correct.

27 Shana Elson            *Shana Elson*

28 _____    _____
(Type or Print Name of Declarant)      (Signature of Declarant)

29

VERIFIED AMENDED PETITION FOR WRIT OF MANDATE