1  R. Christopher Harshman, Esq. (248214)
2    chris@packetlaw.com
   P.O. Box 221
3  Culver City, California 90232
   Telephone:    (310) 425-3529
4  Facsimile:    (310) 382-2092

   *Attorney for Petitioners Kate Scott and*
5  *James Babinski*

6

7

8              SUPERIOR COURT OF CALIFORNIA

9        COUNTY OF LOS ANGELES — CENTRAL DISTRICT

10 | Kate Scott, *et al*,                    | Case no. BS169465
   |                                          |
11 |                 Petitioners/Plaintiffs,  | Assigned to Judge Chalfant, Dept. 85
   |                                          |
12 |          vs.                             | ***Ex Parte* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE re PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF R. CHRISTOPHER HARSHMAN**
13 | City Council for the City of Santa Monica, *et al*, |
   |                                          |
14 |                 Respondents/Defendants.  |
   |                                          |
15 |                                          |
   |                                          | [[PROPOSED] ORDER FILED CONCURRENTLY HEREWITH]
16 |                                          |
   |                                          |
17 |                                          | Date:  October 6, 2017
   |                                          | Time:  8:30 a.m.
18 |                                          | Place:  Dept. 85, Stanley Mosk Courthouse
   |                                          |          111 N. Hill Street, Los Angeles CA 90012
19 |                                          |

20 To All Parties and their Attorneys of Record:

21         Please take notice that on October 6, 2017, at 8:30 a.m. in Department 85 of the above-entitled

22 Court, petitioners Kate Scott and James Babinksi ("Petitioners") will and hereby do apply for a

23 temporary restraining order to restrain defendant City Council for the City of Santa Monica, and their

24 employees, agents, and all persons acting with them or on their behalf (together, "Defendants") from

25 taking any action to shorten the runway of the Santa Monica Municipal Airport (the "Airport" or

26 "SMO").

27         Petitioners also request the Court issue an Order to Show Cause ("OSC"), pursuant to Cal.

28 Rules of Court, rule 3.1150, affording Defendants the opportunity to appear and show cause why a

                                        1

1   Preliminary Injunction should not issue restraining and enjoining Defendants in the same manner for

2   the remainder of this litigation.

3          This application is made pursuant to Cal. Code Civ. Proc. § 527, the Ralph M. Brown Act

4   (Gov't Code §§ 54950 *et seq*), the California State Aeronautics Act (Public Utilities Code §§ 21001 *et*

5   *seq*), and because Petitioners and the general public will suffer immediate and irreparable harm if the

6   Defendants are not so enjoined, as set forth in greater detail in the attached Memorandum.

7          This application is based upon Cal. Code Civ. Proc. §§ 525 *et seq*, Cal. Rules of Court rule 3.1150

8   and rule 3.1200 *et seq*; upon the attached memorandum of points and authorities and declaration of R.

9   Christopher Harshman, upon the Verified Amended Petition on file in this matter, upon the records and

10  files in this action; and upon such further evidence and argument as may be presented prior to or at the

11  time of hearing on this application.

12         There has been no previous application for such relief.

13         The Defendants are represented by Heidi vonTongeln of the Office of the City Attorney, whose

14  address is 1685 MAIN ST RM 310, SANTA MONICA CA 90401-3248, whose: email address is

15  Heidi.vonTongeln@smgov.net; telephone number is (310) 458-8709; and fax number is (310) 395-6727.

16

17                                      Respectfully submitted,

18  Date: October 6, 2017            By: /s/ R. Christopher Harshman

19                                       R. Christopher Harshman, Esq.
                                         Attorney for Petitioners Kate Scott and James Babinski

20

21

22

23

24

25

26

27

28

**Memorandum**

## I. Introduction

The City of Santa Monica ("City") has long sought to close the Santa Monica Municipal Airport ("Airport" or "SMO"). In willful defiance of its duties under the Ralph M. Brown Act – which inexplicably, the City's City Council refuses to cure with a simple agendized open meeting or required public hearing – the City entered into an improper Settlement Agreement. Despite multiple legal challenges[1], including the instant petition, the City is rushing headlong towards acts that cannot be undone easily, if at all.

Petitioners here ask simply that the status quo be preserved while this action proceeds to a determination on the merits. The City must be forced to put on the brakes for a moment, and respect the judicial process and the rights of the people to weigh in on transparent and open government.

## II. Factual and Procedural History

### A. Procedural History

As set forth in the Petitioners' Verified Amended Petition for Writ of Mandate, Injunctive and Declaratory Relief for Violations of the Ralph M. Brown Act ("Petition"), at some point prior to (*Id.*, ¶ 17) or during a closed session held January 28, 2017, the City Council agreed to enter into the Settlement Agreement that purported to settle several lawsuits. (*Id.*, ¶¶ 18-26.) In fact, the Settlement Agreement, which "blindsided" all sides in this hotly contested issue (*Id.*, ¶¶ 21, 27), went beyond the bounds of those pending cases, and incorporated policy decisions that exceeded the litigation then existing. *Id.*, ¶¶ 28-29. In the Settlement Agreement, the City commits to realigning the existing 4973' runway to a runway 3500' in length, the creation of runway safety areas and new runway protection zones, and transfers property to the City for these purposes. *Id.*, 29, 31-34. The City has never conducted the type of public hearings required by the Government Code and Public Utilities Code, including the State Aeronautics Act. Petition, ¶¶ 31-46.

---

[1] E.g., *National Business Aviation Association, Inc. et al v. Michael P. Huerta, et al*, Docket No. 17-1054 (D.C. Cir.); the petitioners in that case sought a stay in March of 2017 (months before the City's announcements, detailed herein, that work to shorten the runway was imminent). That motion was denied without explanation.

The Petitioners sent the City Council a "Notice of Brown Act Violation" on April 18, 2017. *Id.*, ¶¶ 55-56. That notice was ignored, and the City did not and has not cured the violation. *Id.*, ¶¶ 57-59.

On April 28, 2017, the Petitioners filed the instant action. On or about May 31, 2017, the City filed and served a demurrer to the petition, set for hearing on August 8, 2017 (later continued *sua sponte* by the Court to August 10th). On August 10th, the Court granted the demurrer, and issued an order to show cause why this case should not be dismissed. On September 5th, 2017, the Court heard the Petitioners' response to that order to show cause, and granted leave to amend. Petitioners then[2] filed their Verified Amended Petition.

### B.   Airport Issues

On or about Friday, September 22, 2017, the City of Santa Monica sent out an email, "Santa Monica Airport Runway Shortening Project," that began: "We hereby notify you that the work to shorten the Santa Monica Airport runway is scheduled to begin on Monday, October 9, 2017." Declaration of R. Christopher Harshman ("Harshman Decl."), below, ¶ 10, Ex. A. This announcement noted "[t]he Airport will be closed to <u>all</u> aircraft operations … nightly from 9:00 p.m. to 7:00 a.m. … [from] October 9th [through] December 20th" (*Id.*) (emphasis original), and further stated "the Airport will be closed to <u>all</u> aircraft operations for <u>10 consecutive days</u> …[from] December 20th [through] December 30th." *Id.* (emphasis original).

On October 2, 2017, the Santa Monica Daily Press ran a front-page article, "City moves forward with runway demo plans at SMO," which began: "The City Council has urged Santa Monica's top engineer to move forward with plans to demolish part of the runway at Santa Monica Airport and replace it with grass." *Id.*, ¶ 11, Ex. B.

On October 4th at 10:00 a.m., City staff met with demolition planners to discuss destroying a significant portion of the Airport's runway. *Id.*, ¶ 12.

The City intends to move forward with a "Center Option" configuration for the 3500' runway, shifting all aircraft operations approximately 736 feet to the west. *Id.*, ¶ 13. The vast majority (the City

---

[2] Petitioners attempted to file by facsimile transmission, which was ultimately rejected because the font was "too small" (Petitioners used a 13-point font, in excess of the Court's requirements; Cal. Rules of Court, Rule 2.104 ("all papers filed must be prepared using a font size not smaller than 12 points"). The same day this rejection was received, Petitioners had their amended petition filed physically with the Court.

1  has used an assumption of 99%) of aircraft operations at SMO use runway 21 (i.e., facing approximately

2  210° on a compass), to take advantage of the prevailing winds, which blow in from the southwest. *Id.*,

3  ¶ 2.

4       This "Center Option" has significant safety and noise implications. *Id.*, ¶¶ 3-6. Simple

5  trigonometry dictates that an aircraft that starts its take-off roll 736' further west will overfly the

6  neighborhoods to the west of the airport at a lower altitude, and will spend more time over residential

7  areas prior to reaching an altitude from which a safe return to the airport runway could be accomplished

8  in the event of an engine failure or other emergency. *Id.*, ¶ 3.

9       The City will spend up to approximately $7,000,000 in this pursuit. *Id.*, ¶ 13, Ex. C.

10       The City now claims no environmental review is required for these changes (*Id.*, Ex. B), though

11  its long serving former City Attorney opined that such review would likely be required. *Id.*, ¶¶ 7-8.

12      **C.**    **Ex Parte Notice**

13       Counsel for Petitioners provided written *ex parte* notice via facsimile transmission at 9:06 a.m.

14  and via email at 9:07 a.m. on October 5th, 2017 and left notice verbally at 9:54 a.m. *Id.*, ¶ 14 Ex. D.

15  **III.**   **ARGUMENT**

16      **A.**    **Requirements for Issuance of a Temporary Restraining Order and Order to Show**

17          **Cause re Preliminary Injunction are Satisfied Here**

18       A temporary restraining order may issue when "[i]t appears from facts shown by affidavit or by

19  the verified complaint that great or irreparable injury will result to the applicant before the matter can be

20  heard on notice." Cal. Code Civ. Proc. § 527(c)(1). Likewise, a Preliminary Injunction is proper in the

21  following circumstances:

22      (1) When it appears by the complaint that the plaintiff is entitled to the relief demanded,

23      and such relief, or any part thereof, consists in restraining the commission or continuance
         of the act complained of, either for a limited period or perpetually; (2) When it appears by

24      the complaint or affidavits that the commission or continuance of some act during the
         litigation would produce waste, or great or irreparable injury, to a party to the action; (3)

25      When it appears, during the litigation, that a party to the action is doing, or threatens, or

26      is about to do, or is procuring or suffering to be done, some act in violation of the rights of
         another party to the action respecting the subject of the action, and tending to render the

27      judgment ineffectual; (4) When pecuniary compensation would not afford adequate

28

relief; [and] (5) Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief.

Code Civ. Proc. § 526(a). "A preliminary injunction may be granted at any time before judgment upon a verified complaint, or upon affidavit if the complaint in the one case, or the affidavits in the other, show satisfactorily that sufficient grounds exist therefore." Code Civ. Proc. § 527(a)

In determining whether to issue a temporary restraining order ("TRO") or Order to Show Cause re Preliminary Injunction ("OSC"), the Court must evaluate two interrelated factors: (1) the likelihood that the party seeking injunctive relief will prevail on the merits at trial; and (2) the irreparable harm the party seeking injunctive relief is likely to sustain if injunctive relief is denied. *See White v. Davis,* 30 Cal. 4th 528, 554 (2003); *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1449 (2002). These factors are applied on an inverse sliding scale: the greater the likelihood of success on the merits, the less must be shown as to interim harm and vice versa. *Butt v. State of California*, 4 Cal.4th 668, 678 (1992).

"*The ultimate goal* of any test to be used in deciding whether a preliminary injunction should issue *is to minimize the harm which an erroneous interim decision may cause.*" *White*, *supra* (emphasis original), quoting *IT Corp. v. Cty. of Imperial*, 35 Cal. 3d 63, 73 (1983). The court should exercise its judgment in favor of the party most likely to be injured. *Robbins v. Superior Court*, 38 Cal.3d 199, 205 (1985). If the denial of an injunction would result in great harm to the petitioners, and the defendant would suffer little harm if it were granted, then it is an abuse of discretion to fail to grant the preliminary injunction. *Ibid.*

The purpose of a temporary restraining order or preliminary injunction is to preserve the status quo pending the complete briefing and thorough consideration contemplated by full proceedings pursuant to a preliminary injunction. *See Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974) (temporary restraining orders have an "underlying purpose of preserving the status quo and preventing irreparable harm"). "The granting or denial of a temporary restraining order is discretionary with the trial judge and amounts to a mere preliminary or interlocutory order to keep the subject of litigation *in status quo* pending the determination of the action on its merits." *Gray v. Bybee*, 60 Cal. App. 2d 564, 571 (1943) (emphasis original) citing *People v. Black's Food Store*, 16 Cal. 2d 59 (1940); *see*

1  *also, e.g.*, *Continental Baking Co. v. Katz*, 68 Cal.2d 512, 528 (1968), *Froomer v. Drollinger*, 183 Cal. App.

2  2d 787, 788-789 (1960); *Jessen v. Keystone Savings & Loan Assn.*, 142 Cal.App.3d 454, 458 (1983);

3  California Practice Guide, Civil Procedure Before Trial, ¶ 9:558 (The Rutter Group 2016) (referencing

4  *White v. Davis*, *supra* and *Costa Mesa City Employees' Ass'n. v. City of Costa Mesa*, 209 Cal.App.4th 298,

5  305 (2012)).

6       A temporary restraining order is distinguishable from a preliminary injunction in the following

7  respects: It may be issued ex parte; a bond is not essential; and it is of short duration, normally expiring

8  at the time of the hearing on the preliminary injunction. *Chico Feminist Women's Health Ctr. v. Scully*,

9  208 Cal. App. 3d 230, 237 (1989).

10       Such relief may be applied for *ex parte*. Cal. Rules of Court, Rule 3.1150 provides that

11  "[a]pplications for *ex parte* temporary restraining orders are governed by the ex parte rules in chapter 4

12  of this division," and Rule 3.1202(c) requires the *ex parte* "applicant must make an affirmative factual

13  showing in a declaration containing competent testimony based on personal knowledge of irreparable

14  harm, immediate danger, or any other statutory basis for granting relief ex parte."

15      **B.**    **Irreparable Harm**

16       "An application for injunctive relief is more likely to be granted if the moving party can show

17  that it will suffer 'irreparable injury' if an injunction is not issued pending an adjudication of the

18  merits." California Civil Procedure Before Trial (4th ed Cal CEB) § 32.31.

19         *1.   Risk of Personal Harm and Property Damage*

20       A shortened runway, especially the adopted "Center Option," creates a risk of physical harm for

21  anyone piloting or being transported in an airplane departing from the Airport, including the Petitioners.

22  The risk is also increased for those living below the departure path of the Airport. "Risk of harm to

23  persons and property and loss of tenants are injuries which cannot be measured in damages." *Bennett v.*

24  *Lew*, 151 Cal. App. 3d 1177, 1185 (1984).

25         *2.   Petitioners and the Public would be Denied Access to Unique Real Property*

26       Petitioners' access to unique real property – i.e., the full-length runway at SMO – is endangered.

27  Not only is the City actively and imminently moving forward with plans to "restripe" and effectively

28  deny access to the full length of the runway, the City is chomping at the bit with plans to *destroy* a

1   significant portion of the runway, forever depriving Petitioners and the general public access to this

2   important, irreplaceable, piece of national transportation infrastructure.

3        "[P]arcels of real property have always been treated as unique." *Bagdasarian v. Gragnon*, 31

4   Cal. 2d 744, 757 (1948); *and see, e.g., Lennar Homes of California, Inc. v. Stephens*, 232 Cal. App. 4th 673,

5   689 (2014) (quoting *Harbour Vista, LLC v. HSBC Mortgage Services Inc.*, 201 Cal.App.4th 1496, 1505

6   (2011) for the precept that "real property is unique"), *Glynn v. Marquette*, 152 Cal. App. 3d 277, 281

7   (1984) (every piece of property is unique and thus damages are an insufficient remedy to the denial of

8   property rights). "A continuing nuisance or trespass involving real property may

9   constitute irreparable harm because the injury may be unquantifiable or difficult to prove …

10  Notwithstanding the question of irreparable harm, courts may issue preliminary injunctions by focusing

11  on protecting the status quo." California Attorney's Guide to Damages (2d ed Cal CEB) §5.26A.

12       Other courts concur. For example, in *Fairfield Resorts v. Fairfield Mountains Property Owners*

13  *Association*, 2006 WL 1889152, *4-5 (W.D.N.C. 2006), a threatened eviction from – and demolition of –

14  a leased building constituted irreparable harm. *See also Columbia Gas Transmission v. An Exclusive*

15  *Natural Gas Storage Easement*, 688 F.Supp. 1245, 1250-51 (N.D.Ohio 1988) (injunction ordered to

16  prevent irreparable harm to utility and customers from shutdown of gas storage field); *Tau v. Alpha*

17  *Omicron Pi Fraternity*, 2013 WL 5340904, *14 (D.Minn. 2013) (defendant "demonstrated a willingness

18  to act swiftly and unilaterally" to dispose of property at issue); *Hancock Fabrics v. Rutheven Associates*,

19  2006 WL 2459222, *2 (E.D.Va. 2006); *International Snowmobile Manufacturers v. Norton*, 304

20  F.Supp.2d 1278, 1287 (D.Wyo. 2004).

21       *3.  Courts Have Found That Restricting Operations at SMO Would Cause Irreparable Harm*

22       "[A] large disruption to air traffic is avoided and Santa Monica is required to preserve the status

23  quo only while [] proceedings conclude. Given … the potential disturbance to air traffic around the Los

24  Angeles area, the preliminary relief requested (and awarded) is in the public interest. *United States v.*

25  *City of Santa Monica*, 330 F. App'x 124, 125-26 (9th Cir. 2009).

26       Other courts concur that airport access restrictions cause irreparable harm:

27       The curfew has had an adverse effect on the corporate and business aircraft based at the
      Airport. ... Flights in and out of other airports are not an adequate substitute for the

28

6

flexibility provided by business and corporate air flights in and out of the Airport ... On the issue of irreparable harm, plaintiffs have demonstrated negative impact on the airspace in the New York City metropolitan area and beyond, which cannot be measured in monetary damages.

*U.S. v. Westchester County*, 571 F.Supp. 786, 797-98 (S.D.N.Y. 1983). *See also National Aviation v. City of Hayward*, 418 F.Supp. 417, 419 (N.D.Cal.1976); *Friends of the East Hampton Airport*, 152 F.Supp.3d 90, 106-07 (E.D.N.Y. 2015), affirmed in part, vacated in part on other grounds, 841 F.3d 133 (2d Cir. 2016); *AOPA v. City of Pompano Beach*, FAA docket no. 16-04-01, Director's Determination, at 37 (December 15, 2005) ("[t]he presumption that aeronautical users could use other nearby airports to conduct these activities does not relieve the City of its obligation to accommodate these activities").

### 4. *Irreparable Harm is Imminent*

The City intends to imminently exercise its purported authority to shorten the SMO runway.

### 5. *Balancing of Harms*

The requested stay would maintain the status quo at the Airport.  In contrast to the local and regional injuries described above, no harm would come to the City or others by the maintenance of the full runway during this proceeding. The City has operated the SMO runway in substantially its current configuration since shortly after World War II. There are no special circumstances that differentiate SMO from the thousands of general aviation airports around the country that serve their communities every day. Too, by rushing headlong into this process in spite of pending litigation, the City is the architect of any harm it might conceivably argue: "[T]he state entities involved in this case have 'jumped the gun' ... by entering into contractual obligations that anticipated a pro forma result. In this sense, the state entities are largely responsible for their own harm." *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002).

### C.    The Merits

As the Petition sets out (¶¶ 31-45), California law (*inter alia*) requires public hearings before an airport can acquire runway protection zones (as the City – proprietor of SMO – does in the Settlement Agreement), or construct a new runway, or extend or realign an existing runway (the Settlement Agreement provides for a 3,500' runway which the City now construes as a complete "redo" of the

7

Airport, with the construction of new taxiways, a wholesale repositioning and realignment of the runway, new striping, relocation of navigation and approach lighting, etc.). Public Utilities Code §§ 21664.5(a), 21661.6 . New permits are required, which the City has not obtained.

Cal. Public Utilities Code § 21669.6 adopts the requirements of Cal. Gov't Code §§ 11500 *et seq* for the public hearings required; the Government Code, in turn, makes applicable the requirements of Gov't Code §§ 11400 *et seq* to the City's operation of the Airport (Gov't Code § 11501).

The nightly closing, and entire Airport closing for 10 days in December, further require a public hearing (Petition ¶¶ 32, 46; Public Utilities Code § 21605).

The City has not – cannot – demonstrate compliance with those requirements, as evidenced by the oral argument the Court heard in response to its Order to Show Cause re Dismissal in September.

Under the Court's reading of *Trancas Prop. Owners Ass'n v. City of Malibu* (2006), the inferred exception to the Brown Act's liberally applied open meeting requirement is not met here. Petitioners will prevail on the merits.

## IV.   CONCLUSION

Before the City spends millions of dollars enacting a flawed project authorized by its besieged improper entry into the Settlement Agreement, it should – for once – respect the judicial process and the rights of *all* the people impacted by the Airport. The status quo must be preserved; the City must be enjoined from taking actions that cannot be undone.

Respectfully submitted,

Date: October 6, 2017                    By: /s/ R. Christopher Harshman
                                              R. Christopher Harshman, Esq.
                                              Attorney for Petitioners Kate Scott and James Babinski

**DECLARATION**

I, R. Christopher Harshman, declare as follows:

      1.      I am an attorney, duly licensed to practice law before all courts of the State of California, and an attorney of record for petitioners Kate Scott and James Babinski in this action. I have personal knowledge of the following facts except to those stated on information and belief, and as to those facts, I believe them to be true. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

      2.      I am also a certificated pilot with an instrument rating, and fly airplanes from and to the Santa Monica Municipal Airport regularly. In the past two years, I have departed from and/or landed at SMO at least one hundred (100) times. All but one of those aircraft operations has been on runway 21. Runways are aligned to take advantage of prevailing winds at an airport, and the wind almost always blows more or less "straight down" the 21 runway, from the coast (from a compass heading of approximately 210°, e.g., from the southwest).

      3.      From my personal observations and calculations, starting the takeoff roll will result in lower altitudes when leaving the airport environment and overflying the adjacent neighborhoods. For instance, according to the Pilot's Operating Manual for the Piper Cherokee Arrow airplane I often rent at the Santa Monica Airport, the Takeoff Performance (Ground Run) will be approximately 800'. Once airborne, that aircraft's Climb Performance is about 850 feet per minute, at an airspeed of 100 MPH. Thus:

      a.      With the existing runway configuration, I will typically "rotate" (start flying) approximately 1000' west of the eastern edge of the runway, and 4000' later, at the end of the runway, I will be approximately 400' above ground level ("AGL").

      b.      However, if the runway is moved 736' west, I'll be approximately 100' lower (approx.. 300' AGL) at the departure end of the runway (or less, depending on the outside temperature; climb performance is lower on warm days).

      4.      Lower departure altitudes will, of course, be louder to those on the ground. I am informed and believe that the City's own study, done I believe by AECOM, found that the Center Option would increase noise at the departure end of the runway.

9

5.      The Sunset Park neighborhood starts just west of the departure end of runway 21.

6.      Any alteration to SMO that results in lower altitudes over densely populated areas increases the risk to pilots and those on the ground. For example, in aviation, we're taught about the "impossible turn" (see, e.g., FAA Publication V11 FAA-P-8740-44, titled "Impossible Turns"). The FAA (in that document and elsewhere) instructs pilots who experience engine or other mechanical failure to not even attempt to turn back to land on a departure runway below *at least* 400' AGL, noting "provided you have gained at least 600 feet prior to engine failure, there is a reasonable chance of regaining the airfield … below 600 feet AGL, the numbers spell disaster."

7.      I am informed and believe that Marsha Moutrie served as the City Attorney for the City of Santa Monica for twenty-two (22) years, from December 1993 through the end of 2016. I personally reviewed a press release issued by the City on September 22, 2016, City Attorney Marsha Moutrie Announces End-of-Year Retirement[3].

8.      Ms. Moutrie opined, on at least one occasion (speaking to a hypothetical closing of the "western parcel" of the Airport and a resulting, hypothetical, 3000' runway): "some level of environmental assessment would likely be required to close all or part of the Airport and that would take time … environmental review of the 'project' of closure would probably be required by state law.  Such review is also time consuming." Staff report, *available at* https://www.smgov.net/departments/council/agendas/2014/20140325/s2014032508-A.htm

9.      On or about September 22, 2017, the City of Santa Monica sent out an email, "Santa Monica Airport Runway Shortening Project," a true and correct copy of which is attached hereto as **Exhibit A**.

10.     On October 2, 2017, the Santa Monica Daily Press ran a front-page article, "City moves forward with runway demo plans at SMO," a true and correct copy of which is attached hereto as **Exhibit B**.

11.     I am informed and believe that, at 10:00 a.m. on October 4th, 2017, City staff met with demolition planners to discuss destroying a significant portion of the Airport's runway.

---

[3] *Available at* https://www.santamonica.gov/press/2016/09/26/city-attorney-marsha-moutrie-announces-end-of-year-retirement

12.     I am informed and believe that the City intends to move forward with a "Center Option" configuration for the 3500' runway, shifting all aircraft operations approximately 736 feet to the west.

13.     I am informed and believe the City intends to spend "$3.52 million to complete runway shortening construction by December 31, 2017," and then another "$3.44 million" on runway destruction; *see*, *e.g.*, Runway Replacement 1,500 Ft Now $7 Million, Santa Monica Mirror, Sept. 29, 2017, a true and correct copy of which is attached hereto as **Exhibit C**.

14.     **Ex Parte Notice**. On Thursday, October 5, 2017, at approximately 9:05 a.m., I sent written notice of this *ex parte* application to Heidi vonTongeln, an attorney with the Santa Monica City Attorney's Office. A true and correct copy of that written notice, together with the FAX Transmission Report showing successful delivery and the email to which it was attached, are attached hereto as **Exhibit D**. At 9:54 a.m. I attempted to reach Ms. vonTongeln by telephone at (310) 458-8709; I left a voicemail also providing notice. Subsequently, I was contacted by Joanna Simon, an attorney with Morrison Foerster, who informed me she would appear to oppose this application on the City's behalf.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of October, 2016, in Culver City, California.

/s/ R. Christopher Harshman
R. Christopher Harshman, Esq.

## PROOF OF SERVICE

On October 6, 2017 (the "Service Date"), I served a true and correct copy of the foregoing *EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF R. CHRISTOPHER HARSHMAN* (the "Document") upon the parties set forth below, or on the attached service list (the "Recipient(s)") by:

**Personal Service**, in that I handed the Document to the addressee.

Service of the Document was made on each party (or, for a represented party, the attorney(s) representing that party) set forth here:

Joanna Simon
Morrison & Foerster LLP
12531 High Bluff Drive
San Diego, CA 92130-2040

 I hereby certify that: I am over the age of 18 years; not a party to, nor interested in, this matter; that I am an active member of the State Bar of California; and that my business address is P.O. Box 221, Culver City, California 90232.

 I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This Declaration constitutes Proof of Service of the Document.

 Executed on October 6, 2017 at Los Angeles, California.


      /s/ R. Christopher Harshman

      R. Christopher Harshman

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION – MEMORANDUM