1   LANE DILG (SBN 277220)
    City Attorney
2   Lane.Dilg@smgov.net
    JOSEPH LAWRENCE (SBN 99039)
3   Assistant City Attorney
    Joseph.Lawrence@smgov.net
4   HEIDI von TONGELN (SBN 239331)
    Heidi.vonTongeln@smgov.net
5   Deputy City Attorney
    1685 Main Street, Third Floor
6   Santa Monica, California 90401-3295
    Tel:  310.458.8336; Fax:  310.393.6727
7
8   WILLIAM V. O'CONNOR, JR. (SBN 216650)
    WOConnor@mofo.com
9   JOANNA L. SIMON (SBN 272593)
    JoannaSimon@mofo.com
10  MORRISON & FOERSTER LLP
    707 Wilshire Boulevard, Suite 6000
11  Los Angeles, California 90017-3543
    Tel:  213.892.5200; Fax:  213.892.5454
12
13  Attorneys for Defendant
    CITY COUNCIL FOR THE
    CITY OF SANTA MONICA
14

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17  KATE SCOTT, an individual; JAMES          Case No. 2:17-cv-07329-RSWL-FFM
    BABINSKI, an individual;
18                                            **DEFENDANT'S RESPONSE TO
                     Plaintiffs,             ORDER TO SHOW CAUSE RE
19                                            PRELIMINARY INJUNCTION**
          v.
20                                            Hon. Ronald S.W. Lew
    CITY COUNCIL FOR THE CITY OF
21  SANTA MONICA, the governing body
    of the City of Santa Monica which
22  operates the Santa Monica Municipal
    Airport; and DOES 1 through 10,
23  inclusive,

24                   Defendant.

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     BACKGROUND ................................................................................. 3

    A.      The City Acquires the Airport Property ................................. 3

    B.      The City Leases the Airport Property to the United States ................. 3

    C.      The United States Surrenders its Leasehold Interest ........................... 3

    D.      The 1984 Settlement Agreement ............................................ 4

    E.      The City Accepts Its Last Federal Grant in 1994 ................................. 5

    F.      The City Evaluates the Future of the Airport ....................................... 5

    G.      The City's Quiet Title Action Against the United States .................... 6

    H.      The City Approves a Settlement Agreement/Consent Decree ............ 6

    I.      The Runway Shortening Project ............................................ 7

    J.      Petitioners File Their Writ Petition ...................................... 8

    K.      The State Court Grants the City's Demurrer ..................................... 9

    L.      The Present Proceedings ..................................................... 10

III.    PETITIONERS' REQUEST FOR A PRELIMINARY INJUNCTION
    SHOULD BE DENIED ....................................................................... 10

    A.      Petitioners Are Not Likely To Succeed On The Merits ................... 10

        1.      Petitioners' Claims Under the Public Utilities Code Will
        Fail ........................................................................... 10

            a.      Public Utilities Code § 21661.6 Does Not Apply to
            the Runway Shortening Project ...................................... 11

            b.      If Public Utilities Code § 21661.6 Applies, the City
            Held Multiple Public Hearings Related to the
            Runway Shortening Project ........................................... 13

            c.      The City Was Not Required to Hold a Public
            Hearing Under Public Utilities Code § 21605 .............. 14

            d.      There Is No Private Right of Action Under the
            Public Utilities Code ..................................................... 15

            e.      The Public Utilities Code Sections Cited by
            Petitioners are Federally Preempted .............................. 16

            f.      The Public Utilities Code Sections Cited by
            Petitioners are Federally Preempted .............................. 16

        2.      The Law of the Case Doctrine Bars Petitioners' Other
        Claims ...................................................................... 17

        3.      Even If Petitioners Were Procedurally Permitted to Assert
        the CEQA/LA City Plot Allegations, Any Claim Based on
        Those Allegations is Time-Barred ............................................ 20

    B.      Petitioners Will Not Suffer Irreparable Harm .................................... 20

**TABLE OF CONTENTS**
**(continued)**

Page

1. The Runway Shortening Project is Safe ................................... 20

2. The Runway Shortening Project Will Benefit the Environment ................................................................. 22

3. Petitioners Will Not Be Irreparably Harmed By Limited Access to the Airport ......................................................... 23

4. Petitioners Cannot Claim Irreparable Harm Based on Disruption to the National Airspace System ........................... 23

C. The Balance Of Equities Tips In The City's Favor ........................... 23

D. It Is In The Public Interest To Move Forward With The Runway Shortening ....................................................... 25

IV. CONCLUSION ............................................................ 25

# TABLE OF AUTHORITIES

**Page**

*Christianson v. Colt Indus. Op. Corp.*,
    486 U.S. 800 (1988) ...............................................................................18

*City of Santa Monica v. FAA.*,
    U.S. Ct. of Appeals for the 9th Cir., No. 16-72827.................................6

*City of Santa Monica v. United States*, *et al.*,
    C.D. Cal. No. 13-CV-08046 JFW ...........................................................6

*In re: Compliance with Fed. Obligations by the City of Santa Monica*,
    Federal Aviation Administration Docket No. 16-16-13.............................6

*Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers*
    *Local No. 70 of Alameda Cty.*,
    415 U.S. 423 (1974) ...............................................................................18

*Martin v. Midwest Express Holdings, Inc.*,
    555 F.3d 806 (9th Cir. 2009) .................................................................16

*McCasland v. City of Castroville*,
    514 F. App'x 446 (5th Cir. 2013)...........................................................23

*Montalvo v. Spirit Airlines*,
    508 F.3d 464 (9th Cir. 2007) .................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................10

**Statutes**

28 U.S.C. § 1540.............................................................................................18

49 U.S.C. § 40101...........................................................................................16

49 U.S.C. § 40103...........................................................................................23

49 U.S.C. § 46319...........................................................................................16

California Brown Act .................................................................................*passim*

California Environment Quality Act ...........................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

**Page**

California Public Resources Code § 21167 .......................................................20, 23

Federal Aviation Act................................................................................ 16, 17

Pub. Util. Code § 21002 ....................................................................... 15

Pub. Util. Code § 21605 ............................................................... 14, 15

Pub. Util. Code § 21661 ....................................................11, 12, 13, 14

Pub. Util. Code § 21664 ...........................................................12, 13

Pub. Util. Code § 21666 ...................................................... 15

Pub. Util. Code § 21668 ...................................................... 15

## Other Authorities

14 CFR Part 157 .......................................................................8, 17, 21

56 FR 33994-01 ................................................................... 17

## I.   INTRODUCTION

This Court should deny Petitioners' request for a preliminary injunction. Petitioners ask this Court to put on hold a runway shortening project that has been (i) desired by Santa Monica residents for decades; (ii) approved by the City Council in public session by public vote over eight months ago when it approved the Consent Decree; (iii) agreed to by the Federal Aviation Administration (FAA) when it signed the Consent Decree; (iv) approved by the Honorable John F. Walter when he signed and entered the Consent Decree; and (v) the subject of at least four publicly held hearings since February 2017.  The City has acted in full view of the public and Petitioners each step of the way; there have been no secrets.

Nonetheless, Petitioners argue that they were "blindsided" and that the runway shortening must be enjoined.  Nonsense.  Petitioners do not come close to meeting the standard for a preliminary injunction.  Specifically, Petitioners are not likely to succeed on the merits of any of their claims.  Their alleged claims under the Public Utilities Code fail for multiple reasons, including  (i) the provisions of the PUC that Petitioners rely upon are inapplicable to the runway shortening project; (ii) even if the PUC provisions were applicable to the runway shortening, the City has complied with them; (iii) even if the City had not complied with the provisions, there is no private right of action under the PUC; and (iv) if there were a private right of action, Petitioners claims would be preempted by federal law. Petitioners' other claimed violations of the Brown Act and California Environment Quality Act (CEQA) are wrong, barred by law of the case, and time barred.

Nor can Petitioners establish that they will suffer irreparable harm.  All of the admissible evidence before the Court establishes without doubt that the runway shortening project will benefit the environment.  The admissible evidence also confirms that the runway shortening is safe.  The Court should not credit the speculative, anecdotal, and inadmissible safety evidence submitted by Petitioners that it is contradictory to the engineering and safety analyses conducted by experts.

1   The City, on the other hand, will suffer significant harm if the Court grants a
2   preliminary injunction.  Specifically, the City will incur significant financial
3   penalties if construction is delayed, as the City has already contracted with
4   construction firm AECOM to complete the runway shortening, an action that was
5   publicly approved by the City Council at its August 8, 2017, City Council meeting.
6   The public interest weighs heavily in the City's favor. The City has, for
7   years, been working to reduce Airport noise, air pollution, and safety risks.  The
8   Consent Decree settled decades of legal disputes and several legal proceedings
9   through which the City sought to secure local control over the future of the Airport.
10   The Consent Decree made the future of the Airport a matter of local control.
11    Lawsuits and other proceedings ended.  The federal government and the City were
12   no longer opposing parties.  If the City wanted to shorten the runway it could do so
13   after complying with applicable environmental and other laws. The same is true for
14   ultimate closure.  Given this and contrary to Petitioners' claims, the Consent Decree
15   does not by itself shorten the runway or close the Airport.  Rather, before any
16   runway shortening or ultimate Airport closure can occur, appropriate environmental
17   studies and public hearings must occur, in accordance with California law, which is
18   exactly what happened in months following the approval of the Consent Decree.
19   There is more.  Broader public interests are also served by the Consent
20   Decree and runway shortening.   The FAA called the Consent Decree "a fair
21   resolution for all concerned."  "FAA Reaches Settlement Agreement with City of
22   Santa Monica" (Jan. 28, 2017).[1]   Judge Walter, who entered the Consent Decree,
23   further found that the Consent Decree, "taken as a whole, is fair, reasonable and
24   adequate[.]." (Quiet Title Action, Dkt. No. 56.)  Petitioners did not challenge the
25   Consent Decree before Judge Walter when they had the chance to do so.  This

26
27   [1] https://www.faa.gov/news/press_releases/news_story.cfm?newsId=21394 (last accessed Oct. 8, 2017)
28

1   Court should not permit Petitioners to collaterally attack the Consent Decree now.

2   Petitioners are not entitled to preliminary injunctive relief.

3   **II.    BACKGROUND**

4   There is a long and storied history behind SMO, which includes in large part

5   the battle of Santa Monica's residents to gain local control over the Airport.

6   ### A.    The City Acquires the Airport Property

7   In 1926, Santa Monica acquired title to certain parcels of unimproved land

8   that now constitute most of the property known as SMO.  Between 1926 and 1949,

9   the City acquired additional smaller parcels that make up the rest of the airport

10  property.  This is undisputed.  (Makrides Decl. ¶ 5.)

11  ### B.    The City Leases the Airport Property to the United States

12  In December 1941, to aid in the war effort, the City leased the Airport to the

13  United States for nominal rent.  The United States' leasehold at SMO was

14  accomplished through two separate leases covering two adjoining parcels of land.

15  (Request for Judicial Notice ("RJN") Ex. 1, Golf Course Lease; RJN Ex. 4,

16  Runway Lease.) On December 27, 1944, the City and the predecessor to the FAA,

17  the Civil Aeronautics Administration (CAA), entered in to a Form AP-4

18  Agreement.  Under the AP-4 Agreement, the CAA would improve the landing area

19  and other unidentified areas of SMO at its sole discretion.  (RJN Ex. 7, AP-4

20  Agreement, at 3.)  The AP-4 Agreement made clear that "all improvements made

21  under the Project shall be the sole and absolute property of the [City.]"

22  (*Id.* at 2, 3.)

23  ### C.    The United States Surrenders its Leasehold Interest

24  At the end of World War II, the United States determined that it was no

25  longer necessary to maintain a presence at the Airport.  Accordingly, the United

26  States and the City amended both the leases . (RJN Ex. 6, Supp. No. 2 to Runway

27  Lease; RJN Ex. 3, Supp. No. 2 to Golf Course Lease.)  Under the amendments, the

28  United States stopped operating the Airport and paying rent to the City. (*Id.*)

1    On July 29, 1946, the War Assets Administration declared as surplus the

2    United States' leasehold interests, (RJN Ex. 8, Form SPB-5 Declaration of Surplus

3    Real Property), and on August 10, 1948, the United States officially surrendered its

4    leasehold interest in the Airport Property to the City pursuant to an Instrument of

5    Transfer ("IOT").  (RJN Ex. 10, IOT.)   In 1949, the United States transferred to the

6    City by quitclaim deed 20 acres of land acquired through condemnation by exercise

7    of federal war powers and paid for with City funds.  (RJN Ex. 12, 1949 Quitclaim

8    Deed.)  The land subject to this Quitclaim Deed—added to the land that the City

9    already owned—comprises all of the Airport land.

10    **D.    The 1984 Settlement Agreement**

11    In the 1960s, jets began using the Airport, imposing a severe noise impact on

12    adjacent neighborhoods.  In response to resident apprehensions about the jets,

13    various aviation associations began objecting to City plans to close or substantially

14    limit operations at SMO.  The FAA responded to these concerns in an April 1971

15    letter to the Senior Vice President of the Aircraft Owners and Pilots Association.

16    The FAA stated that "Santa Monica Airport is vulnerable to being discontinued and

17    its land used for non-airport purposes."  (RJN Ex. 13, 1971 FAA Letter.)

18    In June 1981, the City Council adopted Resolution No. 6296, declaring its

19    intention to close SMO as soon as legally possible.  (RJN Ex. 14, Santa Monica

20    City Council Resolution No. 6296.)  Thereafter, in 1983, the City adopted a new

21    Master Plan for the Airport Property.  (RJN Ex. 15, 1983 Airport Master Plan.)

22    Resolution No. 6296 and the new Master Plan prompted several administrative

23    actions against the City.  As a result, the FAA negotiated with the City concerning

24    SMO's operations, culminating in the signing of a "Settlement Agreement" in

25    1984.  (RJN Ex. 16, 1984 Agreement.)  The 1984 Agreement expressly provided

26    that the City was required to operate SMO as an airport only until July 1, 2015.

27    (*Id.*)

28

### E. The City Accepts Its Last Federal Grant in 1994

In June 1994, the City accepted its last federal Airport Improvement Grant in exchange for contractual promises to maintain the Airport for the use and benefit of the public for the useful life of improvements made with the funds, but for no more than twenty years from the date of execution of the grant agreement. (Ex. 17, 1994 Grant Agreement Contract No. DTFA08-94-C-20857.)   The City's grant assurances required—consistent with the duration of the 1984 Agreement—that the City continue to operate SMO as an airport until no later than June 29, 2014, twenty years after the City entered into the 1994 Grant Agreement. (*Id.*)

### F. The City Evaluates the Future of the Airport

In December 2010, in anticipation of the expiration of the 1984 Settlement Agreement, the City Council directed its staff to conduct a comprehensive public process regarding SMO's future.  The result was an April 2013 City Council Report on the "Visioning Process." (Cline Decl. ¶ 3, Exhibit A.)  The Visioning Process concluded that the status quo at the Airport was not acceptable to residents. (*Id.*)

In 2014, a City of Santa Monica Airport Development Council-Referred Question, Measure LC, was placed on the election ballot for voters in the city of Santa Monica. (Anderson-Warren Decl. ¶ 7.)  Measure LC would require voter approval for any alternate or new developments on the airport land, except for parks, open space and recreational areas. (*Id.* ¶ 7, Ex. G.)  Under Measure LC, the governance of the airport was placed in the hands of the City Council.  The ballot question was posed as follows: "Shall the City Charter be amended to: (1) prohibit new development on Airport land, except for parks, public open spaces and public recreational facilities, until the voters approve limits on the uses and development that may occur on the land; and (2) affirm the City Council's authority to manage the Airport and to close all or part of it?" (*Id.* Ex. G.)  The voters passed Measure LC, with 15,434 votes in favor, and 10,096 votes against, confirming the community's desire that the Airport be subject to local control and that the property

be developed consistent with community principles. (*Id.* ¶ 8, Ex. I.)

Also on the ballot was Measure D, a counter-initiative that would have amended the city charter to require voter approval in a citywide election before any change in the use of land at the SMO to non-aviation purposes, or that closes or partially closes SMO.  (*Id.* ¶ 7, Ex. H.)  Measure D was nonetheless defeated, with 14,688 "no" votes and only 10,288 "yes" votes. (*Id.* ¶ 8, Ex. I.)

### G.     The City's Quiet Title Action Against the United States

In October 2013, the City filed a quiet title action against the United States seeking a declaratory judgment that the City has unencumbered title to the Airport property.  *City of Santa Monica v. United States*, *et al.*, Civil Action No. 13-CV-08046 JFW (VBKx), Dkt. No. 1 ("Quiet Title Action").[2]  While the Quiet Title Action was pending, the City was involved in several other disputes related to the City's ability to exercise control over Airport operations and to close the Airport. These Airport-related disputes included, among others: (i) *City of Santa Monica v. FAA*, Court of Appeals for the Ninth Circuit, Case No. 16-72827 ; and (ii) *In re: Compliance with Fed. Obligations by the City of Santa Monica*, Federal Aviation Administration Docket No. 16-16-13.

### H.     The City Approves a Settlement Agreement/Consent Decree

On January 28, 2017, the City Council, in compliance with the Brown Act, approved in public session a settlement with the United States that resulted in the Consent Decree, after Council Members were heard on the issue.  (Quiet Title Action, Dkt. No. 57, RJN Ex. 18.)  The Consent Decree resolved all pending litigation between the United States and the City regarding the Airport.  These litigation items were listed on the Meeting Agenda.  The City Attorney reported out

---

[2] The City filed a Notice of Related Case notifying the Court that this matter is related to the *City of Santa Monica v. United States*, *et al.*, Civil Action No. 13-CV-08046 JFW (VBKx).

about them, in full view of the public.  The Consent Decree provides for the runway shortening.  *Id.* at 8.  (*Id.*)

## I.    The Runway Shortening Project

Immediately thereafter, the City began making public efforts, including holding public hearings to effectuate the Consent Decree and to determine whether and how to shorten the runway, all in accordance both with the Consent Decree and the City's legal obligations, including those under CEQA.  Petitioners could have appeared and objected during those meetings.  They did not do so.  (Anderson-Warren Decl. ¶ 3-7.)  The City's public actions are set forth in Table B.

**Table B – Runway Shortening Implementation Steps Made at Public Hearing**

| Date | Action | Evidence |
|---|---|---|
| 2/28/17 | The City awarded a Feasibility Professional Services Agreement to AECOM, which engaged AECOM to study reducing the length of the Run to 3,500 feet. | Cline Decl. ¶ 6, Exs. B, G. |
| 4/24/17 | City staff issued an Information Item responding to the City Council's inquiry about a potential phased interim project for the removal of pavement at the ends of the runway and evaluation of future uses of the excess runway area. | *Id.* Exs. C, G. |
| 5/24/17 | The City selected the centered shortened runway option from the two options presented for runway shortening. The City also authorized staff to proceed with further design of the preferred center option to establish a guaranteed maximum price (GMP) for a design build agreement between the City and AECOM to complete the runway shortening. | *Id.* ¶ 8, Exs. D, G. |
| 5/24/17 | The City adopted Resolution No. 11044 stating that the runway shortening project was categorically exempt from review under the California Environmental Quality Act (CEQA). Resolution 11044 was adopted after extensive environmental review, through which it was determined that "reducing the operational length of the Airport's runway to 3,500 feet will <u>reduce the adverse environmental, health and safety harms and risks that</u> | *Id.* ¶ 9, Exs. E, G. |

| | | | |
|---|---|---|---|
| | | current Airport operations impose on residents of the City and the adjacent cities, including by reducing jet traffic, noise impacts and air emissions." | |
| | 5/24/17 | The City directed staff to investigate pavement removal options for the unused and abandoned portions of the runway | *Id.* ¶ 8, Exs. E, G. |
| | 7/31/17 | The FAA sent the City a letter concerning the center option for the runway shortening.  The FAA considered "the options for the shortened runway; the replacement of FAA-owned visual aids for the runway (VASI and PAPI); the changes to runway safety areas; and the required airspace review (14 CFR Part 157 and FAA Form 7480-1) to reasonably retain existing approach and departure procedures when the shortened runway is operational." The FAA stated that the City's planned runway shortening would not "impede reasonably continuous and stable operations of [the Airport]" and thus the FAA did not object to the implementation of the City's plans, and thanked the City for its "continued collaboration with the FAA." | RJN Ex. 21. |
| | 8/8/17 | The City authorized the City manager to execute a design build agreement with AECOM, for a GMP of $3.52 million to complete the runway shortening construction. | Cline Decl. ¶ 10, Exs. F, G. |
| | 9/26/17 | The City Council publicly discussed options for treatment of the excess pavement created by the runway shortening. | *Id.* ¶ 11, Ex. G. |
| | 10/3/17 | The City and AECOM entered into a Design-Build Agreement for shortening of the Runway. | Valte Decl. ¶ 2, Ex. 1. |
| | 10/18/17 | Construction slated to begin on runway shortening project, assuming progressive mobilization of materials and equipment starting no later than October 11. | *Id.* ¶ 7. |

### J.     Petitioners File Their Writ Petition

On April 18, 2017, eighty days after the City Council voted to approve the Consent Decree, Petitioners sent the City a demand letter arguing that the approval of the Consent Decree was void *ab initio* due to alleged violations of the Ralph M. Brown Act, California Government Code section 54950 *et seq.* (the "Brown Act").

On April 28, 2017—ninety-three days after the City voted to approve the Consent Decree—Petitioners filed a Verified Petition for Writ of Mandate and Complaint for Injunctive and Declaratory Relief (the "Petition") in Los Angeles County Superior Court.  (Dkt. No 01-2, Petition.)

### K.    The State Court Grants the City's Demurrer

On August 10, 2017, Judge Chalfant of the Los Angeles Superior Court granted the City's demurrer to the Petition and dismissed all of Petitioners' Brown Act claims <u>with prejudice</u>.  (RJN Ex. 19.)  Judge Chalfant explained, correctly, that the Brown Act expressly provides the City with the authority to discuss its legal disputes in closed session, to determine legal strategy, and to settle disputes in closed session. (*Id.*)  Judge Chalfant continued that, in compliance with the Brown Act, the City listed various Airport legal disputes on its January 28, 2017 closed session agenda. (*Id.*)  Before the City Council went into closed session, the public was afforded the opportunity to speak on those closed session matters. (*Id.*) Following closed session, the City Council reported that it had action to take with regard to the Airport related legal disputes. (*Id.*)  The City Attorney outlined the key settlement terms of the proposed Consent Decree. (*Id.*)  The City Council held a public discussion of its members' views, and then took a public vote on whether to agree with the Consent Decree and settlement agreement.  (*Id.*)  Judge Chalfant concluded that the "City Council exceeded the requirements of the [Brown Act] by reporting the substance of the Consent Decree and by voting on it in open hearing" and accordingly, Petitioners "fail[ed] to state a claim[.]" (*Id.*)

On September 5, 2017, after conducting a hearing on an Order to Show Cause re Dismissal of the action, Judge Chalfant allowed Petitioners leave to file an amended petition on a very narrow issue that was not pleaded in the original Petition: whether under the California Public Utilities Code ("PUC"), a public hearing was required to discuss shortening the runway before the City entered into the Consent Decree.  (RJN Ex. 20, Notice of Ruling.)

**L.     The Present Proceedings**

On September 28, 2017, Petitioners filed their Amended Petition. (Dkt. No. 01-19, "Am. Petition.")[3]  The City timely removed this case on October 5, 2017, because the Amended Petition raises substantial federal questions.  (Dkt. No. 1.)  Petitioners filed their *ex parte* application for a TRO in this Court on October 6, 2017.  (Dkt. No. 6.)  On October 8, 2017, the Court granted the TRO.  (Dkt. No. 12.)  October 8, 2017, the City requested that the Court reconsider the TRO and order an expedited schedule for briefing on a preliminary injunction.  (Dkt. No. 14.)  The Court denied reconsideration, but granted expedited briefing.  (Dkt. No. 32.)

**III.   PETITIONERS' REQUEST FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED**

Petitioners cannot meet the standard for a preliminary injunction.  A party seeking a preliminary injunction must establish that: (i) "he is likely to succeed on the merits," (ii) "he is likely to suffer irreparable harm in the absence of preliminary relief," (iii) "the balance of equities tips in his favor," and (iv) the "injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

**A.     Petitioners Are Not Likely To Succeed On The Merits**

Petitioners' request for a preliminary injunction must be denied because Petitioners cannot show that they are likely to succeed on the merits.

**1.     Petitioners' Claims Under the Public Utilities Code Will Fail**

Petitioners are not likely to succeed on their claims that the City violated the PUC because: (i) the provisions of the PUC that Petitioners rely upon are inapplicable to the runway shortening project; (ii) even if the PUC provisions were applicable to the runway shortening, the City has complied with them; (iii) even if

---

[3] The Amended Petition improperly rehashes prior allegations of Brown Act violations from the original Petition that were dismissed by Judge Chalfant with prejudice.

1  the City had not complied with the provisions, there is no private right of action by

2  which Petitioners can enforce those provisions in civil litigation; and (iv) if there

3  were a private right of action available to Petitioners, Petitioners' claims would be

4  preempted by federal law.

5           **a.**      **The Brown Act and Not the Public Utilities**

                     **Code Establishes the Requirements for How**

6                       **Litigation is to be Settled**

7        The Brown Act is very specific regarding how litigation matters are to be

8  handled at public meetings. In contrast, nothing in the PUC mentions litigation or

9  settlement; and nothing in the PUC suggests that the PUC supplants the Brown Act.

10  Moreover, it is well understood that specific laws control over more general ones.

11  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012).

12  Consequently, while the PUC's hearing requirements *might* apply in some

13  instances, they do not apply with regard to litigation settlements.  The Brown Act

14  does, and the City fully complied with the Brown Act.

15           **b.**      **Public Utilities Code § 21661.6 Does Not Apply**

                     **to the Runway Shortening Project**

16

17        Petitioners allege the City violated PUC § 21661.6 because the City did not

18  hold a "public hearing" concerning the runway shortening.  (Dkt. No. 1-19,

19  Amended Petition ¶ 31.)  Public Utilities Code § 21661.6 is titled "Submission of

20  plan for <u>expansion</u> or <u>enlargement</u> of airport."  PUB. UTIL. CODE § 21661.6

21  (emphasis added).   It provides that "[p]rior to the <u>acquisition</u> of land or any interest

22  therein… for the purpose of <u>expanding</u> or <u>enlarging</u> any existing publicly owned

23  airport, the acquiring entity shall submit a plan of that <u>expansion</u> or <u>enlargement</u> to

24  the board of supervisors of the county, or the city council of the city, in which the

25  property proposed to be acquired is located."  PUB. UTIL. CODE § 21661.6

26  (emphasis added).  On its face this provision does not apply to the City's plans for

27  shortening the runway for multiple reasons.

28        First, PUC § 21661.6 applies to only when a "acquires land or any interest

therein. PUB. UTIL. CODE § 21661.6.  The City did not "acquire any land" or "any interest in" any land through the Consent Decree, and, specifically, did not acquire land for runway protection zones.  (Makrides Decl. ¶ 9.)  It is undisputed that, at least since 1949, the City has had title to the 227 acres of land underlying the Airport.   (*Id.* ¶ 5.)  Thus, contrary to this Court's analysis of Petitioners' TRO application, this City did not "acquire runway protection zones;" no additional land is being added to the Airport property.

Second, PUC § 21661.6 applies only to projects that expand or enlarge an airport.  PUB. UTIL. CODE § 21661.6.  The City is reducing, not "expanding" or "enlarging," the Airport.  (*Id.* ¶ 4.)  Indeed, a stated purpose of the Consent Decree was to limit jet aircraft operations by <u>reducing</u> the length of the existing runway.  As the City Attorney reported after the public City Council vote to approve the Consent Decree:  "the operational length of the runway will be <u>reduced</u> to 3500 feet – that, with regard to that – it is anticipated that the <u>reduction</u> in the runway length will cause over 40% of current jet operators to no longer be able to use the Santa Monica Airport…"  (Dkt. No 1-19 at 10 of 90.)  Because the City is not enlarging or expanding the Airport, PUC § 21661.6 does not apply.

Third, Petitioners argue that because under PUC § 21664.5, "expansion" of an airport includes "realignment of an existing runway," PUC § 21661.6's requirement for a public hearing therefore applies to the City.  (Dkt. No. 6-1 at 3 of 14 (Petitioners argue that "the City commits to <u>realigning</u> the existing 4973' runway to a runway 3500' in length" (emphasis added.).)  Petitioners are incorrect that the runway shortening constitutes realignment of the existing runway.  (Makrides Decl. ¶¶ 10-12.)  In fact, on September 7, 2017, the California Department of Transportation, Division of Aeronautics, confirmed that the runway shortening project does not constitute an extension or realignment.  (*Id.* at Ex. 1.)

**Excerpt of Letter from California DOT, Division of Aeronautics**

> We confirm that a Corrected Airport Permit is required for the shortening of the runway and that an Amended Airport Permit is not required because the runway is not being extended or realigned. A Division of Aeronautics form DOA-0103, Amended/Corrected Airport Permit – Application, is the proper form to submit and request a Corrected State Airport Permit. A Corrected State Airport Permit will be issued upon completion of the runway work.

The California DOT, Division of Aeronautics, is the agency charged with reviewing and approving Airport-related permits under the PUC, "including the requirement for public hearings in connection therewith." PUB. UTIL. CODE § 21664.5. The California DOT has, in writing, informed the City that the runway shortening is not a realignment. (Makrides Decl. ¶¶ 12, 13, Ex. 1 – California DOT Letter.) The City should not be forced to comply with requirements that the California DOT has expressly told the City do not apply to the runway shortening.

The California DOT's finding that the runway shortening is not realignment makes sense. The runway shortening project is taking place on the existing runway, in its existing location, using its existing surface. (*Id.* ¶¶ 14-18.) It is not moving or rotating; its compass heading will remain the same. (*Id.*) It is merely being shortened as described in the September 26, 2017, Staff Report. (Cline Decl. Ex. G.) Because PUC § 21661.6 does not apply to the runway shortening project, Petitioners cannot show a likelihood of success on their claim under that provision.

### c. If Public Utilities Code § 21661.6 Applies, the City Held Multiple Public Hearings Related to the Runway Shortening Project

Even if, somehow, PUC § 21661.6 was applicable to the runway shortening project (for reasons above, it is not), the City has held numerous public hearings concerning the runway shortening, thus satisfying any public hearing requirement. These include, at least, public hearings on: (i) February 28, 2017 (awarding a Feasibility Professional Services Agreement to AECOM and engaging AECOM to study reducing the length of the Run to 3,500 feet) (Cline Decl. Ex. G); (ii) May 24,

1   2017, (selecting the center shortened runway option from the two options presented

2   for runway shortening and authorizing staff to proceed with further design of the

3   preferred center shortened runway option;  adopting Resolution No.11044 finding

4   no environment impact) (*Id.* Ex E); (iii) August 8, 2017 (authorizing the City

5   manager to execute a design build agreement with AECOM for a GMP of $3.52

6   million to complete the runway shortening construction) (*Id.* Ex. F) and (iv)

7   September 26, 2017, (discussing options for treatment of the excess pavement

8   created by the runway shortening). (*Id.* Ex. G.)  Because each of these meetings

9   was a public hearing concerning the runway shortening, the City has met its

10   purported obligation under PUC § 21661.6.   Further, while the City does not

11   concede it is required to "cure" any failure to hold a public hearing, these public

12   hearings would amount to a "cure," which Petitioners admit is possible, rendering

13   the claim moot and subject to dismissal.  (Dkt. No. 20 at 6:19-12).

14           **d.     The City Was Not Required to Hold a Public**
                     **Hearing Under Public Utilities Code § 21605**
15

16        In granting the TRO, the Court properly found that PUC § 21605 did not

17   require the City to hold a public hearing because, under that section, the

18   Department "may" conduct a public hearing.  (Dkt. No. 12 at 5, n.2.)  The Court's

19   conclusion was correct, and should not be disturbed.

20        In addition to the Court's reasoning, PUC § 21605 is inapplicable on its face

21   to the runway shortening project.  Under PUC § 21605, "[n]o proprietor of any

22   permitted airport which is open to the public and has received public funds shall

23   close or suspend operation of the airport, or close an existing runway or taxiway

24   except on a temporary basis for inspection, maintenance, construction, or

25   emergency purposes, without notifying the department in writing 60 days prior to

26   the intended closure or suspension of operations."  PUB. UTIL. CODE § 21605

27   (emphasis added).  Here, suspension of airport operations during the runway

28   shortening project will be on a "temporary basis" for "construction." (Makrides

Decl. ¶ 21.)  Thus, the runway shortening project is expressly not subject to any alleged hearing requirement of PUC § 21605. [4]

### e.  There Is No Private Right of Action Under the Public Utilities Code

Even if Petitioners' claims were substantively viable (they are not for the reasons above), Petitioners cannot assert them in this forum because there is no private right of action under the PUC provisions cited by Petitioners.  The California Legislature intended that those provisions be administered by the California Department of Transportation ("DOT") and the State Aeronautics Board, not by private citizens.  The legislative intent was to grant "to a <u>state agency</u> powers, and imposing upon it duties, so that <u>the state</u> may properly perform its functions relative to aeronautics…" PUB. UTIL. CODE § 21002 (emphasis added). The State Aeronautics Board was created so that <u>the state</u> could ensure "uniformity of the laws and regulations relating to aeronautics."  PUB. UTIL. CODE § 21002 (c). Petitioners concede that PUC § 21002 governs.  (Am. Petition at ¶ 37.)

The statutory scheme specifically provides that those aggrieved under the PUC may be heard by the California DOT (not by a court in private litigation).  For example, with regard to suspension of airport operations, the PUC specifically provides that "any person aggrieved by the action of the department shall, upon request, be granted a hearing by <u>the department</u>[.]" PUB. UTIL. CODE §§ 21666, 21668(e), 21668.2 (emphasis added).  Accordingly, the intent of the Legislature is to direct complaints and resolutions under the PUC to the DOT, rather than the court system.  Because there is no private right of action, Petitioners have no probability of success in this forum.

---

[4] Petitioners appear to claim that the Consent Decree amounts to permanent Airport closure, triggering the alleged hearing requirement of PUC § 21605.  This is not true. The Consent Decree merely gives the City the <u>option</u> to close the airport in the future after January 1, 2029.   (RJN Ex. 18.)

**f.     The Public Utilities Code Sections Cited by Petitioners are Federally Preempted**

Even if there was a private right of action and Petitioners' claims were substantively viable, Petitioners cannot prevail on the merits of their PUC claims because those claims are preempted by the Federal Aviation Act, 49 U.S.C. § 40101 *et seq.*, and its implementing regulations, which pervasively and comprehensively occupy the entire field of aviation safety. *Montalvo v. Spirit Airlines,* 508 F.3d 464, 471 (9th Cir. 2007). Field preemption exists "when federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* Where the FAA issues "pervasive regulations" in an area, the Federal Action Act "preempts all state law claims in that area." *Martin v. Midwest Express Holdings, Inc.*, 555 F.3d 806, 811 (9th Cir. 2009). Courts have recognized that "'preemptive intent is more readily inferred' in the field of aviation, because it is 'an area of the law where the federal interest is dominant.'" *Id.* "[T]he regulations enacted by the FAA, read in conjunction with the [Federal Aviation Act] itself, sufficiently demonstrate an intent to occupy exclusively the entire field of aviation safety and carry out Congress' intent to preempt all state law in this field." *Montalvo*, 508 F.3d at 471.

Here, Petitioners assert claims under the PUC that require the City to conduct a public hearing, among other things, before approving plans to shorten the airport runway or close the airport. (Dkt. No. 1-2, Petition.) Petitioners' claims are preempted because the Federal Aviation Act, Federal Aviation Regulations, and corresponding FAA requirements create a comprehensive web of federal regulation over aviation safety involving construction and alteration of airports.

Indeed, in exercising its plenary authority over the field of aviation safety, the FAA, pursuant to section 46319, only requires that a public agency provide "written notice to the Administrator of the [FAA] at least 30 days before the date of the closure [of an airport]." 49 U.S.C. § 46319. Part 157 of the Federal Aviation

Regulations regulates the notice requirement for public agencies "proposing to construct, alter, activate, or deactivate a civil or joint-use (civil/military) airport or to alter the status or use of such an airport."  14 CFR Part 157.  Under section 157.5, public agencies must submit notice of FAA Form 7480-1 detailing the construction, alteration or deactivation plan.  14 CFR Part 157.5.

Once the public agency submits the Form (as the City has here, Makrides Decl. ¶¶ 22-23, Ex. 2), the FAA reviews it to make an advisory determination as provided in section 157.7 to consider various safety concerns such as "the effects the proposed action would have on existing or contemplated traffic patterns of neighboring airports."  14 CFR § 157.7.  The legislative history of Part 157 explains that the FAA "revised certain notice requirements associated with the construction, alteration, activation, and deactivation of airports" in part to "clarif[y] the scope of part 157 to include consideration of the safety of persons and property."  56 FR 33994-01.  Because shortening the runway implicates aviation safety governed by the Federal Aviation Act and its implementing regulations, including 14 C.F.R. Part 157, Petitioners' PUC claims are preempted.

### 2. The Law of the Case Doctrine Bars Petitioners Other Claims

The law of the case doctrine precludes Petitioners from asserting claims under the Brown Act or any other law unrelated to the PUC.  On August 10, 2017, Judge Chalfant—a very experienced Superior Court judge, well versed in California's Brown Act—sustained the City's demurrer to Petitioners' Brown Act claims with prejudice because he found that the City Council approved the Consent Decree in public session, not behind closed doors.  (RJN Ex. 19, Decision on Demurrer.)  On September 5, 2017, after conducting a hearing on an Order to Show Cause regarding Dismissal of the entire action, Judge Chalfant reluctantly allowed Petitioners leave to file an amended petition on a very narrow issue that was not pleaded in the original Petition: whether under the California Public Utilities Code,

<u>a public hearing was required to discuss shortening the runway before the City</u>
<u>entered into the Consent Decree.</u> (RJ Ex. 20, Notice of Ruling.)  Despite this ruling, Petitioners improperly included both Brown Act claims (again) and CEQA-related claims in their Amended Petition.  (Am. Petition ¶¶ 17-27, 30, 50-59, 60-99 (Brown Act); ¶¶ 33-34, 36, 43 (CEQA).)  This Court should ignore these allegations.

"[W]hen a Court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Op. Corp.*, 486 U.S. 800, 815 (1988).  The law of the case doctrine applies to decisions rendered by a state court before removal.  *Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 435–36 (1974) ("Judicial economy is promoted by providing that proceedings had in state court shall have force and effect in federal court"); 28 U.S.C. § 1540 ("proceedings had … prior to removal shall remain in full force and effect…").

Judge Chalfant previously sustained <u>with prejudice</u> the City's demurrer to all of Petitioners' Brown Act claims because he found that the City Council <u>approved the Consent Decree in public session, not behind closed doors.</u>  (Dkt. No. 1-13, Decision on Demurrer Sustained.)  *See* Table A.

### Table A:  Law of the Case Demurrer Rulings

| Petitioners' Allegation | Judge Chalfant's Ruling |
|---|---|
| Petitioners alleged that the City Council violated section 54957.1(a)(2) by discussing the Consent Decree in closed session.  (RJN Ex. 19, Pet. ¶ 16.6(a).) | Demurrer sustained with prejudice because: "the City Council voted on the Consent Decree in public session and reported its substance." (RJN Ex. 19, Decision on Demurrer Sustained at 8 of 10.) |
| Petitioners alleged that the City Council violated section 54957.1(a)(3)(A) and (B) because the City Attorney falsely reported that the Consent Decree had been approved by the FAA, | Demurrer sustained with prejudice because: (1) "[T]he City Attorney only stated that the City, the United States, and the FAA have agreed to the terms of the Consent Decree.  The City Attorney recommended that City Council approve the Consent Decree,… [and] the City |

| Department of Justice, and the White House as of January 20, 2018. (*Id.*, Pet. ¶ 16.6(b).) | Attorney did not claim that the Consent Decree had already been signed by the United States or the FAA. (*Id.*); (2) The "City Council exceeded the requirements of the [Brown Act] by reporting the substance of the Consent Decree and by voting on it in open hearing." (*Id.*); (3) "The Petition fails to state a claim for violation of section 549571(a)(3)(A) or (a)(3)(B)." (*Id.*) |
| Petitioners alleged that the City Council violated section 54953's open meeting requirement by coming to a collective decision or commitment to approve the Consent Decree through serial actions prior to the January 28, 2017 meeting. (*Id.*, Pet. ¶¶ 34, 41.) | Demurrer sustained with prejudice because: (1) "[T]he Petition does not allege any ultimate facts to support this contention." (*Id.* at 9 of 10.); (2) None of the allegations "indicate that the City Council came to a collective decision regarding the Consent Decree prior to the January 28, 2017 meeting." (*Id.*) (3) "The Petition fails to state a claim under the Brown Act." (*Id.*) |
| Petitioners alleged a pattern and practice by the City to commit Brown Act Violations, and seeks mandate for the City Council to tape and digitally record its sessions under section 54960. (*Id.*, Pet. ¶ 43, Prayer ¶ 6.) | Demurrer sustained with prejudice because: "The Petitioner does not adequately allege a claim, and therefore cannot support a remedy under section 54960." (*Id.* at 9 of 10, n.4.) |

Petitioners may not like it, but the City did precisely what the Brown Act authorized and permitted it to do.  In reality, Petitioners' dispute is with the Brown Act itself and the California legislature and not the City, as the City simply followed the Brown Act.  Judge Chalfant's factual findings and rulings concerning Petitioners' claims under the Brown Act are the law of the case and preclude Petitioners from re-asserting those claims here.[5]  Judge Chalfant also expressly

---

[5] The PUC requires nothing more. The Brown Act, not the PUC sets forth how legal disputes can or cannot be discussed and settled.  Nothing in the PUC suggests that it supplants the more specific Brown Act.  Nothing in the PUC suggests that litigation settlements, which the judicial system and public policy strongly encourage, must wait for some other kind of public hearing.  As noted, the PUC applies, if at all, only in very specific and limited circumstances, none of

(Footnote continues on next page.)

1   limited Petitioners' right to amend their Petition to the question of <u>whether under</u>

2   <u>the California Public Utilities Code, a public hearing was required to discuss</u>

3   <u>shortening the runway before the City entered into the Consent Decree</u>.  (RJN Ex.

4   20.)  To the extent Petitioners base their claims on allegations unrelated to the PUC,

5   those allegations go beyond that permitted relief, and cannot be the basis of

6   Petitioners' requested injunctive relief.  These include Petitioners allegations

7   concerning CEQA and other obligations.   (Am. Petition ¶¶ 33-36, 43, 48-49.)

8   Because Petitioners' were not granted leave to amend to add these allegations after

9   the City's demurrer was sustained without leave to amend, the claims are barred.

10,11   **3.    Even If Petitioners Were Procedurally Permitted to Assert the CEQA/LA City Plot Allegations, Any Claim Based on Those Allegations is Time-Barred**

12   Even if this Court were to consider Petitioners' allegations concerning CEQA

13   (Amended Petition ¶¶ 33-34, 36, 43) any claim based on those allegations fails as

14   time-barred.  On May 25, 2017, the City filed a Notice of Exemption Concerning

15   the "Santa Monica Airport Runway Shortening Project."  (RJN Ex. 11, Notice of

16   Exemption.)  Under California Public Resources Code § 21167, any action to

17   challenge this categorical exemption had to be commenced within 35 days of the

18   City's filing of the Notice—by June 29, 2017.  Pub. Res. Code § 21167.

19   Petitioners did not file any such challenge within applicable limitations period.

20   Accordingly, even if the Court considers Petitioners' CEQA allegations (which it

21   should not), Petitioners cannot show that they are likely to succeed on the merits.

22   **B.    Petitioners Will Not Suffer Irreparable Harm**

23   **1.    The Runway Shortening Project is Safe**

24   Petitioners argue that they will be irreparably harmed because the runway

26   (Footnote continued from previous page.)

27   which occurred here, and most certainly none occurred before or at the time that the Consent Decree and settlement agreement was publicly approved.

shortening creates "a risk of physical harm for anyone piloting or being transported in an airplane departing from the Airport, including Petitioners." (Dkt. No. 6-1 at 7 of 14.) The basis for Petitioners' argument is the declaration of Petitioners' attorney, R. Christopher Harshman. (Dkt. No. 61- at 11 of 14.) Mr. Harshman is not an expert in aviation safety. His declaration is wholly insufficient to establish any safety risk. (McFall Decl. ¶¶ 11-19.)[6]

As set forth in the Declaration of Tommy McFall, an aviation safety expert, filed concurrently herewith, there are many safety benefits to the shortened runway. Specifically, the shortened runway will (i) enable 300-foot safety areas by repurposing portions of the old runway at both ends; (ii) limit access to the Airport by larger, louder, and faster aircraft due to the reduced length of the runway; and (iii) reduce the overall frequency of aircraft take offs and landings. (McFall Decl. ¶¶ 20-32; Figure A, *supra*.) All of these factors reduce the risk of aircraft accidents.

Mr. McFall's opinions are in accord with the FAA's position concerning the runway shortening project. On July 31, 2017, the FAA sent the City a letter concerning the centered shortened runway option. (RJN Ex. 21.) The FAA considered "the options for the shortened runway; the replacement of FAA-owned visual aids for the runway (VASI and PAPI); the changes to runway safety areas; and the required airspace review (14 CFR Part 157 and FAA Form 7480-1) to reasonably retain existing approach and departure procedures when the shortened runway is operational." (*Id.*) The FAA stated that the runway shortening would not "impede reasonably continuous and stable operations of [the Airport]" and the FAA did not object to the implementation of the City's plans." (*Id.*)

---

[6] The City has filed objections to Mr. Harshman's declaration. Mr. Harshman is incorrect regarding the propriety of the "impossible turn," which according to the FAA and Mr. McFall, is the "worst possible action" and a "bad idea" at SMO, regardless of the length of the runway. (McFall Decl. ¶¶ 13-19.)

## 2.    The Runway Shortening Project Will Benefit the Environment

Petitioners also seem to argue that the runway shortening will cause irreparable harm because it will have negative environmental impacts.  This argument is contradicted by all the actual evidence, including years of environmental studies, including those concerning air quality and noise impact.

Most recently, on May 24, 2017, the City adopted Resolution No. 11044 stating that the runway shortening project was categorically exempt from review under CEQA. (Cline Decl. Ex. E.)  Through that Resolution, the City determined that "reducing the operational length of the Airport's runway to 3,500 feet will reduce the adverse environmental, health and safety harms and risks that current Airport operations impose on residents of the City and the adjacent cities, including by reducing jet traffic, noise impacts and air emissions." (*Id*.)  Studies also found that shortening the runway using the centered option would "reduce the impact of aircraft exhaust and fumes on surrounding residential neighborhoods, because the changes in aircraft number, types, and approach and departure procedures would result in aircraft reaching the recommended default mixing layer of 3,000 feet sooner than under existing conditions, reducing the amount of vertically mixing pollutant on surrounding neighborhoods." (*Id.*)  The City determined that the shortened runway would "benefit the environment and it can be seen with certainty that there is no possibility that shortening the runway may have a significant effect on the environment, including on air traffic, air quality, greenhouse emissions, safety or any other aspect of the environment." (*Id.*)  These determinations were not challenged by Petitioners (or anyone else) and are now final under CEQA.

Petitioners' attempt to boot strap claims under CEQA into "irreparable harm" must be rejected for a separate reason:  it is too late for Petitioners to assert CEQA challenges to the runway shortening project.  Any claim based on allegations that the City failed to comply with CEQA had to be commenced within 35 days of the

City's May 25, 2017, filing of the Notice of Exemption— by June 29, 2017.  PUB. RES. CODE § 21167.  Petitioners never sought environmental review of the runway shortening project; Petitioners did not file any environmental challenge to the runway shortening project within applicable limitations period (or ever).  The Court should not give credence to Petitioners belated assertion that the environmental impact of the runway shortening project constitutes irreparable harm.

### 3.      Petitioners Will Not Be Irreparably Harmed By Limited Access to the Airport

Petitioners also argue they will be irreparably harmed because they will be denied access to a piece of real property.  (Dkt. No. 6-1 at 5:25-6:20.)  Petitioners are not being denied access to anything—they will have access to the Airport on the same terms as anyone else.  And because Petitioners do not have a protectable property interest in the Airport, they cannot claim entitlement to the Airport.  *See, e.g.*, *McCasland v. City of Castroville*, 514 F. App'x 446, 448–49 (5th Cir. 2013).

### 4.      Petitioners Cannot Claim Irreparable Harm Based on Disruption to the National Airspace System

Petitioners also argue that the shortened runway will disrupt the national airspace system.  (Dkt. No. 6-1 at 6:22-7:9.)  Petitioners' position contradicts the views of the FAA, which has the "sole authority to regulate the use of the airspace as necessary to ensure its efficient use and the safety of aircraft." *See* 49 U.S.C. § 40103(b)(1).  The FAA, <u>a party</u> to the Consent Decree, described the careful balance it struck:  "This is a fair resolution for all concerned because it strikes an appropriate balance between the public's interest in making local decisions about land use practices and <u>its interests in safe and efficient aviation services.</u>" *FAA Reaches Settlement Agreement with City of Santa Monica* (Jan. 28, 2017).

### C.      The Balance Of Equities Tips In The City's Favor

The balance of the equities also favors the City.  The City has publicly debated the future of the Airport for half a century.  The Consent Decree was

1   entered over eight months ago, after years of hard-fought litigation.  The public

2   process, replete with public hearings to shorten the runway began almost

3   immediately thereafter, and the City has invested considerable time and its and

4   community resources to complete the runway shortening as soon as legally

5   possible, but not in haste.  Contrary to the Court's TRO, the City's process leading

6   up the runway shortening has not been a "rush," but rather has been a responsibly

7   planned public process, in consultation with the community and FAA, based on

8   multiple environmental and engineering studies.  Petitioners could have participated

9   but did not.  This process should not be delayed based on Petitioners late,

10  unsupported, and seemingly endless allegations.  The City's residents have waited

11  long enough to begin the process of reducing the Airport's impact.

12       The City will also incur large financial penalties if construction is delayed, as

13  the City has already contracted with construction firm AECOM to complete the

14  runway shortening, an action that was publicly approved by the City Council at its

15  August 8, 2017, City Council meeting.  (Valte Decl. ¶¶ 2-4, Ex.1.)  Under the

16  contract, the City is obligated to pay AECOM (i) $5,200 for each day the runway

17  shortening project is delayed beyond the scheduled completion date (*id.* at 5.); and

18  (ii) for subcontractor labor and material increases, plus storage costs.  (*Id.* at 6.)

19       Although construction is not scheduled to being until October 18, based on

20  the Court's TRO, the City will incur delay penalties as of October 11 associated

21  with AECOM's inability mobilize for the runway shortening project.  (Valte Decl. ¶

22  7.)  Mobilization includes installation of fencing, construction submittals of

23  materials and equipment, and sub-contract execution costs.  (*Id.*)  After October 23,

24  if a preliminary injunction is issued, the City may be required to terminate the

25  AECOM contract, pay delay penalties and other costs, and start the process over,

26  which will be costly given construction demand in the Los Angeles Area.  (*Id.* ¶ 9)

27  Any new construction contract the City enters will result in financial consequences

28  to the City, not to mention the additional time and effort required by city staff to

1    enter into new agreements to implement the runway shortening.  (*Id.* ¶ 10.)

2        The City and its residents will be harmed if a preliminary injunction issues.

3    **D.    It Is In The Public Interest To Move Forward With The Runway Shortening**

4

5        The City has, for years, been working to "to identify and analyze the

6    possibilities for current and future action to reduce Airport noise, air pollution and

7    safety risks."  (Cline Decl. ¶ 3, Ex. A.)  City residents made their voice heard in

8    when they passed Measure LC, placing governance of the Airport in the hands of

9    City Council.  (Anderson-Warren Decl. ¶¶ 7-8, Exs. G and I.)   Residents rejected

10   Measure D, which would have required voter approval before any change in the use

11   of land at the SMO to non-aviation purposes. (*Id.* ¶ ¶ 7-8, Exs. H and I.)  The

12   community wants to reduce Airport operations.  The City Council represents—and

13   is accountable to—the community.  The Consent Decree and runway shortening

14   further serve, in the City Council's judgment, the community's best interests.

15       Broader public interests are also served by the Consent Decree.  The City and

16   the United States, two governmental bodies, entered into the Consent Decree.  The

17   FAA called the Consent Decree "a fair resolution for all concerned."  *FAA Reaches*

18   *Settlement Agreement with City of Santa Monica*, (Jan. 28, 2017).   Judge Walter

19   agreed that the Consent Decree, "taken as a whole, is fair, reasonable and adequate

20   to all concerned." (Quiet Title Action, Dkt. No. 56.)

21       Petitioners' baseless allegations concerning the public interest cannot be a

22   substitute for the judgment of Santa Monica's elected officials, multiple courts

23   presiding over years of litigation, and the FAA.

24   **IV.   CONCLUSION**

25       For the foregoing reasons, Petitioners' request for a preliminary injunction

26   should be denied.

27

28

1

Dated:  October 10, 2017          MORRISON & FOERSTER LLP

2

3                                              By: /s/ William V. O'Connor

4                                                  WILLIAM V. O'CONNOR

5                                              Attorneys for Defendant
                                               CITY COUNCIL FOR THE
6                                              CITY OF SANTA MONICA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28