LANE DILG (SBN 277220)
City Attorney
Lane.Dilg@smgov.net
IVAN O. CAMPBELL (SBN 216049)
Deputy City Attorney
Ivan.Campbell@smgov.net
HEIDI von TONGELN (SBN 239331)
Deputy City Attorney
Heidi.vonTongeln@smgov.net
1685 Main Street, Third Floor
Santa Monica, California 90401-3295
Tel:  310.458.8336; Fax:  310.393.6727

DAVID M. WALSH (SBN 120761)
DWalsh@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California 90017-3543
Tel:  213.892.5200; Fax:  213.892.5454

WILLIAM V. O'CONNOR, JR. (SBN 216650)
WOConnor@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California 92130
Tel:  858.720.5100; Fax:  858.720.5125

Attorneys for Defendant
CITY COUNCIL FOR THE
CITY OF SANTA MONICA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATE SCOTT, an individual; JAMES BABINSKI, an individual;<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY COUNCIL FOR THE CITY OF SANTA MONICA, the governing body of the City of Santa Monica which operates the Santa Monica Municipal Airport; and DOES 1 through 10, inclusive,<br><br>                    Defendant. | Case No.  2:17-cv-07329-PSG-FFMx<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION OF SUPERIOR COURT DECISION REGARDING INTERPRETATION OF THE BROWN ACT, CALIFORNIA GOV'T CODE SECTION 54950**<br><br>Hon. Philip S. Gutierrez |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................ 1

II.   THE CITY'S ATTEMPT TO REGAIN CONTROL OVER SMO HAS
      BEEN PUBLIC KNOWLEDGE FOR DECADES ................................... 1

      1.    The City Has Been Taking Public Actions to Gain Local
            Control of SMO Since the 1960s .............................................. 1

      2.    Resolution No. 6296, Adopted in 1981, Publicly Declares
            the City's Intent to Close SMO ............................................... 2

      3.    The City Publicly Signed the 1984 Agreement to Close
            SMO in 2015 ............................................................................. 2

      4.    The City Publicly Accepted Its Last Federal Grant in
            1994 to Enable the City to Close SMO in 2015 ....................... 3

      5.    In 2010 the City Again Publicly Evaluated the Future of
            SMO ........................................................................................... 3

      6.    The City's Quiet Title Action and Other SMO-Related
            Litigation ................................................................................... 5

      7.    In 2014, Two Public Ballot Measures Concerning SMO
            Were Put Up for Vote in Santa Monica .................................... 5

      8.    The City Settles the Quiet Title Action and Other SMO-
            Related Litigation ..................................................................... 6

      9.    The January 28, 2017 City Council Meeting ............................ 7

      10.   The Consent Decree .................................................................. 8

III.  PLAINTIFFS' CHALLENGE TO THE CONSENT DECREE HAS
      ALREADY BEEN DENIED ............................................................... 9

      A.    Plaintiffs' Writ Petition for Violations of the Brown Act ................... 9

      B.    Judge Chalfant Sustains the City's Demurrer to the Writ Petition ....... 9

      C.    Judge Lew Denied Plaintiffs' Identical Motion Seeking Ex Parte
            Relief ...................................................................................... 10

IV.   PLAINTIFFS HAVE NOT MET THE STANDARD FOR
      RECONSIDERATION .................................................................... 10

      A.    Legal Standard ........................................................................ 11

      B.    Plaintiffs' Fail to Allege a Proper Basis for Reconsideration ............. 12

V.    THE PRIOR RULING IS CORRECT AND SHOULD NOT BE
      DISTURBED ................................................................................ 14

      A.    Judge Chalfant Correctly Found That the City Complied with
            the Requirements of Gov. Code § 54956.9(c) ................................ 15

      B.    Judge Chalfant Correctly Found that the City Provided More
            Transparency than Required under the Brown Act ......................... 15

      C.    The Trancas Decision Does Not Undermine Judge Chalfant's
            Rulings .................................................................................... 17

**TABLE OF CONTENTS**
(continued)

Page

VI.    PLAINTIFFS' OTHER ARGUMENTS ARE UNPERSUASIVE............... 19

    A.    The Results Could Have Been Achieved Through Litigation ............ 19

    B.    The Proposed Consent Decree Did not Reverse Legislative Policy................................................................................................. 19

VII.    CONCLUSION ............................................................................. 19

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Daghlian v. DeVry Univ., Inc.*,
5
    582 F. Supp. 2d 1231 (C.D. Cal. 2007)................................................................11

6

*Frietsch v. Refco, Inc.*,
7
    56 F.3d 825 (7th Cir.1995) ......................................................................13

8

*Kapa Investment v. Cirrus Design Corp.*,
    2009 WL 10673050 (C.D. Cal. Aug. 27, 2009) (Gutierrez, J.).....................11, 13
9

10

*Ketab Corp. v. Mesriani Law Grp.*,
    2015 WL 2084469 (C.D. Cal. May 5, 2015).........................................11, 12, 14
11

12

*Kinetics Noise Control, Inc. v. ECORE Intern., Inc.*,
    2011 WL 940335 (C.D. Cal. Mar. 14, 2011) (Gutierrez, J.) ................................13
13

*Trancas Prop. Owners Assn v. City of Malibu*,
14
    138 Cal. App. 4th 172 (2006) ..............................................................13, 17, 18

15

*United States v. Syrax*,
16
    235 F.3d 422 (9th Cir. 2000) ...............................................................14

17

**Statutes**

18

GOV. CODE § 54950. ....................................................................................................9
19

GOV. CODE § 54956.9 ............................................................................................7, 15
20

21

GOV. CODE § 54957.1 ..........................................................................................15, 16

22

GOV. CODE § 54960.1 .................................................................................................9

23

**Other Authorities**

24

Fed. R. Civ. P. 11(b)(2) ...........................................................................................14
25

Fed. R. Civ. P. 59 .....................................................................................................11
26

Local Rule 7–1 .........................................................................................................11
27

Local Rule 7–18...................................................................................................*passim*
28

1   The City Council for the City of Santa Monica (the "City") hereby submits
2   its opposition to Plaintiffs' Motion for Reconsideration of Superior Court Decision
3   Regarding Interpretation of the Brown Act (the "Motion").  (Dkt. No. 62.)

### I.    INTRODUCTION

Plaintiffs' Motion is a misguided attempt to resuscitate a meritless claim that
has already been ruled on by Judge Chalfant and dismissed with prejudice.
Plaintiffs completely ignore this Court's rule regarding the narrow set of
circumstances that warrant reconsideration.  Plaintiffs also fail to show how Judge
Chalfant erred (much less committed clear error) in his prior, well-reasoned ruling
in the state court.  Plaintiffs' Motion is nothing more than a last-ditch attempt to
salvage any claim (even those previously dismissed) based on the Brown Act.
Accordingly, the Motion should be denied.

The City notes that this meritless suit is one of many that have burdened the
City and this Court.  The City respectfully requests that this Court consider putting
safeguards in place.  Neither the City nor the Court should be required to dedicate
more time and effort into responding to frivolous filings.

### II.    THE CITY'S ATTEMPT TO REGAIN CONTROL OVER SMO HAS BEEN PUBLIC KNOWLEDGE FOR DECADES

For decades the City has sought to regain local control over the Santa Monica
Municipal Airport ("SMO"), including by prosecuting and defending various legal
disputes in court and before FAA administrative tribunals.  A brief history of the
pertinent proceedings demonstrates the factual inaccuracies of Plaintiffs' Motion.

#### 1.    The City Has Been Taking Public Actions to Gain Local Control of SMO Since the 1960s

For nearly 100 years, the City has owned the real property underlying SMO.
During World War II, the City entered into a wartime lease with the federal
government to facilitate military manufacturing and training exercises at SMO.
Almost immediately after World War II, the government surrendered its lease to
allow the City to resume operating SMO.

1

In the 1960s, jets began using SMO, imposing severe noise impacts on adjacent neighborhoods. Local residents were apprehensive about SMO's future and began organizing to reduce or eliminate airport traffic. It was widely known as early as 1971 that the City was making plans to close or substantially limit operations at SMO. (RJN Ex. 1, 1971 FAA Letter.) In fact, in response to resident apprehensions about jet traffic, various trade associations representing aviation interests began objecting to the City's plans. The FAA responded to these concerns in an April 1971 letter to the Senior Vice President of the Aircraft Owners and Pilots Association. The FAA stated that "Santa Monica Airport is vulnerable to being discontinued and its land used for non-airport purposes." (*Id.*)

## 2. Resolution No. 6296, Adopted in 1981, Publicly Declares the City's Intent to Close SMO

In June 1981, the City Council adopted Resolution No. 6296, declaring its intention to close SMO as soon as legally possible. (RJN Ex. 2, Santa Monica City Council Resolution No. 6296.) In Resolution 6296, the City set forth its reasons for closure, which included safety concerns for neighborhoods surrounding SMO, the relatively small number of residents who benefit from SMO, the ad-hoc planning surrounding the use of SMO, and the long-term goals of the city. (RJN Ex. 2, Resolution 6296.)

In 1983, the City adopted a new Master Plan for SMO. (RJN Ex. 3, 1983 Airport Master Plan Study.) The Master Plan again stated residents' "desire to close the airport." However, because the City was at that time obligated a by federal airport grants (which arguably provided that the airport could not be closed immediately), the Master Plan instead focused on ways to limit and reduce jet traffic at SMO. (*Id.*) *This was 35 years ago*.

## 3. The City Publicly Signed the 1984 Agreement to Close SMO in 2015

City Council Resolution No. 6296 and the new Master Plan prompted several administrative actions against the City before the Federal Aviation Administration.

2

1    As a result of these administrative proceedings, the FAA negotiated with the City

2    concerning SMO's operations.  These negotiations culminated in the signing of a

3    settlement agreement in 1984 (the "1984 Agreement").  (RJN Ex. 4, 1984

4    Agreement.)  The 1984 Agreement expressly provided that the City was required to

5    operate SMO only until July 1, 2015.  (*Id.*)  The implicit understanding was that the

6    City could close SMO when the 1984 Agreement expired.

### 4. The City Publicly Accepted Its Last Federal Grant in 1994 to Enable the City to Close SMO in 2015

In June 1994, the City accepted its last federal airport grant in exchange for
contractual promises to maintain SMO for the use and benefit of the public for the
useful life of improvements made with the funds, but for no more than twenty years
from the date of execution of the grant agreement ("1994 Grant Agreement").
(RJN Ex. 5, 1994 Grant Agreement Contract No. DTFA08-94-C-20857.)  The City
was therefore required to operate SMO until June 29, 2014, twenty years after the
City entered into the 1994 Grant Agreement.  (*Id.*)

### 5. In 2010 the City Again Publicly Evaluated the Future of SMO

In December 2010, in anticipation of the expiration of the 1984 Agreement
and the 1994 Grant Agreement, the City Council directed its staff to conduct a
comprehensive public process regarding SMO's future.  The result was an April
2013 City Council Report on the "Visioning Process."  (RJN Ex. 6, April 2013
Report.)  The Visioning Process concluded that the status quo at SMO was not
acceptable to City residents.  (*Id.*)  This Visioning Process was comprehensive, and
"the largest public process ever undertaken by the City."  It included the following
items, *all completed in the view of the public*:

- On December 14, 2010, the City Council publicly authorized a
professional services agreement with the RAND Corporation to study best practices
and uses that might be compatibly and beneficially located at SMO.  The City
Council also publicly authorized a contract with Point C Partners to formulate and

1  undertake a preliminary community interview process regarding the range of

2  possibilities for SMO's future.  (RJN Ex. 6, April 2013 Report)

3      •    On February 22, 2011, the City Council publicly directed staff to

4  proceed with Phase I of a comprehensive, three-phase airport Visioning Process.

5  The City Council also publicly approved a contract with HR&A Advisors to

6  analyze the general economic and fiscal impacts of current airport operations and

7  activities.  (*Id.*)  On October 4, 2011, staff publicly reported to City Council

8  concerning Phase I of the Visioning Process.  (*Id.* at 7.)

9      •    On December 6, 2011, the City council publicly approved a

10  professional services contract for Phase II of the Visioning Process.  This would

11  develop public community discussion groups to discuss and provide a forum for

12  community members and all other interested persons to share their views on SMO

13  and its future.  Over 300 community members and others participated, making this

14  the largest public process ever undertaken by the City.  (*Id.* at 7.)

15      •    On May 8, 2012, the report from Phase II was publicly presented to the

16  City Council.  That report indicated that City residents were concerned about noise

17  pollution, health impacts of aircraft emissions, safety risks related to flight training

18  and the proximity of homes and a gas station to the runway ends, the growth of

19  airport operations, damage to the residents' life quality, environment impacts

20  inconsistent with City policies, and lack of local control.  (*Id.* at 8.)

21      •    On August 14, 2012, the City Council publicly approved a

22  professional services agreement with IBI Group to prepare enhancement concepts

23  for SMO for non-aviation land.  (*Id.* at 9.)

24      At the end of the Visioning Process, staff made several recommendations.

25  Among them were "suggested changes to the runway for the purpose of enhancing

26  community health and safety, which would have the effect of limiting Airport

27  Access."  (*Id.* at 31.)  This included "effectively shorten[ing] the runway."  (*Id.* at

28  34.)  Ultimately, it was recommended that the City continue to research the

"benefits of closing or attempting to close all or a portion of the Airport"; and that staff "return to Council, by March of 2014, with an assessment . . . so that Council can determine whether the City should, after the expiration of its current obligations, implement additional changes that will reduce adverse Airport impacts," including "whether the City should undertake closure of all or part of the Airport."  (*Id.* at 1. )

### 6.  The City's Quiet Title Action and Other SMO-Related Litigation

In October 2013, the City filed a quiet title action against the United States seeking a declaratory judgment that the City had unencumbered title to SMO.  *City of Santa Monica v. United States*, *et al.*, Civil Action No. 13-CV-08046 JFW (VBKx), Dkt. No. 1 ("Quiet Title Action") (Dkt. No. 1, Notice of Removal Ex. R, Plaintiffs' Amended Petition ("Am. Petition") ¶14.).  While the Quiet Title Action was pending, the City was involved in several other disputes related to the City's ability to exercise control over airport operations and to close SMO.  These disputes included, among others: *City of Santa Monica v. FAA*, Court of Appeals for the Ninth Circuit, Case No. 16-72827  (the "Ninth Circuit Action"); (Am. Petition ¶ 15.) and *In re: Compliance with Fed. Obligations by the City of Santa Monica*, Federal Aviation Administration, Docket No. 16-16-13 (the "Administrative Proceeding"). (Am. Petition ¶ 16.)

### 7.  In 2014, Two Public Ballot Measures Concerning SMO Were Put Up for Vote in Santa Monica

While the Quiet Title Action was pending, and as directed by the Visioning Process, in early 2014, the City of Santa Monica Airport Development Council referred a question, Measure LC (named LC for "Local Control"), which was placed on the election ballot for voters in the City of Santa Monica.  (RJN Ex. 7, Resolution No. 10827.)  Resolution No. 10827 was designed to empower City residents concerning SMO's future:

WHEREAS, the City Council wishes to place before the voters a measure that would amend the City Charter by empowering the voters to establish parameters that will guide the future use of the Airport land if the Santa Monica Airport is fully or partially closed to aviation use; and

Under Measure LC, the governance of SMO was placed in the hands of the City Council.  The ballot question was posed as follows: "Shall the City Charter be amended to: (1) prohibit new development at SMO, except for parks, public open spaces and public recreational facilities, until the voters approve limits on the uses and development that may occur on the land; and (2) affirm the City Council's authority to manage the Airport and to close all or part of it?"  (*Id.*)  The voters passed Measure LC, with 15,434 votes in favor, and 10,096 votes against, confirming the community's desire that SMO be subject to local control and that the property be developed for non-aviation use consistent with community principles.  (RJN Ex. 8, Resolution No. 10850.)

Also placed on the ballot was Measure D, a counter-initiative that would have amended the City Charter to require voter approval in a citywide election before any change in the use of land at the SMO to non-aviation purposes, or that closes or partially closes SMO.  (RJN Ex. 9, Resolution No. 10828)  Measure D was defeated, with 14,688 "no" votes and only 10,288 "yes" votes.  (RJN Ex. 8, Resolution No. 10850.)

### 8. The City Settles the Quiet Title Action and Other SMO-Related Litigation

On January 30, 2017, the City and the federal government executed the proposed Consent Decree, which settled the Quiet Title Action, the Ninth Circuit Action, and the Administrative Proceeding.  (Am. Petition ¶ 26, Ex. F; RJN Ex. 12, As-filed Consent Decree at 11.)  On February 1, 2017, the Honorable John F.

1   Walter entered an order approving the Consent Decree.  (RJN Ex. 14, Minute Order

2   and Ex. 15, Final Consent Decree, respectively.)  The City then made the Consent

3   Decree publicly available by posting a true and correct copy on the City's website.

4   (RJN Ex. 16, Website.)

5            **9.      The January 28, 2017 City Council Meeting**

6        On or about January 25, 2017, while the Quiet Title Action, the Ninth Circuit

7   Action, and the Administrative Proceeding were pending, the City posted an agenda

8   for a Special Meeting of the City Council to be conducted on January 28, 2017.

9   (Am. Petition ¶ 18, Ex. D; RJN Ex. 10, Jan. 28 Special Meeting Agenda .)  The

10  Special Meeting Agenda included six closed session items for conference with legal

11  counsel regarding pending litigation, as authorized under California Government

12  Code § 54956.9.  (RJN Ex. 10, Special Meeting Agenda at 3.)  The Administrative

13  Proceeding was listed as item 1.A, the Quiet Title Action was listed as Item 1.D and

14  the Ninth Circuit Action was listed as Item 1.E.  (*Id.*)

15       Three members of the public, but not Petitioners, made public comments on

16  the Closed Session items prior to the City Council convening for Closed Session.

17  (Am. Petition ¶ 19, Ex. E; RJN Ex. 11, Jan. 28 Meeting Minutes.)  After hearing

18  public comment, the City Council convened into Closed Session to discuss the

19  litigation items listed on the Agenda.  (*Id.*)

20       Upon reconvening into open session, the Interim City Attorney reported on

21  Items 1.A (the Administrative Proceeding), 1.D (the Quiet Title Action) and 1.E

22  (the Ninth Circuit Action).  (Am. Petition ¶ 22; RJN Ex. 11, Jan. 28 Meeting

23  Minutes.)  The Interim City Attorney gave a detailed explanation of the proposed

24  Consent Decree.  (*Id.*)  He explained that the proposed Consent Decree would: (i)

25  resolve all the outstanding disputes between the City and the federal government as

26  to the Administrative Proceeding, the Quiet Title Action and the Ninth Circuit

27  Action; (ii) require the City to operate SMO only until December 31, 2028; and (iii)

28  give the City the right to shorten the runway to 3,500 feet.  (*Id.*)  The proposed

1   Consent Decree itself did not by its own dictate the shortening or closure of the

2   runway; it merely set forth a framework for local control of SMO and *the right* to

3   shorten the runway.

4         The Interim City Attorney also explained that the City Attorney's Office, as

5   well as the City's outside legal counsel, all recommended settlement of the three

6   matters pursuant to the Consent Decree.  (*Id.*)  After the Interim City Attorney

7   completed his report and questions were answered, the City Council *publicly*

8   *debated* the merits of the proposed Consent Decree, moved for a vote, and voted in

9   public 4-3 to approve the proposed Consent Decree.  (RJN Ex. 11, Jan. 28 Meeting

10  Minutes.)

11                    **10.   The Consent Decree**

12        On January 30, 2017, the City and the federal government executed the

13  proposed Consent Decree.  (Am. Petition ¶ 26, Ex. F; RJN Ex. 12, As-filed Consent

14  Decree at 11.)  That same day, the proposed Consent Decree was submitted to this

15  Court for review and for a decision whether to enter it.  (*Id.*)  The next day, an

16  emergency application was filed by a resident group to intervene and to challenge

17  entry of the Consent Decree.  (RJN Ex. 13, Resident Group Intervention.)

18        On February 1, 2017, the Honorable John F. Walter entered the Consent

19  Decree.  (RJN Ex. 14, Minute Order and Ex. 15, Final Consent Decree,

20  respectively.)  Judge Walter also rejected the challenge to the Consent Decree as

21  untimely.  (Minute Order ("intervention is not merited *at this late stage.*")

22  (emphasis added.)  Upon entry by the Court, the City made the Consent Decree

23  publicly available by posting a true and correct copy on the City's website.  (RJN

24  Ex. 16, Website.)

25

26

27

28

### III. PLAINTIFFS' CHALLENGE TO THE CONSENT DECREE HAS ALREADY BEEN DENIED

#### A. Plaintiffs' Writ Petition for Violations of the Brown Act

On April 18, 2017, Plaintiffs sent the City a demand letter arguing that the approval of the Consent Decree was void *ab initio* due to alleged violations of the Ralph M. Brown Act, California Government Code section 54950 *et seq.* (the "Brown Act"). (RJN Ex. 17, Brown Act Demand.) Although the City had 30 days to respond to Plaintiffs' demand, Government Code section 54960.1(c)(1)-(4), just ten days later Plaintiffs filed a Verified Petition for Writ of Mandate and Complaint for Injunctive and Declaratory Relief in Los Angeles County Superior Court. (Dkt. No 1-2, Petition.)

#### B. Judge Chalfant Sustains the City's Demurrer to the Writ Petition

On August 10, 2017, the City's demurrer to the Petition was heard. Before hearing argument on the demurrer, Judge Chalfant noted that he had "personal knowledge" that the "the city of Santa Monica has long wanted to close" SMO. (Dkt. No. 40-2, 5:5-7.) Then, at the end of the hearing, Judge Chalfant granted the City's demurrer and dismissed all of Plaintiffs' Brown Act claims *with prejudice*. (RJN Ex. 18, Decision on Demurrer.) He explained, correctly, that the Brown Act expressly provides the City with authority to discuss its legal disputes, determine legal strategy, and settle disputes in closed session. (*Id.*) Judge Chalfant also held that:

- In compliance with the Brown Act, the City listed various SMO legal disputes on its January 28, 2017, closed session agenda, including the Quiet Title Action, the Ninth Circuit Action, and the Administrative Proceeding. (*Id.*)

- Before the City Council went into closed session, a public hearing occurred and the public was afforded the opportunity to speak on those closed session matters. (*Id.*)

- Following closed session, the City Council reported that it had action

1  to take with regard to the SMO-related legal disputes. (*Id.*)

2   &bull;   The City Attorney outlined the key settlement terms of the proposed

3  Consent Decree.  (*Id.*)

4   &bull;   The City Council held a public discussion of the Councilmembers'

5  views, and then took a *public vote* on whether to agree to the Consent Decree.  (*Id.*)

6   &bull;   The "City Council exceeded the requirements of the [Act] by reporting

7  the substance of the Consent Decree and by voting on it in open hearing." (*Id.*)

8   Based on these facts, Judge Chalfant dismissed Plaintiffs' claims arising

9  from the actions taken at the January 28 Council Meeting for failure to state a

10  claim.[1]  (*Id.*)

### C.   Judge Lew Denied Plaintiffs' Identical Motion Seeking *Ex Parte* Relief

On October 12, 2017, Plaintiffs filed an application for *ex parte* relief

seeking reconsideration of the Superior Court's decision.  (Dkt. 40.)  The next day,

on October 13, 2017, Judge Lew denied Plaintiffs' *ex parte* application, noting that

"Plaintiffs should have moved for reconsideration in the Superior Court in August

2017."  (Dkt. 43.)  Undeterred, Plaintiffs filed the current Motion, the substance of

which is identical to their *ex parte* application before Judge Lew.

### IV.   PLAINTIFFS HAVE NOT MET THE STANDARD FOR RECONSIDERATION

Local Rule 7–18 governs the process for filing a motion for reconsideration.

---

[1] On September 5, 2017, after conducting a hearing on the Order to Show Cause re Dismissal of the action, Judge Chalfant allowed Plaintiffs leave to file an amended petition on a very narrow issue that was not pleaded in the original Petition: whether "a Brown Act violation occurred because the City failed to conduct a public hearing as required under the Public Utilities Code to discuss shortening the runway at Santa Monica Airport prior to agreeing to enter into the Consent Decree[?]"  (RJN Ex. 19, Notice of Ruling.)  The Plaintiffs' claims regarding the Public Utilities Code are addressed in the City's motion to dismiss. (Dkt. 42 at 10–20.)  Moreover, Judge Lew has already determined that these r claims lack merit in the context of Plaintiffs' Application for a Preliminary Injunction.  (Dkt. 56 at 11–17.)

In pertinent part, it states: "No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." (L.R. 7–18.)  Plaintiffs *concede* that their motion fails to comply with Local Rule 7–18.  (Dkt. 62 at 2, n.2.)  On this ground alone the Motion should be denied.

### A.    Legal Standard

"Whether to grant a motion for reconsideration under Local Rule 7–18 is a matter within the court's discretion." *Daghlian v. DeVry Univ., Inc.*, 582 F. Supp. 2d 1231, 1251 (C.D. Cal. 2007).[2]  As this Court has made clear time and again, a motion for reconsideration under Local Rule 7–18 may be made on only the following grounds:

> (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or

> (b) the emergence of new material facts or a change of law occurring after the time of such decision, or

> (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

C.D. Cal. Civ. L.R. 7–18; *see Kapa Investment v. Cirrus Design Corp.*, 2009 WL 10673050, at *2 (C.D. Cal. Aug. 27, 2009) (Gutierrez, J.).

---

[2] Plaintiffs' only avenue to pursue reconsideration is Local Rule 7–18.  The Federal Rules of Civil Procedure require a party to move to amend or alter a judgment "no later than 28 days after the entry of the judgment."  Fed. R. Civ. P. 59.  The ruling Plaintiffs challenge was entered on August 10, 2017.  Twenty-eight days after this entry is September 7, 2017.  As such, Plaintiffs can only seek reconsideration under, and must comply with the strictures of, the "narrower" Local Rule 7–18.  *Ketab Corp. v. Mesriani Law Grp.*, 2015 WL 2084469, at *2 n.4 (C.D. Cal. May 5, 2015).

1    This Court has been careful to explain that a Plaintiff "who moves pursuant

2    to Local Rule 7–18 is limited to the grounds permitted by Local Rule 7–18." *Ketab*

3    *Corp. v. Mesriani Law Grp.*, 2015 WL 2084469, at *2 n.3 (C.D. Cal. May 5, 2015).

4    Notably, a "motion for reconsideration pursuant to Local Rule 7–18 must not

5    'repeat any oral or written argument made in support of or in opposition to the

6    original motion.'" *Id.* (*quoting* C.D. Cal. Civ. L.R. 7–18).  Indeed, if a movant

7    simply repeats arguments already considered and denied, the Court need not

8    examine them and can simply deny the motion.  *See, e.g.*, *id*. (denying a motion for

9    reconsideration because the movant simply repeated arguments made in the original

10   motion).

11            **B.       Plaintiffs' Fail to Allege a Proper Basis for Reconsideration**

12   Plaintiffs' Motion is procedurally improper for the following reasons.

13            *First*, Plaintiffs admit that no "new material facts are present."  (Dkt. 62 at 2

14   n.2.)  And of course this is true.  As set forth at length above, the challenged

15   conduct underlying the Motion is entirely historic; the allegation is that the City

16   failed to comply with the Brown Act when the City Council approved the Consent

17   Decree on January 28, 2017.  Plaintiffs raised these issues in prior proceedings and

18   the court ruled against them.

19            *Second*, Plaintiffs do not allege any new law that would put into question the

20   prior ruling.  Instead, Plaintiffs (literally) copy and paste arguments from their prior

21   submissions in state court and cite the exact same cases in support of the exact same

22   position that was already rejected.  Even a cursory review of Plaintiffs' Motion

23   shows that they are not claiming that intervening law warrants reconsideration:

24            •       The first two paragraphs regarding the Brown Act contained in

25   Plaintiff's Motion are directly copied from page 1 of Plaintiff's Opposition to the

26   Demurrer below.  *Compare* Dkt. 62 at 2-3 *with* RJN Ex. 20, Opposition to

27

28

12        DEF'S OPPOSITION TO PLAINTIFFS' MOTION FOR
                                                                RECONSIDERATION OF SUPERIOR COURT DECISION

1    Demurrer at 1.[3]

2    •       The next two paragraphs in the Motion regarding the Brown Act are

3    directly copied from page 4 of Plaintiff's Opposition.  *Compare* Dkt. 62 at 3 *with*

4    RJN Ex. 20, Opposition to Demurrer at 4-5.

5    •       Plaintiffs' block quote of *Trancas* on page 5 of the Motion was lifted

6    from page 5 of their Opposition.  *Compare* Dkt. 62 at 5 *with* RJN Ex. 20,

7    Opposition to Demurrer at 5.

8           Indeed, Plaintiffs cited the *same three cases* (*Trancas*, *Page*, and *Shapiro*) to

9    support both their Motion and their Opposition to the City's demurrer in state court.

10   And Plaintiffs acknowledge that their only complaint with Judge Chalfant's opinion

11   is that his "interpretation runs afoul of the express purpose of the Brown Act as

12   stated by the legislature, and as interpreted by the courts of the State of California."

13   (Dkt. 62 at 1.)  This type of collateral attack on a prior ruling is by definition

14   prohibited:  a "motion for reconsideration pursuant to Local Rule 7–18 must not

15   'repeat any oral or written argument made in support of or in opposition to the

16   original motion.'"  *Kapa Investment*, 2009 WL 10673050, at *2.

17          *Third*, Plaintiffs do not suggest, nor can they, that the prior decision "fail[ed]

18   to consider material facts" that were presented in proceedings below.  Instead,

19   Plaintiffs simply argue that Judge Chalfant's interpretation of the Brown Act "runs

20   afoul of the express purpose of the Brown Act as stated by the legislature, and as

21   interpreted by the courts of the State of California."  (Dkt. 62 at 1; Dkt. 62 at 9.)

22   Even assuming Plaintiffs are correct, this is not a valid basis for seeking

23   reconsideration.  *Kinetics Noise Control, Inc. v. ECORE Intern., Inc.*, 2011 WL

24   940335, at *1 (C.D. Cal. Mar. 14, 2011) (Gutierrez, J.) (quoting *Frietsch v. Refco,*

25   *Inc.*, 56 F.3d 825, 828 (7th Cir.1995) (Posner, J.) for the proposition that "It is not

26   _____

27   [3] The Demurrer Opposition is also Exhibit H to the City's Notice of
     Removal. (Dkt. No. 1-9.)

28

1   the purpose of allowing motions for reconsideration to enable a party to complete
2   presenting his case after the court has ruled against him. Were such a procedure to
3   be countenanced, some lawsuits really might never end, rather than just seeming
4   endless.").

5       Accordingly, Plaintiffs' Motion should be denied.  Judge Chalfant considered
6   all of the material facts and pertinent law presented in the Motion and rejected the
7   same arguments presented by Plaintiffs once again.[4]

8       ## V.   THE PRIOR RULING IS CORRECT AND SHOULD NOT BE DISTURBED
9
10      This Court need not consider the merits of Plaintiffs' Motion.  But if the
11  Court takes just a peek at the merits, it will see another problem with the Motion:  it
    is entirely premised on an inappropriate standard of review.  (Dkt. 62 at 2.)  This
12  Court has made clear that "clear error" review does not apply to the review of
13  motions for reconsideration under Local Rule 7–18.  *See Ketab*, 2015 WL 2084469,
14  at *2, n.3 ("Plaintiff's first ground, that the Court committed 'clear error' resulting
15  in a manifestly unjust decision, is not a permitted ground for reconsideration under
16  Local Rule 7–18.").
17
        Assuming, *arguendo*, that "clear error" review applies, "clear error" occurs
18  only when this "Court is left with a definite and firm conviction that a mistake has
19  been committed."  *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000)
20  (citations and quotation marks omitted).  Judge Chalfant's decision was thoughtful
21  and correct; it certainly does not rise to the level of clear error.
22
23
24
    _____
25      [4] Given that Plaintiffs have conceded that their Motion does not comport with
26  the governing rule and fail to raise any new fact or law in the current proceeding,
    the City respectfully submits that this Motion is frivolous.  Plaintiffs should not be
27  permitted to serially file meritless motions to the detriment of both the City and this
    Court.  *See* Fed. R. Civ. P. 11(b)(2).
28

### A. Judge Chalfant Correctly Found That the City Complied with the Requirements of Gov. Code § 54956.9(c)

The Brown Act generally requires cities to operate in public. An exception to this general rule is to allow a legislative body to hold "closed sessions" for purposes of conferring with legal counsel related to anticipated or pending litigation. GOV. CODE § 54956.9. The "pending litigation" exception applies when litigation has formally commenced, or when there is significant exposure to litigation against the local agency. *Id.* § 54956.9(a), (b).

In order to invoke the "closed session" exception for pending litigation, the Brown Act requires a legislative body to state on the agenda or publicly announce the subdivision of the section that allows for the closed session discussion. *Id.* § 54956.9(c). All that is required is that the agenda provide the name of the case; reference to claimant's name; names of parties; or the case or claim numbers. *Id.* § 54954.5(c). Here, Items 1.A, 1.D, and 1.E on the January 28, 2017, Meeting Agenda properly described the City Council consideration of the Administrative Proceeding, Quiet Title Action, and Ninth Circuit Action, respectively. (RJN Ex. 10, Jan. 28 Meeting Agenda.) Thus, the City Council was permitted under the Brown Act to discuss the pending litigations in closed session. *Id.* § 54956.9(a).

Judge Chalfant correctly found that the City was permitted under the Brown Act to discuss the Quiet Title Action, Administrative Proceeding, and Ninth Circuit Action in closed session.

### B. Judge Chalfant Correctly Found that the City Provided More Transparency than Required under the Brown Act

Judge Chalfant also correctly found that the City provided more transparency than required under the Brown Act by reporting the proposed Consent Decree out to the public prior to approval, execution, and entry by the District Court.

The Brown Act requires a legislative body to "report out" of a closed session when approval is given to legal counsel of a settlement of pending litigation after the settlement is final. GOV. CODE § 54957.1(a)(3). If the legislative body accepts

1   an offer signed by the opposing party, the legislative body is required to report
2   acceptance of the settlement and identify the substance of the agreement in open
3   session at the meeting during which the closed session is held.  *Id.*
4   § 54957.1(a)(3)(A).  If final approval rests with some other party to the litigation or
5   with the court, then as soon as the settlement becomes final, and upon inquiry by
6   any person, the local agency shall disclose the fact of that approval, and identify the
7   substance of the agreement.  *Id.* § 54957.1(a)(3)(B) (emphasis added).  This timing
8   element makes clear that the disclosure is only required once the settlement is final.
9        On January 28, 2017, when the Interim City Attorney reported out of closed
10  session, and the City Council took its vote to approve the proposed Consent Decree
11  in open session, the Federal Government had not yet signed the proposed Consent
12  Decree (it was not executed until January 30, 2017).  (RJN Ex. 12, As-Filed
13  Consent Decree.)  Further, final approval of the Consent Decree rested with the
14  District Court, which had not yet occurred.  (*Id.* (stating that the Consent Decree
15  becomes effective upon entry by the District Court).)  Because the Consent Decree
16  had not yet been executed by the United States or approved by the District Court on
17  January 28, 2017, the City was under no obligation to publicly report out on those
18  items at that time, because nothing was yet *final*.  See GOV. CODE
19  § 54957.1(a)(3)(B).  Instead, the City was required, upon request, to produce a copy
20  of the Consent Decree once entered by the Court.  *Id.* § 54957.1(a)(3)(B).
21       On January 28, upon reconvening into open session, the Interim City
22  Attorney reported out on Items 1.A (the Administrative Proceeding), 1.D (the Quiet
23  Title Action) and 1.E (the Ninth Circuit Action).  (Am. Petition ¶ 22; RJN Ex. 11,
24  Jan. 28 Meeting Minutes.)  The Interim City Attorney then gave a detailed
25  explanation of the proposed consent decree ("Consent Decree") and what it would
26  accomplish, and noted that the City Attorney's Office and the City's outside legal
27  counsel recommended settlement of the three matters pursuant to the Consent
28  Decree.  (*Id.*)

DEF'S OPPOSITION TO PLAINTIFFS' MOTION FOR
RECONSIDERATION OF SUPERIOR COURT DECISION

After the Interim City Attorney completed his report and questions were answered, the City Council publicly debated the merits of the proposed Consent Decree. (RJN Ex. 11, Jan. 28 Meeting Minutes.) Only then, after public debate and response to questions, did Councilmember O'Day, seconded by Mayor Pro Tem Davis, make a motion to approve the proposed Consent Decree. (*Id.*) At public vote, the proposed Consent Decree was approved four-to-three (4-3). (*Id.*) By voting in open session and before all necessary actions to approve the settlement had been taken, the City Council went above and beyond, rather than falling short, of what is required under the Brown Act.

Accordingly, Judge Chalfant's ruling that the "City Council exceeded the requirements of the [Brown Act] by reporting the substance of the Consent Decree and by voting on it in open hearing" was correct.

### C.    The *Trancas* Decision Does Not Undermine Judge Chalfant's Rulings

Plaintiffs argued extensively before Judge Chalfant that *Trancas Prop. Owners Assn v. City of Malibu*, 138 Cal. App. 4th 172 (2006) required a different outcome. Setting aside that these arguments are procedurally barred, it is odd that Plaintiffs' raise them again here given that Judge Chalfant granted Plaintiffs' the exact relief they requested below—leave to amend based on the *Trancas* holding. (Dkt. No. 40-3, September 5, 2017 Hearing Transcript.) Judge Chalfant stated:

> I'm not going to dismiss. I'm going to give you leave to amend to allege only one claim based on this utilities code statute about realigning the runway. And I think I stated it accurately that the theory is that this statute applies to the consent decree that a public hearing was required and that an after-the-fact public hearing after you've entered into the consent decree is not good enough and that, before entering into a consent decree that involves a realignment of a runway, i.e., shortening, a public hearing was required. And, therefore, under *Trancus*, [sic] there can be a Brown Act violation. That's

your legal theory embellished however you want.

Nonetheless, Plaintiffs once again argue that Judge Chalfant's ruling concerning the permissible scope of amendment incorrectly applied the decision in *Trancas*. But Plaintiffs do not even discuss the actual holding in *Trancas*. *Trancas* held that the Brown Act's "exception for adoption of litigation settlements in closed session does not embrace such agreements" when "*other laws*" require that the decision being made is "preceded by public hearings." *Trancas*, 138 Cal. App. 4th at 186–87. The Brown Act itself does not impose on city governments independent obligations to hold a public hearing prior to entering a settlement unless some "other" applicable law required such a hearing. *Id.*

Judge Chalfant's ruling was directly in line with the reasoning in *Trancas*. After dismissing the claims based on the City Council's conduct at the January 28, 2017, Meeting, Judge Chalfant permitted Plaintiffs to amend their complaint and allege that an "other law," namely, the PUC, independently required a hearing. Specifically, he allowed Plaintiffs to amend to that "a Brown Act violation occurred because the City failed to conduct a public hearing as required under the Public Utilities Code to discuss shortening the runway at Santa Monica Airport prior to agreeing to enter into the Consent Decree."

Plaintiffs did just that in their Amended Petition, alleging that two provisions of the PUC code required the City to undertake a public hearing prior to entering into the proposed Consent Decree.[5]

## VI.   PLAINTIFFS' OTHER ARGUMENTS ARE UNPERSUASIVE

Plaintiffs appear to make two other arguments in support of their position that Judge Chalfant's ruling must be reconsidered. First, they argue that the

---

[5] As noted, Judge Lew has already determined that these PUC claims lack merit in the context of Plaintiffs' motion for a preliminary injunction. (Dkt. 56 at 11–17.)

1  proposed Consent Decree achieved results that could not have been accomplished

2  through litigation.  Second, they say the proposed consent decree reversed other

3  Council Resolutions.  Neither argument is correct.

4        **A.**    **The Results Could Have Been Achieved Through Litigation**

5        If the City had prevailed in the Quiet Title Action and the Ninth Circuit

6  Action, the Administrative Proceeding would have been mooted because the City

7  would not have been bound by any federal obligations.  At that point, the City

8  would have had unencumbered title to SMO.  The City could have done anything it

9  wished with SMO (subject to applicable law) immediately upon prevailing in those

10  actions.  To that end, the proposed Consent Decree did not give the City anything

11  that it could not have accomplished through litigation.  Plaintiffs admit as much

12  when they say "if the City had prevailed in both the District Court Action and the

13  [Ninth Circuit Action], presumably the City would have closed the airport . . . ."

14  (Dkt. No. 40 at 8, n.5.)

15        **B.**    **The Proposed Consent Decree Did not Reverse Legislative**

16               **Policy**

17        Plaintiffs summarily state that the Proposed Consent Decree secretly

18  "reversed" City legislative policy.  That is not true.  The proposed Consent Decree

19  did not do *anything* to SMO.  (RJN Ex. 15, Consent Decree.)  It merely gave the

20  City local control over the property at a date certain, and the right to shorten the

21  runway.  Both of these items had been discussed and debated by the Santa Monica

22  City Council and the City's residents for half a century.

23  **VII.**  **CONCLUSION**

      The City respectfully requests that the Court deny Plaintiffs' Motion.

24

25

26

27

28

         19

DEF'S OPPOSITION TO PLAINTIFFS' MOTION FOR
RECONSIDERATION OF SUPERIOR COURT DECISION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  November 27, 2017          MORRISON & FOERSTER LLP


By: /s/ William V. O'Connor
     WILLIAM V. O'CONNOR

Attorneys for Defendant
CITY COUNCIL FOR THE
CITY OF SANTA MONICA